# EXHIBIT C

```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3    DAVID A. DEWAR,                )
                                    )
4               Plaintiff,          )
                                    )
5          vs.                      )    No. 16 CV 2287
                                    )
6    OFFICERS T.J. FELMON, M.K.     )
     DEVINE and SUPERVISOR C.J.     )
7    LONG and CHICAGO POLICE        )
     DEPARTMENT,                    )
8                                   )
                Defendants.         )
9

10            The deposition of DAVID A. DEWAR, taken

11   pursuant to the Federal Rules of Civil Procedure,

12   before Kathleen A. Hillgard, Certified Shorthand

13   Reporter No. 084-004093, at 30 North LaSalle

14   Street, Suite 900, Chicago, Illinois, on Thursday,

15   May 11, 2017, commencing at 10:04 p.m. pursuant to

16   notice.

17        APPEARANCES:

18            MR. DAVID A. DEWAR
              (11347 South Millard Avenue
19             Chicago, Illinois 60655
               773.445.5340
20             ddewar@hotmail.com)
                 appeared pro se;

21

22

23

24
```

DAVID DEWAR, 05/11/2017

```
                                                            Page 2
 1           APPEARANCES:  (Cont'd)

 2              HONORABLE EDWARD N. SISKEL
                CORPORATION COUNSEL, by
 3              MS. KELLY C. BAUER
                Assistant Corporation Counsel
 4              MS. BARRETT ELIZABETH BOUDREAUX
                Senior Counsel
 5              (30 North LaSalle Street, Suite 900
                 Chicago, Illinois 60602-2502
 6               312.742.9586
                 kelly.bauer@cityofchicago.org
 7               barrett.rubens@cityofchicago.org)
                   appeared on behalf of the defendants.
 8
                   *   *   *   *   *   *   *   *
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

DAVID DEWAR, 05/11/2017

```
 1                    I N D E X

 2

     Witness:                              Page
 3
          DAVID A. DEWAR
 4
              Examination by:
 5
                 Ms. Bauer...................    4
 6

 7

 8                    E X H I B I T S
 9

10
     No.   Description             Marked/Referenced
11
        1  Answers to Interrogatories............. 148
12   2-7  Photographs........................... 28

13
              (Exhibits attached/scanned.)
14

15                    -  -  -

16

17

18

19

20

21

22

23

24
```

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

```
 1        Q.    Okay.  Do you have a middle name?

 2        A.    Yes.  A for Andrew.

 3        Q.    Okay.  Is that common spelling?

 4        A.    Pardon?

 5        Q.    Is that common spelling for Andrew?

 6        A.    Yes, common spelling for Andrew.

 7        Q.    Have you ever been deposed before?

 8        A.    No.  This would be the first time.

 9        Q.    Are you currently represented by

10   counsel today?

11        A.    No, I am not.

12        Q.    Okay.  I have a couple questions I ask

13   everyone.  Please don't take offense.

14              Do you understand that you are under

15   oath?

16        A.    Yes.

17        Q.    And what does that mean to you?

18        A.    To tell the truth on all questions and

19   their full -- and, you know, full length to the

20   best of my knowledge.

21        Q.    Okay.  And are you currently under the

22   influence of alcohol?

23        A.    No.

24        Q.    Are you currently under the influence
```

DAVID DEWAR, 05/11/2017

```
 1   of any illegal drug?

 2        A.    No.

 3        Q.    Are you on any medication that would

 4   prevent you from testifying fully and accurately

 5   today?

 6        A.    No.

 7        Q.    Is there any reason that you can think

 8   of that you would not be able to give truthful and

 9   complete testimony today?

10        A.    No.

11        Q.    All right.  I'd also like to go over a

12   few ground rules.  You heard these when you came in

13   with your mother.

14        A.    Yes.

15        Q.    But if you do not understand a

16   question, please let me know, and I will try to

17   rephrase it.  Okay?

18        A.    Okay.

19        Q.    And if you answer my question, I'm

20   going to assume that you understand that question.

21        A.    Okay.

22        Q.    Now, if you don't hear a question, let

23   me know, and I can repeat it.  Okay?

24        A.    Okay.
```

DAVID DEWAR, 05/11/2017

1        Q.      And please answer every question out

2    loud so that the court reporter can take it down.

3        A.      Okay.

4        Q.      And please wait until I finish my

5    question before you give your answer so the court

6    reporter can get everything we say down.

7        A.      Okay.

8        Q.      All right.   Now, we can also take

9    breaks.   The only thing that I ask is if I've just

10   asked you a question, that you give an answer

11   before we take a break.   Okay?

12       A.      Okay.

13       Q.      All right.   What was your address in --

14   at the time of the event?

15       A.      11347 South Millard Avenue in Chicago,

16   Illinois, 60655.

17       Q.      How long have you lived there?

18       A.      I've lived there for the full duration

19   with my mother for 33 years, since 1984.

20       Q.      Did you live anywhere else prior to

21   that?

22       A.      Actually, there were.   For a short

23   time, I lived in an address on 8229 South Troy for

24   maybe about a year, actually, and I believe that

DAVID DEWAR, 05/11/2017

Page 8

1    was in '91, '92, come to think of it.  So actually

2    that would be 32 years at Millard and maybe about

3    one year at 82nd -- 9229 South Troy.

4           Q.    Okay.  Have you lived anywhere else

5    besides those two addresses?

6           A.    No.

7           Q.    Did you live with anyone else there?

8           A.    Yes.

9           Q.    Who else did you live with?

10          A.    The property owner, his name was Tom

11   Gurskis, and tenant named Todd Johnson.  Those were

12   the two I lived at 8229 South Troy.

13          Q.    Okay.  Could you spell Gurskis?

14          A.    Sure.  It's G-u-r-s-k-i-s.

15          Q.    Okay.  And who was the other person

16   besides him?

17          A.    Todd Johnson.  And he was a tenant like

18   myself, and Gurskis was the home owner.

19          Q.    Okay.  What year were you born?

20          A.    1964, October 20th, 1964.

21          Q.    Okay.  So how old were you when you

22   were living there in '91 and '92?

23          A.    Well, I'd be 27 to 28.

24          Q.    Oh, I see.  Okay.

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 9

1              And why did you live there for that

2    period of time?

3         A.    I was employed at a place closer to,

4    you know, that residency.  I was employed at a --

5    because I have a stationary engineer's license.  I

6    had just acquired -- and, actually, you know what,

7    the years were '92 to '93.  Excuse me.

8         Q.    Okay.

9         A.    Yeah.  I'm trying to go back.  I want

10   to give you an accurate account.  So I just

11   received -- that's one of the licenses that I put

12   into my interrogatory, you know, as far as some of

13   the things I have.

14              And I had got a position at the time

15   at -- employment on 47th and Kedzie.  Troy is one

16   block east of Kedzie, so it was closer in proximity

17   to my employer at the time.

18        Q.    Okay.  And how long did you work there?

19        A.    I was there for about a year and a

20   half.

21        Q.    Okay.  And who was your employer at the

22   time?

23        A.    It's called Excell Laboratories.

24   They're no longer there.  That was an industrial

DAVID DEWAR, 05/11/2017

Page 51

```
 1   windows; and if you can try not to, I'd be

 2   appreciative.  You know, with -- very diplomatic.

 3   And then he -- I had the Bluetooth in my right ear.

 4               And he said, Are you recording me?

 5   And I said, No, I'm not recording you.  And then he

 6   said, You threatened to kick my ass.  Right after I

 7   said that, he said, You threatened me.

 8       Q.    Did you threaten him?

 9       A.    No, no.

10       Q.    Okay.  So why would he say that?

11       A.    Pardon?

12       Q.    Why would he say that then?

13       A.    I have no idea.  Now, the thing is,

14   I -- I believe because of the history of -- with

15   his son, which I went into, 2011.  Just my

16   assumption.  I can't prove it.  I just -- you asked

17   me a question what I think.  I think it might be

18   revenge.  I don't know.

19               But also too, Mr. Hosty, William

20   Hosty, he works closely with some of the political

21   people, and he works closely with -- it could be

22   the -- it was the perfect storm to nail me.

23       Q.    What do you mean by political people?

24   What do you mean?
```

DAVID DEWAR, 05/11/2017

Page 52

```
 1      A.    Matt O'Shea, the 19th Ward alderman.

 2  Fran Hurley, the 35th District State

 3  Representative.  He works closely with all of them.

 4      Q.    Okay.  What does he do with them?  Does

 5  he work with them?

 6      A.    He campaigns with -- for Fran Hurley.

 7  She's a 35th District State Representative.  And

 8  I'm an election judge, so I've worked it four

 9  years.  I'm a republican judge, and he works with

10  the democrat judges.  And he basically has, let's

11  just say, favor with him, Fran; and also with Matt

12  O'Shea, the 19th Ward alderman.

13            So, you know, anyhow, it was so

14  convenient for the police to take his side and not

15  even consider our side, which we'll get into.  So I

16  can speculate that, but as far as him saying, You

17  threatened to kick my a-s-s, that's -- could be an

18  assumption.

19            But the point is, he made the

20  threat, and I did not threaten him in no means or

21  matter.  As a matter of fact, I was very reluctant

22  to talk to him because my instinct told me, This is

23  not going to go well.  But I did what my mom asked

24  and that -- that was the result.  So he said I
```

DAVID DEWAR, 05/11/2017

Page 53

1    threatened him.

2                    At the time, you can see the house,

3    and here's --

4         Q.    Pointing to Exhibit 3.

5         A.    So Exhibit 3 shows where I was

6    standing.  You can't see the garbage can, but I was

7    standing here.  His daughter at the time right

8    after he said I threatened him, she was in the

9    doorway.  But the door was closed.  So there's no

10   way she could have heard it.  That's a glass door.

11   He signaled to her after he claimed I threatened

12   him.  She opened the door, and he said, Call the

13   police.

14        Q.    Okay.

15        A.    So I believe Jennifer Hosty, his

16   daughter-in-law, John, his son's wife, made the

17   call, I'm assuming, to the Chicago Police

18   Department.

19        Q.    Okay.  So was the front door closed or

20   just the glass screen door there?

21        A.    Actually, very interesting question.

22   As -- as right after he made the threat, she was

23   like proceeding to open up the front door.

24        Q.    Okay.

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 54

```
 1          A.     So she was like -- so based on that,
 2   there's no way that she could have heard it.  She
 3   was just -- you know.  He made the threat.  Boom.
 4   She opens up the front wooden door.  And then he
 5   signals her, and she opens up the glass door, and
 6   says, Call the --
 7          Q.     What threat did he make against you?
 8   You said he made the threat.  What threat?
 9          A.     Who, William Hosty?
10          Q.     Yeah.  You just said that he made the
11   threat?
12          A.     No, no, no.  He didn't make a threat
13   against me.  He claimed I threatened him.
14          Q.     I see.
15          A.     He claims I -- he made no threat
16   against me.  He made the allegations that I
17   threatened to kick his -- you know, his a-s-s.
18                 And at that point, what I did is I
19   immediately retreated.  So I immediately went onto
20   our property.  So I went in front of the house into
21   the driveway.  Okay.
22                 Now, for whatever reason --
23          Q.     Into your driveway, right?
24          A.     Correct, into my driveway.
```

DAVID DEWAR, 05/11/2017

Page 55

1      Q.      Okay.

2      A.      And I went into the gated area.   So

3   there's a gate there, and I went into the gate,

4   which I was right near the side door.   Because I

5   was kind of freaking out.   I was like, Oh, my

6   goodness.   You know, I was kind of in shock.

7              So, like I said, I approached him

8   about 6:24, 6:25 p.m.   And then when I went into

9   the side of my prop- -- or my mom's property into

10   the gate, closed the gate, I was outside the side

11   door.

12              And then what I did is at that

13   point, I called the 22nd District Chicago Police

14   Department.

15      Q.      Okay.

16      A.      312.745.0570.   Unfortunately, I know

17   the number.

18              So I called them, and I talked to

19   the front desk person.   And I said, I'm here at

20   11347 Millard, you know, Mr. Hosty, he doesn't live

21   there.   He claimed I threatened to kick, you know,

22   a-s-s, and it was all about blowing the snow.   And

23   they said, We can't help you.   Call 911.

24              So immediately at 6:27, a minute --

DAVID DEWAR, 05/11/2017

Page 61

```
 1       A.    Tried to change out of my wet clothes,

 2   so it was -- I had layers and layers of clothes.

 3   Because it was freezing and we got, you know,

 4   15, 18 inches of snow on February 17th, 2014, on a

 5   Tuesday.

 6             So as I was taking the clothes off,

 7   she was -- we had the conversation on, I can't

 8   believe he said I threatened him.  She was all

 9   upset.  The police are going to be coming out.  We

10   know how he has political pull.  Oh, no.  And I was

11   like, Yeah, this is not good.

12             So anyhow, as I was trying to get

13   out of my clothes and my layers, I still had on a

14   wet T-shirt, wet pants, wet socks, and there was

15   the pounding on the door.  I'm like, Here we go.

16   Boom, boom, boom.

17             Now, I looked at the complaint, and

18   if I'm not -- if I'm not mistaken, did the -- well,

19   I don't know if it said on there, if my memory's

20   right, that the police said they did not knock on

21   the door, but they knocked on the door very loud,

22   Officer Felmon and Officer Devine.

23             So anyhow, we went upstairs and went

24   to approach the front door to answer, me and my
```

DAVID DEWAR, 05/11/2017

Page 62

```
 1   mom.  Okay?
 2          Q.     Okay.  So the side door that you're
 3   referring to when you went through that, that goes
 4   down to the basement?
 5          A.     Yes.
 6          Q.     Okay.  So you came up from the
 7   basement?
 8          A.     Came up from the basement up to the
 9   main level of the house, and then our living
10   room -- you have to go to the kitchen through the
11   living room to the front door.
12          Q.     Okay.
13          A.     And that's where we went to meet
14   Officer Felmon and Officer Devine.
15          Q.     Okay.  And how many times did they
16   pound on the door?
17          A.     Two or three times.  We were in the
18   basement, so ...
19          Q.     So did you hear it or not?
20          A.     Yeah, we heard it.
21          Q.     Okay.
22          A.     Sure.
23          Q.     So it was two to three times?
24          A.     Yeah.
```

DAVID DEWAR, 05/11/2017

Page 63

```
 1      Q.    Okay.

 2      A.    Roughly.

 3      Q.    And it was loud?

 4      A.    Yeah.

 5      Q.    Okay.  And then how do you know the

 6  officers' names to be Felmon and Devine?

 7      A.    It's on their badge.

 8      Q.    Okay.

 9      A.    That's the first thing -- you know, I

10  mean, you look, it says -- you know, says Devine;

11  it says Felmon.

12      Q.    Okay.

13      A.    It's right there.

14      Q.    Okay.  And have you had any

15  interactions with these officers prior to this

16  incident or after?

17      A.    I've seen Officer Devine a few times at

18  a -- I'm with the Mount Greenwood Chamber of

19  Commerce, so I've seen him at annual events.

20      Q.    Was this before or after?

21      A.    After.

22      Q.    Okay.

23      A.    So 2015, 2016, you know, in that.

24  Officer Felmon, I've seen --
```

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 64

```
 1        Q.    Okay.  Hold on.

 2              How many times have you seen him?

 3        A.    Devine?

 4        Q.    Yes.

 5        A.    Twice.

 6        Q.    Okay.  Have you spoken to him during

 7   that time?

 8        A.    No, no, no.  After something like this,

 9   no, there's no need.

10        Q.    Okay.  And he didn't come up to speak

11   with you either?

12        A.    No, no.  It's -- you know, it's one of

13   these events in August, and they have it through

14   the Chamber of Commerce, all the vendors are out

15   there, and he just happened to be on duty making

16   his rounds.

17        Q.    Okay.  And now Felmon?

18        A.    I've seen Felmon at a CAPS meeting.

19   I've been at a few of the CAPS meetings after this.

20        Q.    Okay.

21        A.    Because I've had -- and I have a whole

22   file, which you had asked my mom, it's ridiculous,

23   all on the complaints we had last year.  I have a

24   thick file of all the complaints.
```

DAVID DEWAR, 05/11/2017

Page 65

1       Q.      The complaints that you and your mother

2   have filed?

3       A.      Yeah, because of the ringing of the

4   doorbells, the rocks on the windows.  It just goes

5   on and on and on.  It's ridiculous.  I didn't

6   realize until I looked.

7               But we met Sergeant Egan.  He's

8   over there at the 22nd District, and we spoke to

9   him and --

10      Q.      I'm sorry, Sergeant Egan?

11      A.      Egan, yeah.

12      Q.      How do you spell that?

13      A.      E-g-a-n.

14      Q.      Okay.  And how many times have you seen

15  Felmon at these CAP meetings?

16      A.      Twice.  I think he -- and he has a

17  different partner now.  It's not Devine.  I don't

18  know who his other partner is, but yeah, he's

19  usually there for Beat 2211.  That's our beat,

20  22nd District, Beat 2211.  And then he's there with

21  his other partner, I don't know who he is or what

22  his name is, and he's representing the police.

23      Q.      Okay.

24      A.      So ...

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 75

1   so we can resolve this.

2                And at that point when my mom said

3   again, you know, Well, it's all a lie; he said, you

4   know, my son threatened to kick his ass, that's not

5   true, because he was blowing the snow.

6                At that point -- Officer Felmon was

7   very, very frustrated.  And at that point, Officer

8   Felmon said, Why don't you shut up and go in the

9   house, you know, and if -- if you don't keep it

10  down, then I'm going to go into your house.

11       Q.   Okay.  Hold on.

12       A.   And at that time, I'm --

13       Q.   Hold on, hold on.  You'll get to say

14  everything.

15       A.   Sure.

16       Q.   We just need to kind of break it down

17  just like we did a couple days ago with your mom.

18                You said that Officer Felmon got

19  frustrated.  How did he portray that to you?

20       A.   By just what he said.

21       Q.   Okay.

22       A.   And his tone.  And he actually posed it

23  towards my mom.  Because he -- he was frustrated.

24  You could tell by his tone and his body language

DAVID DEWAR, 05/11/2017

Page 76

```
 1   and the tone of his voice.  He said, Hey, you know,

 2   you need to calm down; and if you don't, you

 3   know -- you know.

 4        Q.    If you don't, what?

 5        A.    I think he said shut up.  If you don't

 6   shut up, then I'll go into your house, and I can go

 7   and I can.

 8        Q.    Okay.  Did he say anything else at that

 9   point?

10        A.    No.  And then I responded.

11        Q.    Okay.

12        A.    And --

13        Q.    Sorry.  Hold on.

14              How did your mom respond to that, if

15   at all?

16        A.    She was like, you know, just said

17   nothing, but she -- her expression was she was

18   taken aback.

19        Q.    Okay.

20        A.    At that point, I could have said to

21   him -- what was going through my mind was, Dude,

22   you don't have a warrant.  This is going through my

23   mind, but that's not what I said because I knew

24   this was not going the right way, and I was like,
```

DAVID DEWAR, 05/11/2017

1    Wow.

2              So I had said to him, Well, you know

3    what, I'll calm her down, you know, I'll calm her

4    down, you know.  I didn't say, You can't do that.

5    Obviously, he can't do that.  He doesn't have a

6    warrant and he shouldn't make those types of

7    threats, those types of intimidating, strong-arm

8    tactics, which he was, no doubt about it.

9              So I responded and said, Well, you

10   know, I'll calm her down.

11        Q.    Okay.  Had your mom been yelling and

12   being loud before then?

13        A.    No, no.  She was just emotional, you

14   know.  This isn't yelling.  She's very emotional.

15        Q.    Okay.  And what do you mean by

16   emotional?

17        A.    Well, she's very emotional in terms of

18   her tone, her body language, because of the

19   situation.  You know, she's upset that, first off,

20   the snow was being blown on her property.  And,

21   remember, there's a history here.  Mr. Hosty,

22   William Hosty, has been doing this for three to

23   four years.  He comes three to four years at 5:30,

24   6:00 o'clock, and it's the same MO, blowing the

DAVID DEWAR, 05/11/2017

Page 78

 1   snow over the fence and what have you.

 2              And when she confronted one time

 3   before, which I had mentioned, he -- which was --

 4   this was 2014.  I think it was 2012, she mentioned

 5   this to him before.  And he kept saying the word,

 6   F, F, F, like for three minutes straight.  So they

 7   have a history here, okay?  I didn't really get

 8   into that.

 9              So the thing is is when he made --

10   not only was blowing the snow, but then made a

11   threat against me saying that I threatened him, my

12   mom's upset; she's emotional.  So when she, you

13   know, made her comments, she said, No, you know, he

14   blew the snow, he don't even live here, he's the

15   neighbor's son -- father, and my son did not

16   threaten him.

17        Q.    Okay.  So this other instance that

18   you're referring to with William in 2012 --

19        A.    With my mom.  Oh, that was bad, yes.

20        Q.    Did you witness that?

21        A.    No.

22        Q.    And when you're saying that he was

23   saying F, F, F, are you referring to the F-word, so

24   f-u-c-k over and over?

DAVID DEWAR, 05/11/2017

1      A.      Yes, oh, yeah.

2      Q.      Okay.

3      A.      In his frustration.

4      Q.      Okay.  So what happened with that

5  incident?

6      A.      As I said, she approached him as far as

7  where he's blowing the snow, and he responded in

8  frustration and just said, I'm fed up with you, and

9  then he just walked away from her and proceeded to

10  do what he did, and he said the F-word numerous

11  times.  So that's ...

12      Q.      And did anything else come about?

13      A.      No, no, not -- nothing came about.

14      Q.      Okay.

15      A.      So what he would do is -- 2011, 2012,

16  I'm trying to remember.  Around that time.  But the

17  point is he started coming around earlier.  At the

18  time he was doing the snow maybe between 8:00 and

19  9:00, then he started stepping it down to 5:00 to

20  6:00, so he can avoid it --

21      Q.      Okay.

22      A.      -- do what he wanted to do.

23      Q.      Okay.  And did your mom call the police

24  about that event or make a complaint about that

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 91

```
1        Q.     -- be quiet or else he's going to go in
2   the house.   What happened next?
3        A.     What happened was then I said, you
4   know, diplomatically said to Officer Felmon, I'll
5   calm her down, that's not necessary.  In so many
6   words.
7        Q.     Okay.  And did you say anything to your
8   mom at that point?
9        A.     Yes.  I said, Please go into the house.
10       Q.     And did she go into the house?
11       A.     No.  She wanted to be a witness, which
12  was a good thing.
13       Q.     Okay.  Did she say anything in response
14  to you?
15       A.     That, No, I'm going to stay out here.
16       Q.     Anything else?
17       A.     No.
18       Q.    · Okay.
19       A.     Not that I recall.
20       Q.     And then who spoke next?
21       A.     Then they basically -- Mr. Devine said,
22  Why don't we come over and, you know, talk with
23  Mr. Hosty and resolve this.  So he engaged me, and
24  my mom followed along, to talk with Mr. William
```

DAVID DEWAR, 05/11/2017

Page 92

1   Hosty in regards to the situation.

2               And at that point, we were -- I was

3   on the sidewalk here on the end of the driveway, he

4   was there, and we were all right in that corner.

5       Q.    Okay.  So plaintiff is motioning to

6   Exhibit 2, and it looks like they were in the

7   corner where John Hosty's driveway, the end of the

8   driveway, meets plaintiff's house.

9               Is that correct?

10      A.    Meets the front sidewalk, right.

11      Q.    Okay.  So then at that point, who was

12  all in that area?

13      A.    The people I just mentioned.  So

14  Jennifer Hosty.  They were on the side of -- no,

15  John Hosty -- on that part of their property at

16  11343.  So it was Jennifer Hosty, Detective Scott

17  McKenna.  And then the complaint -- you know, said

18  I made the threat on William Hosty.  And then it

19  was on -- kind of towards our area was Officer

20  Devine, myself, Mr. Felmon, and my mom.

21      Q.    Okay.  And then who spoke next?

22      A.    Officer Felmon.

23      Q.    Okay.  And what did he say?

24      A.    Well, actually, no.  The first person

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 93

```
 1    that spoke was William Hosty.

 2         Q.    Okay.  And what did he say?

 3         A.    He said that, you know, I was blowing

 4    my snow; this guy threatened to kick my, you know,

 5    a-s-s.  He said, My grandkid says this guy's a

 6    six-four monster; he's afraid of him.  He goes, you

 7    know, This ain't right.

 8               So he pleaded his case as far as,

 9    you know, posing a picture of me being a threat to

10    the kids, which is ridiculous.

11         Q.    Okay.

12         A.    Never.

13               So --

14         Q.    Did he say anything else besides what

15    you've just said?

16         A.    No, not that I recall.

17         Q.    Okay.  And then who spoke next?

18         A.    Officer Felmon.

19         Q.    And what did he say?

20         A.    He never asked me again to state what

21    we told him.  He basically went right into his

22    bullying mode, and he said, You need to

23    apologize --

24         Q.    Okay.  So when you --
```

DAVID DEWAR, 05/11/2017

Page 94

```
 1        A.      -- immediately.

 2        Q.      Okay.  You --

 3        A.      Never heard my side.  Never.

 4        Q.      Okay.

 5        A.      In front of him with the interaction,

 6   never.  So he requested I apologize, Officer Tom

 7   Felmon.

 8        Q.      Okay.  So what -- what you were saying

 9   earlier, that he never asked what you said to him,

10   you were saying he never asked you what you said to

11   William Hosty; is that right?

12        A.      Yes.

13        Q.      And -- okay.  And you said bullying

14   mode.  What do you mean by that?

15        A.      Very loud, very intimidating.  His body

16   language.  The way he did it.  He was using my mom

17   as a ploy.

18        Q.      What do you mean?

19        A.      Well, she was already rattled, as I

20   talked about, in terms of being emotional,

21   flamboyant, as far as the situation.  And when he

22   said, You need to apologize for what you did, he's

23   looking at her, and he's riling her up more because

24   she -- she's upset anyhow.  So she's at a volcano
```

DAVID DEWAR, 05/11/2017

Page 95

1    pitch as far as erupting, as far as emotionally.

2                    So I responded, and I responded as

3    diplomatically as I can.

4        Q.    Okay.  Hold on.

5                    Do you think since -- if Officer

6    Felmon was looking at your mom, do you think he

7    wanted your mom to apologize?

8        A.    No.

9        Q.    No?

10       A.    Because he -- what he did is he was --

11   so he's looking at me, and he says, You need to

12   apologize, and then he looks at my mom.  Okay.  So

13   they -- let's be clear, he's looking at me to

14   apologize, and then he's looking at her and, you

15   know, kind of looked like, there's going to be

16   consequences here, but he -- that's the way I felt.

17       Q.    Okay.  And then how did you -- or who

18   spoke next after that?

19       A.    Me, I did.

20       Q.    And what did you say?

21       A.    I said, you know, I apologize that the

22   Chicago police had to come out and we couldn't

23   resolve this as two gentlemen over something like

24   this about the snow.

DAVID DEWAR, 05/11/2017

Page 96

```
 1    Q.    And did you say anything else?

 2    A.    No.

 3    Q.    Okay.  Who spoke next?

 4    A.    And then Officer Felmon said, That's

 5  not good enough; you need to apologize to him.

 6    Q.    And who was he referring to?

 7    A.    Me.

 8    Q.    When you said --

 9    A.    Oh, him, Mr. Hosty.  Yeah, sorry.  So

10  yeah.

11    Q.    Okay.  And --

12    A.    So he -- he's pretty much at that

13  point, you know, saying, Hey, you need to apologize

14  to this guy.

15    Q.    Okay.

16    A.    Not knowing, in fact, this is an

17  alleged allegation, and they're going to

18  investigate.  I understand they're police, but

19  immediately he's taking their side, saying -- you

20  know, Mr. Hosty's side, saying, You need to

21  apologize.

22              And he's saying that, and then he

23  glances at my mom, and she's like really upset at

24  this point.  You can see her body language.  Okay.
```

DAVID DEWAR, 05/11/2017

1       Q.      Okay.

2       A.      So what's that going to make -- so then

3   I responded.

4       Q.      Okay.  So what did you say in response

5   to him?

6       A.      I reiterated what I said in my original

7   statement, I apologized the police had to come out

8   for this situation and we couldn't resolve this as

9   gentlemen over the snow.

10      Q.      Okay.

11      A.      And I'm trying -- at this point,

12  I'm trying to be diplomatic because I know I'm

13  in trouble.  I see Scott McKenna there, a

14  detective.  I see this guy.  I know all the

15  stuff I've been involved -- I'm like, This is --

16  I'm thinking -- I'm just giving you the thoughts of

17  my mind.

18              I'm thinking, I'm in trouble here,

19  they're going to nail me anyway.  I don't -- this

20  is a set up.  This is what I'm thinking.  Like,

21  This ain't right.

22              So I -- so I was hoping that that

23  would be good enough, but I knew it wasn't.  But at

24  this point I knew I wasn't going to admit to

DAVID DEWAR, 05/11/2017

Page 98

1  something I didn't do.

2           So I responded, as I said, second

3  time.

4       Q.    Okay.  And what did you say the second

5  time exactly?

6       A.    Just, as I said, I apologized.  I'm

7  apologetic that the police had to come out; we

8  couldn't resolve this as two gentlemen over the

9  snow.

10      Q.    Okay.  Then what happened?

11      A.    At that point, Officer Felmon, he got

12  loud.  He said, Come -- you got to apologize,

13  apologize.  He goes, That's not good enough.  He

14  goes, If you don't apologize, I'm going to have to

15  arrest you.

16           And he started -- and then he was

17  twirling his handcuffs, and he riled her up.  And

18  he was like this, and he had a -- oh, wait.  Hang

19  on a second.  Wait.  I missed something.  Excuse

20  me.

21           After I said the statement the

22  second time, Mr. Hosty made his comment.  He was in

23  the driveway there and towards the sidewalk where

24  it meets.  And he walked two feet back and forth,

DAVID DEWAR, 05/11/2017

Page 99

1 and he goes, Apologize for what? And he was very,

2 you know, confident in himself. He goes, Apologize

3 for what? Apologize for threatening me.

4            You know, and he's like -- so he's

5 mocking me to apologize, knowing that he has the

6 full support of Officer Felmon and Devine following

7 along.

8       Q.   Okay.

9       A.   So that was what he said, what's his

10 name, excuse me, William Hosty. So that was his

11 comment.

12            And then Officer Felmon said, you

13 know, Apologize, you got to apologize. And he got

14 loud, and he said -- and he was twirling the

15 handcuffs, looking at my mom. He goes, If you

16 don't, we're going to have to arrest you, you know.

17      Q.   Okay.

18      A.   And he -- he started -- and my mom

19 screamed, and she was beside herself. And she

20 goes, Oh, she goes -- she was like, Apologize? He

21 didn't do it. Apologize? She just -- you know, he

22 broke her.

23            And I didn't appreciate what he did

24 to her as far as the mental anguish, trying to use

DAVID DEWAR, 05/11/2017

Page 100

```
 1   her as a ploy against me.  And then I responded.

 2        Q.     Okay.  So when you said that he was

 3   twirling his handcuffs, what hand was he twirling

 4   them in?

 5        A.     Right hand.

 6        Q.     And how was he twirling them?

 7        A.     Like this, like a little bow, you know.

 8        Q.     So he held them out with --

 9        A.     Yeah.

10        Q.     -- one -- like his index finger?

11        A.     Yeah, you know, or two fingers, and

12   he's like this, you know.

13        Q.     Okay.  So his first two fingers, so his

14   index and his second finger, and he --

15        A.     Yeah.

16        Q.     -- was twirling --

17        A.     Yeah, like this.

18        Q.     -- them around in the air?

19        A.     Like this, like side to side, like

20   that.

21        Q.     Okay.  And was Officer Devine doing

22   anything at this time?

23        A.     He looked like he didn't want to be

24   there, so -- but he -- he -- but he went with the
```

DAVID DEWAR, 05/11/2017

1  program, you know.  He looked and he just was like,

2  you know, and that, like I said, the lead officer

3  here was Officer Felmon.

4       Q.    Okay.  And then after your mom

5  screamed, you know, apologize, he didn't do it,

6  what happened next?

7       A.    I basically said, you know, I can't

8  apologize for something I didn't do or say and, you

9  know, I can't apologize to him for that because I

10 didn't say it.

11      Q.    Okay.  And what happened next?

12      A.    At that point, then Officer Felmon

13 said, You're under arrest.  Officer Devine -- which

14 I didn't resist.  So as soon as that happened, it

15 was like they -- they were kind of surprised.  I

16 kind of got the impression they were trying for me

17 to resist arrest, my opinion.

18           And I immediately put my hands

19 behind my back, you know, so I'm showing no resist,

20 which they put on the report no resist.  And then

21 Officer Devine just kind of held my arm like this,

22 which was unnecessary really, but he did.  And then

23 Officer Devine was the lead officer that handcuffed

24 me.

DAVID DEWAR, 05/11/2017

Page 102

1  Q.    So Devine handcuffed you and held

2  your --

3     A.    No.   Felmon handcuffed me.  And if you

4  look, when I sent you the exhibits, Kelly, there's

5  Exhibit 1 through 6, and there's 12 pages on

6  Exhibit 1, and that's the Chicago police report,

7  and on page 8 of 12, it clearly shows in the report

8  that Officer Felmon is the first arresting officer

9  and Officer Devine is the second.

10     Q.    Okay.  Well, I just want to know what

11  you know.

12     A.    Yeah, but that -- that's what I recall

13  as well.

14     Q.    Okay.  And then you mentioned that

15  Devine put his -- one of his hands on your upper --

16     A.    No.

17     Q.    -- left --

18     A.    He just kind of went like this, you

19  know, kind of -- which he was -- they were kind of

20  surprised, because as soon as it happened, boom.

21  I wasn't going to resist.  I wasn't going to give

22  them a reason to do anything other than what they

23  said they were going to do.

24               But they didn't read my Miranda

DAVID DEWAR, 05/11/2017

```
 1   rights.

 2         Q.     Okay.  Hold on.

 3                So Officer Devine put one of his

 4   hands on your upper left forearm; is that right?

 5         A.     No.  Say right here.  Yeah.

 6         Q.     By your elbow there?

 7         A.     Yeah.  Just kind of -- just like real

 8   quick for a brief second, and then he let go.

 9         Q.     Okay.  And were you injured during

10   that?  Were you physically injured when he did

11   that?

12         A.     I suffered multiple injuries.  No, I

13   didn't.  I didn't.  No.

14                I know I shouldn't -- no.  There

15   were no injuries.  And I put that on the report,

16   there were no injuries.  As far as physical

17   injuries, no.

18         Q.     Okay.  So when you said you suffered

19   multiple injuries, were you --

20         A.     I didn't.

21         Q.     -- being sarcastic just now?

22         A.     Yes, yes.

23         Q.     Okay.

24         A.     And the thing is, let me be frank here,
```

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 104

1   this is a serious thing.  Okay.  I'm not only --

2   you know, I'm not only suing because of the money.

3   I'm suing because of the -- I feel this is an

4   injustice.  And if this can occur to me, it can

5   occur to anybody.  Okay.  So I'm clear as far as in

6   the report and the information, and I know you want

7   to get my testimony.  No.  I didn't suffer any

8   bodily injuries.  None whatsoever.  No.

9        Q.     Okay.  Were both of the officers in

10  uniform?

11       A.     Yes.

12       Q.     Okay.  And do you remember what they

13  looked like?

14       A.     Well, now, Officer Devine is about five

15  ten, medium build.  He's got a full head of hair.

16  He's got no facial hair.  And he's got a touch of

17  gray on his -- you know, on his hair.

18       Q.     Then how about Felmon?

19       A.     Felmon, little taller, maybe five

20  eleven, little more weight to him, maybe medium to

21  large build, black hair, side combed, no facial

22  hair.

23       Q.     And where was their vehicle parked

24  during this?

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 105

```
 1        A.     Across the street.  It was adjacent to

 2   the property.  So it was about two houses up

 3   adjacent on the other side of the street.  And it

 4   was a squad, a CPD squad car.

 5        Q.     Okay.

 6        A.     Minivan, like a minivan.

 7        Q.     So if you're looking --

 8        A.     Here, let me show you here.

 9        Q.     Okay.

10        A.     So if you look here -- yeah, this is

11   probably -- so Exhibit 3 is probably the best

12   indicator.  So if you cross the street here, then

13   you go two houses north, they were parked right

14   there.

15        Q.     Across the street.

16        A.     Across the street and then two blocks

17   further north of the Hosty residence.

18        Q.     Okay.  So if you're looking outside

19   your front door to your house, they would be to the

20   right side, right?

21        A.     Yes, going north.  And it would be

22   three -- there's a side street there, so they

23   intersected with that side street on Millard, and

24   they were in front of that -- that property.
```

DAVID DEWAR, 05/11/2017

Page 119

```
 1      A.      Yeah.

 2      Q.      Okay.  Who said it first?

 3      A.      I believe Felmon and then Devine said

 4  it.

 5      Q.      Okay.

 6      A.      But then I started talking to them on

 7  111th Street, so we're on that -- the house where

 8  we pulled away from is on Millard.  Millard is

 9  maybe a half -- we're about two blocks off of the

10  main street, which is 111th Street.  Once we got

11  onto 111th and Central Park Avenue and we started

12  to proceed east towards the police station, which

13  was only a few miles away, we were talking after

14  they made that statement.

15                  And we're talking about Demon Dogs.

16  There's a place on 116th and Pulaski 11600 South

17  Pulaski in Alsip, called Demon Dogs.  And Officer

18  Felmon said, Yeah, I was over there; they got the

19  best hamburgers.  And I'm thinking to myself, Well,

20  first you say you're from the North Side, but then

21  you know where all the feeding holes are.  So I'm

22  thinking, Okay, fine, just -- you know, and I'm

23  nervous, and I'm talking to them and stuff like

24  that.  And they seemed okay at that point as we're
```

DAVID DEWAR, 05/11/2017

Page 120

1   going to the police station.

2              And I said, Yeah, I know some

3   coppers.  I know Officer Gene Griffin.  And they

4   were a little like, Oh, really?  So, you know,

5   letting them know I know some officers.  And not

6   just let them know, You're in trouble, I know some

7   officers, I'm just saying, you know, kind of making

8   conversation.  I'm a regular guy caught up in this.

9   Why am I caught up in this?

10       Q.    Okay.

11       A.    You know, I'm a guy from the

12   neighborhood.  You know, why?

13       Q.    So was that the first thing that was

14   said in the car other than the North Side comment

15   by Felmon, it was about the Demon Dogs?

16       A.    I believe so, yeah.  Well, I said

17   something like, I'm from the -- and then we got in

18   the thing as far as hamburgers and Demon Dogs.

19       Q.    Okay.  So how about you tell me, best

20   of your recollection, everything you said to them

21   and everything they said to you on the way to the

22   station?

23       A.    That's basically it.  You know, I mean,

24   perbatim [sic], I couldn't tell you perbatim, but

DAVID DEWAR, 05/11/2017

Page 121

1    basically they said they were from the North Side.

2    And then I basically told them, you know, I know

3    some other officers in the neighborhood, you know,

4    Gene Griffin, whatever.  And then we started

5    talking about food.

6                   And then we got to Demon Dogs, and

7    Felmon mentioned Demon Dogs, Yeah, I was just over

8    there, I like going over there, you know, they got

9    some good hamburgers, so on and so forth.

10                  And, remember, it's a short distance

11   to the police station.  You're talking once we hit

12   111th and Kedzie, and they're telling me they're

13   from the North Side, you go one more mile to

14   Western and then a half mile down the hill and

15   you're at the police station.  So it's only like

16   three, four minutes away, so, you know, there isn't

17   really a lot of time to engage in conversation, you

18   know.

19                  But that -- that's pretty much the

20   way it went until we got to the side door of the

21   22nd District police station.

22        Q.    Okay.  What happened when you arrived

23   at the police station?

24        A.    They opened the door.

DAVID DEWAR, 05/11/2017

Page 122

1    Q.    Who did, which officer?

2    A.    I think it was Felmon.  Because he was

3  the closest.  He was, you know, right in front of

4  me there.  So opened the door.  I skimmied out.  We

5  went through the side door, and then they --

6  Officer Felmon -- Officer Devine went to -- there's

7  a holding cell.

8            So Officer Felmon, before he put me

9  in the holding cell, he took -- he took off my

10 shoelaces because I guess, you know, people hang

11 themselves, unfortunately.  And then he -- my

12 sweater, he cut off the string, you know, those

13 strings.  He -- actually, he didn't let me -- no,

14 no.  Actually, I didn't have a sweater.  I had a

15 t-shirt.  So he cut off my shoelaces.  I had wet

16 socks on, wet pants, a wet t-shirt.  And then I

17 went into the holding cell.  And that was a little

18 after 7:00 o'clock, 7:05.

19    Q.    And what were your clothes wet with?

20    A.    Well, when they came -- because there

21 was a short distance from the time we made that

22 call, the second call, and went in the house.  So I

23 didn't have a chance to change into dry clothes.

24    Q.    Right, but what -- what were the

DAVID DEWAR, 05/11/2017

1    clothes wet with to begin with?

2         A.    Oh, because I was shoveling snow for

3    three hours.  I was snow blowing and out -- you

4    know, I was out there for three hours, you know,

5    from 3:00 to 6:00 or 3:30 to 6:30.  So, you know,

6    all the snow.  You blow the snow, you shovel the

7    snow, it keeps getting on you.  It melts, your

8    clothes get wet.  So from removing the snow

9    earlier.

10        Q.    Okay.

11        A.    Yeah.

12        Q.    And then -- and then other than the

13   shoelaces, did Officer Felmon do anything else with

14   your attire?

15        A.    No.  He just put me in the cell and --

16   the holding, they call it the holding cell, and

17   that was it.

18        Q.    Okay:  Where did you -- where did you

19   last see Devine at this point?

20        A.    Once we went through the side door and

21   then we got to the area where the holding cell,

22   he -- you can see through the holding cell to the

23   left there's a bunch of desks, and I assume that's

24   probably where the officers make up their reports.

Urlaub Bowen & Associates, Inc.  312-781-9586

DAVID DEWAR, 05/11/2017

Page 129

1    and throw you in there?

2         A.    No.   He just basically walked me there

3    and -- on my own accord, reluctantly cooperated,

4    and went into the cell.

5         Q.    Okay.

6         A.    Yeah.  So ...

7         Q.    And did -- did you have any

8    conversations with any officers during that time?

9         A.    No.

10        Q.    All right.

11        A.    I think during the time from 8:40 to

12   11:10, I just -- I mentioned them to open the door

13   because I was getting claustrophobic, you know,

14   just I was really claustrophobic and kind of

15   hyperventilating, but then, you know, I had to

16   compose myself.  And at times, you know, you'd have

17   an officer, I don't know who, not Devine and

18   Felmon, walk by and make their rounds.  He probably

19   heard it all, and he's, Yeah, it'll be okay,

20   they'll come get you.  And they walked away.  I

21   don't know who he was.

22                   So that was it until I -- they let

23   me out at ten after 11:00.  So I was in there for

24   two and a half hours.

DAVID DEWAR, 05/11/2017

Page 130

```
 1        Q.    Okay.  What did you say to the officer
 2   that was walking by?
 3        A.    I just said, Hey, I'm getting a little
 4   bit claustrophobic here, you know, can you get some
 5   air here?  And he's like, Yeah, you'll be okay,
 6   and just walked by, you know.  Really -- you know.
 7        Q.    Okay.
 8        A.    Because when I was in the cell, it
 9   reminded me of high school when people take wet
10   toilet paper and they throw it.  And there was
11   toilet paper that they thew on the heating vent,
12   and they threw so much toilet paper that it was all
13   over the heating vent, so there was practically no
14   heat coming in there and ventilation because it was
15   all clogged up with toilet paper.  So they might
16   want to think about hiring a better cleaning lady
17   in those cells.
18                And that's why I was like, Oh, my
19   goodness, I'm nervous, can I breathe, you know, is
20   this inhabitable to live -- you know, to be in here
21   for the time.  So that's why I made that response,
22   that plea to that officer walking by.  And, you
23   know, he's just like, Yeah, yeah, you'll be okay,
24   they'll come get you.
```

DAVID DEWAR, 05/11/2017

Page 131

1    Q.    And was this toilet paper in your cell?

2    A.    Yes.  It's -- you know, you figure

3  we're sitting right here, this is -- and then up in

4  the top part of the cell where the heating system

5  is, the vent, it's all clogged with toilet paper.

6  Terrible.

7    Q.    Okay.  So it was in the ceiling?

8    A.    No.  It was on the wall, the top part

9  of the wall.

10    Q.    Okay.

11    A.    The top part of the wall is where the

12  heating duct comes out.

13    Q.    And did you try to remove it?

14    A.    Couldn't reach it.

15    Q.    Okay.

16    A.    Probably a cell, you're looking,

17  12 feet up.  I'm tall, but I'm not that tall.

18  Yeah, I can't get to that, nor would I make an

19  attempt.

20    Q.    Okay.  What happened next?

21    A.    They -- at ten after 11:00, they said,

22  Somebody posted bail, you know, bond for you, and

23  they let me out.

24    Q.    And who came to get you?

DAVID DEWAR, 05/11/2017

Page 132

1    A.    My mother came accompanied with my
2    brother Dan.
3         Q.    But which officer came to get you from
4    the cell?
5         A.    It wasn't either Devine or Feldman.
6    And I don't recall.  It's on the report.  So I
7    don't know.  It was -- like I said, it's on the
8    report whoever released me and walked me to the
9    front.  So whoever was on duty at the 22nd District
10   at the time.
11        Q.    Okay.  And then did you have any issues
12   with the person that walked you out of the cell?
13        A.    No.  I actually was excited to follow
14   them out of the cell.  Yeah, so yeah.
15        Q.    Okay.  And then did you get your
16   belongings back?
17        A.    Yes.  They gave me the evidence bag.
18   And, like I said, with the evidence bags here, said
19   on there Dan Dewar.
20        Q.    Okay.
21        A.    You need to see a copy where it says
22   Dan Dewar?  Since we're at that point, I kept you
23   one.
24        Q.    I think you sent it to me.  Did you

Urlaub Bowen & Associates, Inc.   312-781-9586

DAVID DEWAR, 05/11/2017

Page 133

1  already send it to me?

2      A.    You know what, it's in the paperwork.

3  You know, it says Dan Dewar.  It's in one of the --

4  I think it's Exhibit 4, and then somewhere in

5  Exhibit 4 there's like 12 pages.  It's one of the

6  pages that shows Dan Dewar.

7                So when they did give me my

8  possessions in the evidence bag, it did say Daniel

9  Dewar instead of myself, David Dewar.  So ...

10     Q.    Okay.  And why is that significant to

11 you?

12     A.    Because in the file, I put in there my

13 cellphone records, and I took what they call a

14 Photoshop, which you've probably seen, and it shows

15 I called at 6:26 to Chicago police station,

16 312.745.0570.  That's sick I know the number of the

17 22nd District.

18                But then they told me to call 911 at

19 6:27.  So it's on my phone.  That's the Photoshop I

20 put in my exhibit.

21                But then when I got my cellphone

22 back and I requested from T-Mobile my phone

23 records, that call at 6:27 p.m. on February 17th,

24 2014, was not on my phone records.  Okay.  So from

DAVID DEWAR, 05/11/2017

1    the time I went into the cell, which was about

2    7:05, till the time I was released at 11:00, the

3    cellphone was in the possession of the Chicago

4    police.

5            So the question is, was there any

6    correlation to them having that deleted?  Thus,

7    you've probably seen I subpoenaed T-Mobile for

8    those records.  So that's why it's relevant.

9            How did that thing possibly be

10   deleted?  I made the call.  I had the -- I actually

11   have a freedom of information record showing

12   through the Chicago police I made the call.  I have

13   the audio I saved of the call, everything, where it

14   says -- Chicago police said, Yeah, you made that

15   911 call at 6:27, here's the transcript.

16           But now it's not there when it was

17   in the possession of the police.  Is there a

18   connection?  I don't know.  We'll find out.  So

19   that's why it's relevant.

20      Q.    So you think someone deleted it?

21      A.    Possibility of it, yeah.  Could be.

22   We'll find out.

23      Q.    How are you going to find that out?

24      A.    Well, as best as I can.  But the thing

DAVID DEWAR, 05/11/2017

Page 135

1    is is it -- that's why I believe it's relevant as

2    far as the cellphone, and I believe it's relevant

3    in terms of the evidence bag.

4            Q.    So how does that relate to the evidence

5    bag?

6            A.    Well, I find it suspicious as anyone

7    that when I was processed with all the paperwork,

8    it clearly said David Dewar.  Why would the

9    evidence bag say Daniel Dewar?  I don't understand

10   why.  You know, that's kind of a big mistake.

11           Q.    And you think that's evidence that they

12   deleted a call from your phone?

13           A.    The reason why they misnamed it from

14   David to Daniel?

15           Q.    I don't know.  You think they purposely

16   misnamed it?  I'm just trying to understand what

17   you think is going on.

18           A.    I think there's a possibility of that,

19   yeah.

20           Q.    Okay.

21           A.    I'm -- let's put it this way, if you're

22   able to get everything right except the evidence

23   bag with a different name and you clearly know I'm

24   David because all the other documents say I'm

DAVID DEWAR, 05/11/2017

1    David, okay, and then all of a sudden my cellphone

2    that was in the possession of the 22nd District for

3    four hours is deleted, you know, you -- you need to

4    think there's some connection there, or a

5    possibility of connection.

6              So yeah.  I can think that, but

7    until I can prove that, it's something different.

8    So ...

9         Q.   So why -- I'm just trying to

10   understand, and maybe I'm just missing it.  But so

11   you think that the fact that your bag was labeled

12   Daniel Dewar is linked to a police officer deleting

13   a phone call from your phone?

14        A.   I don't know who deleted it.  I don't

15   know if it's a police officer.  Could be someone

16   within there or one of the two arresting officers.

17   But that would seem the reason that there could be

18   a connection, yeah.

19        Q.   And what -- and try to connect that for

20   me.  Like what's the connection you see there,

21   between the mislabeling of a bag or -- and someone

22   deleting a phone call from your phone?

23        A.   Well, if it says Daniel Dewar, can it

24   be disputed then it's not David Dewar's bag, and

DAVID DEWAR, 05/11/2017

Page 137

1  evidence in that bag?  And then if the phone

2  records, which I have in the file which you have

3  all of that, if it shows that I did make that call

4  to 911 at 6:27 pertaining to why this whole

5  incident happened with the snow, okay, that's what

6  started the whole thing.

7              And remember, we go back to March

8  25th of 2014 when we went before the judge five

9  weeks after the accident, the judge was surprised

10  to find out that this all started from the snow.

11              That being the case, the evidence of

12  making the 911 call, and the transcript shows that

13  it was all initiated from the snow, not that I

14  threatened Mr. William Hosty.

15              So I believe there's a connection

16  myself.  Okay?  That's the long answer, but I

17  believe there's a connection.

18      Q.    Okay.

19      A.    I can't figure it out.  How can --

20  think from my perspective.  I've got all these

21  phone calls.  I've been with T-Mobile for 15 years.

22  I've made a few 311, 911 calls, and when this

23  turmoil happens in my life, how -- why is this call

24  deleted?  And in -- when I'm in the possession of

DAVID DEWAR, 05/11/2017

Page 138

```
 1   somebody else, in this case the Chicago Police
 2   Department.  That is cause for suspicion of why.
 3        Q.    Okay.  Did you talk to anyone at the
 4   police station about that suspicion?
 5        A.    No.
 6        Q.    All right.
 7        A.    What can I say to anyone?  I can't
 8   prove anything.
 9        Q.    Okay.
10        A.    And I'm not going to -- you know, I'm
11   not going to make that accusation.  You know, I
12   don't know.  No.
13        Q.    All right.  Did anything else happen at
14   the police station that we haven't discussed?
15        A.    I think there was somebody in the cell
16   I was talking with.
17        Q.    In the same cell as with you?
18        A.    No.  In another cell. It's -- I don't
19   know if it's relevant, but since you asked.  It was
20   somebody in a cell, and I think the guy got
21   arrested for petty theft, yeah.  I shouldn't even
22   talk with him.  But, yeah, that was it.  I had
23   maybe a two-minute conversation with him.  That
24   was it.
```

DAVID DEWAR, 05/11/2017

Page 139

```
 1        Q.     Okay.  Do you know his name or --
 2        A.     No, I don't know his name.  Just a
 3   voice through the wall.
 4        Q.     Okay.
 5        A.     Yeah.  And that was it.
 6        Q.     Did anything happen during the arrest
 7   that we haven't talked about yet?
 8        A.     You mean from the time I was arrested?
 9        Q.     Yes.
10        A.     In front of my house?
11        Q.     Yeah.
12        A.     No.
13        Q.     Okay.
14        A.     That's everything I recall.
15        Q.     Okay.  Any other conversations you had
16   with your neighbor or the police officers that day
17   that we haven't discussed?
18        A.     No.
19        Q.     Okay.  Where did you go after you were
20   released from the police station?
21        A.     I went home.  My brother Dan was the
22   primary driver.  I was in the passenger seat.
23   After my mom -- it was $120 cash, 10 percent of a
24   $1,200 bond.  And then my brother Dan, like I said,
```

DAVID DEWAR, 05/11/2017

Page 140

```
 1   drove.  I was in the passenger, and we went -- I
 2   went home, and he left.  That was it.  I went in.
 3        Q.    Okay.  Was your mom in the backseat?
 4        A.    Yes.  My mom was in the backseat.
 5        Q.    Did you ever appear before a judge
 6   after your arrest?
 7        A.    Yes.  There was -- because the arrest
 8   was on February 17th, 2014, and as I stated, we
 9   went before the judge March 25th of 2014.  And that
10   was the 35th branch, 7 -- 27 East 111th Street.
11   That's where we appeared with Mr. Hosty, the
12   state's attorney.  I hired a guy named Larry
13   Liebforth, which was absolutely useless, and then
14   my mom.  And that's when we appeared before the
15   judge.
16        Q.    Okay.  And what happened in relation to
17   that case?
18        A.    Not good.  What happened was I met --
19   went with my mom, and I met Attorney Larry
20   Liebforth at the courthouse.  He showed up late a
21   few minutes.  We -- he went from the courtroom to
22   the front to talk with the state's attorney
23   representing -- I don't know her name, Panici.  It
24   was an Italian a name.  She represented William
```

DAVID DEWAR, 05/11/2017

1   Hosty.  He came back a few minutes later.

2                  We went to the back of the court

3   into the -- the meeting area.  And he said this,

4   We're not going to apologize, and we're -- we've

5   agreed to admonish the case.  It was very vague and

6   ambiguous.  What do you mean by admonish?  You

7   know, I'm not going to admit -- you know, I'm not

8   guilty.  Am I -- is this case going to be

9   dismissed?  You know, so on and so -- he goes,

10  We're going to admonish.

11                 So as he was doing that for about

12  three minutes, the bailiff knocked on the door.  He

13  quickly raced to the front to meet the judge

14  through the gates.  I quickly followed him.  And

15  then my mom proceeded, and they cut her off.  They

16  didn't let her go through.

17      Q.   But she was in the courtroom, right?

18      A.   She was in the courtroom.  She sat in

19  the front there and -- you know, in the court room.

20      Q.   Okay.

21      A.   So that's when he started, you know,

22  with the judge.  And if you want me to go through

23  the -- you want me to go through it?

24      Q.   Well, what was the result of the case?

DAVID DEWAR, 05/11/2017

Page 142

```
1        A.    The result of the case was that
2   Mr. Hosty proceeded he didn't want to file charges,
3   but my attorney -- the judge basically on the
4   transcript, which he never said, okay, he said, Did
5   you apologize?  And I said, Yeah, I apologized for
6   the police coming out.
7               On the transcript, which really
8   frustrates me, it says, The judge says, Well, I'm
9   giving you a World Series break, referring to me,
10  I'm giving you the moon, the stars, the sky -- I'm
11  like, He never said that.
12              Anyhow, Mr. Hosty never proceeded.
13  He testified, I just want peace.  At the end of it,
14  instead of dismissing the case -- and my attorney
15  didn't even represent me really -- they didn't have
16  it dismissed.  It should have been dismissed.
17              It ended up going SOL, stricken off
18  with leave to reinstate, 90 days.  It should have
19  never done that.  It should have never done that.
20  It should have been dismissed.  So it went SOL
21  90 days, which it should have never.  Because he
22  never testified, it never happened, but it wasn't
23  dismissed.
24              So at the end of all this, the
```

DAVID DEWAR, 05/11/2017

Page 143

```
 1   state's attorney -- or assistant state's attorney,

 2   said, Yeah, we're requesting an SOL.  I didn't know

 3   this.  This is all new to me until afterwards.

 4                   My attorney instead of saying, Well,

 5   based on him not testifying, this never happened,

 6   I'd like this dismissed.  He never did that.  So it

 7   was SOL.

 8        Q.    Okay.

 9        A.    And then at the end, I said to

10   Liebforth, Well, do I get a document?  And he goes,

11   Oh, no, you don't need a document.  He goes, You

12   can go downtown and get it.

13        Q.    Okay.

14        A.    And I was like, No, no, no, no.  I was

15   like -- and I go, Do I need to pay you?  And he's

16   like, Oh, you don't need to pay me.  And I'm

17   thinking, Wait a minute, you know.  So he left.

18                   And then I stuck around and said, Do

19   I get some kind of paperwork validating that this

20   happened?  And they're like, Well, yeah, right

21   there.  He's out the door.  He lied to me.  He

22   misinformed me.

23        Q.    Did you sue the attorney?

24        A.    No, no, no.
```

DAVID DEWAR, 05/11/2017

Page 144

1      So what happened was I got the
2   document.  They notarized it.  I went to his office
3   on 95th and Pulaski.  He's up on the second floor.
4   And I didn't realize until I researched him that he
5   actually -- his wife, Panozzo, she is a judge in
6   Markham.  She's since retired.  And she has been
7   backed up by the Fraternal Order of Police Local 7.
8   So he's hooked up to the police.
9          And I couldn't understand why he did
10  what he did.  That might have cleared some things
11  up.
12          But anyhow, I went to see him on
13  95th and Pulaski, and I said to him, Yeah, Larry,
14  you ran away, I owe you some money.  And I said,
15  Yeah, you were wrong about that, they gave me a
16  copy of this, and it was SOL.  And he looked really
17  worried.  And he was like, Oh, okay.  I said, Yeah,
18  so what do I owe you?  $275.  So I said, Can you
19  write out a receipt?  And he wrote it on the back
20  of a business card.  And I said, Larry, that's not
21  a -- can you do like a regular receipt?  So anyhow,
22  he did it on a regular receipt, and that was it.
23          But just for the record, in the next
24  few days I'm going to file a complaint against him.

DAVID DEWAR, 05/11/2017

Page 145

1  I haven't, but I'm going to.  So I'm going to file

2  a complaint against him for his misrepresentation.

3  You'll be -- you'll see it anyhow in the file.  So

4  I believe that he did not -- you know.  I'm going

5  to -- with the ethics bureau of attorneys, I forgot

6  what it is, but I'm going to file that because I

7  feel that he did not represent me as well as he

8  could.

9              He specifically told my mom not to

10  show up.  And when my mom was there, he was like,

11  Why did you bring your mom?  And I'm convinced if

12  my mom was not there to clarify that this whole

13  thing happened about the snow, that this judge

14  would have maybe stuck it to me.  I may not have

15  gotten the SOL.  That's the way I feel.

16              So based on the lack of

17  representation in front of the judge and the

18  misinformation as far as getting the SOL document

19  and the other things, I'm not very happy with, you

20  know, my representation of Mr. Liebforth.

21      Q.    Okay.  Did you ever pay him?

22      A.    I paid him.

23      Q.    Okay.  And you think this is because

24  his --

DAVID DEWAR, 05/11/2017

Page 146

1    A.    I don't know.  I don't know.  I don't

2    know.

3    Q.    Okay.  Well, let me ask the question.

4    A.    Sure.

5    Q.    Do you think this is because his wife

6    is a judge and she's being backed by the Fraternal

7    Order of Police?

8    A.    Fraternal locally.  Possibly.

9    Q.    Okay.

10    A.    You know, this is not -- you know, this

11    is not typical behavior of an attorney representing

12    a client.  At least I don't think it is.  I'm not

13    familiar with it.  So yeah, I mean, this -- that's

14    why I'm going crazy here.  It's like everywhere I

15    turn.

16              So, you know, I -- I had applied for

17    a conceal and carry license, but that was denied

18    because of this simple assault too, which I put in

19    there, which is very frustrating too.  But I don't

20    know if there's a -- you know, I checked out, and

21    there is a connection between him and the FOP, and

22    that made me suspect there could be some

23    relationship to the way he did not represent me.

24    I don't know.

DAVID DEWAR, 05/11/2017

Page 147

```
 1      Q.     Okay.

 2      A.     So it was SOL.

 3      Q.     What were you charged with as a result

 4  of this incident?

 5      A.     Simple assault.

 6      Q.     Anything else?

 7      A.     No.

 8      Q.     Were you ever told by the police what

 9  you were being charged with?

10      A.     No.

11      Q.     And when was the first time you learned

12  about the charges against you?

13      A.     Well, immediately.

14      Q.     Well, when did you first find out it

15  was for simple assault?

16      A.     The paperwork was available ten days

17  later, I believe.  Well, you know what, let me

18  recap.  Because I was arrested on February 17th,

19  which was a Tuesday, and I kept calling for the

20  paperwork.  And then they said, Well, you know, the

21  paperwork's at 727 East 111th Street, which is

22  Branch 35.

23             So the 17th -- the 22nd, I believe

24  it was five days later, I received the paperwork.
```

DAVID DEWAR, 05/11/2017

Page 148

1  And then as I received the paperwork of all the

2  details, it said simple assault.  So five days

3  later.

4       Q.    I'm going to show you what's been

5  marked as Exhibit 1.  Could you please review that

6  for me?

7       A.    Oh, this is just the interrogatory,

8  right?

9       Q.    Yes.

10      A.    And as -- can I speak?

11      Q.    Um-hmm.

12      A.    As it says here on answer to

13  interrogatory No. 6, those are the two contracts

14  before Henry Hill and this Mary Fitzgibbons.

15            Do you have the questions to these,

16  the interrogatories?

17      Q.    Not with me.  I just have what you sent

18  back.

19      A.    Okay.  The reason why I'm mentioning

20  it, and I believe it's No. 16, you had asked -- and

21  I was incorrect on it.  You had asked have I ever

22  filed bankruptcy or have I ever been involved in

23  civil lawsuits, and I put none.  I have.  So I

24  wanted to clarify that.

DAVID DEWAR, 05/11/2017

Page 149

1              I believe it's question 16.  Let

2    me -- I have a copy here, so we can go through

3    that.  Okay?  I just want to make sure you --

4    because that was something that I wanted to recount

5    because I was inaccurate on my interrogatory.

6          Q.    Well, you can go ahead and write the

7    correct answer on there.

8          A.    Okay.  Give me a second here.  I can

9    just attach -- here we go.  Yeah.  That was No. 16.

10                  Okay.  Do you want to make copies of

11   these?  This is the civils as a plaintiff, as a

12   defendant.  It'd probably be easier.  And this too.

13   I'll attach this to No. 16.

14         Q.    Sure.

15         A.    Okay.  That'll make it easier.  Then

16   I'll put ...

17         Q.    So have you filed for bankruptcy?

18         A.    No.

19         Q.    Okay.  So these are lawsuits that

20   you've brought?

21         A.    No -- yeah.  I went to the circuit, and

22   it shows me civil lawsuits.  You know, it's full

23   disclosure.  So it's -- you know, it's civil

24   lawsuit as plaintiff, a defendant, and then one is