

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**FILED**

**JUN 2 8 2018**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

DAVID A. DEWAR, )
)
      *Pro se* Plaintiff, )    Case No. 16 cv 2287
)
v. )    The Honorable Virginia Kendall
)
CHICAGO POLICE DEPARTMENT and )    Magistrate Judge Jeffrey Cole
CHICAGO POLICE OFFICERS T.J. FELMON, )
M.K. DEVINE and C.J. LONG, )
)
      Defendants. )

### PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO
### MOTION FOR SUMMARY JUDGMENT

Plaintiff David Dewar, *pro se*, for his Response Memorandum in Opposition to

Defendants' Motion for Summary Judgment, in accordance with Rule 56 of the Federal

Rules of Civil Procedure and Local Rule 56.1(b)(2), states as follows:

### INTRODUCTION

During a major snowstorm, Plaintiff approached William Hosty ("William")[1], his

neighbor's father -- who was depositing all of the snow that he was removing with his

snowblower onto Plaintiff's property -- and asked him to place the snow somewhere else.

Rather than doing so, William called the Chicago Police Department. Based solely on

William's false claim that Plaintiff had threatened to "kick your ass," Plaintiff was arrested,

spent hours in jail, was compelled to post excessively high bail and was forced to go to

court on a criminal complaint that William ultimately elected not to pursue.

---

[1] William Hosty is referred to as "William" to distinguish him from his son, John Hosty ("John"), who is also
mentioned in this Response Memorandum. This Memorandum also refers to three Dewars -- Plaintiff, Plaintiff's
mother, Shirley Dewar ("Shirley") and one of Plaintiff's brothers, Daniel Dewar ("Daniel").

The Chicago Police Department's arrest of Plaintiff and Plaintiff's subsequent prosecution implicate the Fourth, Eighth and Fourteenth Amendments of the United States Constitution and also gives rise to a malicious prosecution claim under Illinois law. In their Motion for Summary Judgment, Defendants Felmon, Devine and Long claim that, based solely on William's statements, they had probable cause to arrest Plaintiff and are entitled to qualified immunity and, further, that Plaintiff lacks any evidence of a conspiracy.[2] Contrary to the arguments of the Motion for Summary Judgment, even if William were believed, his allegations clearly failed to state a viable claim for simple assault, the offense under which Plaintiff was charged. In these circumstances, controlling Seventh Circuit precedent compels a finding that Defendants lacked any probable cause to arrest Plaintiff and that they are not eligible for qualified immunity. Furthermore, Defendants did not release Plaintiff until he posted a bond based on a bail amount **ten times** the permissible level. There are several disputed issues of fact on Plaintiff's conspiracy claim. Finally, Plaintiff also possesses substantial evidence in support of his cause of action for malicious prosecution -- a claim not even addressed in the Motion for Summary Judgment.

## FACTUAL BACKGROUND

This matter originates in long-running tensions between neighbors. Plaintiff and Shirley Dewar, his mother ("Shirley"), have resided at 11347 S. Millard Avenue, Chicago, Illinois 60655 (the "Property") since 1984. [Statement of Additional Facts ("SAF") ¶ 1]. Since approximately 2000, Plaintiff's neighbor to the north has been John Hosty ("John"), William's son. (SAF ¶ 2). Both William and Scott McKenna ("McKenna"), a detective

---

[2]  Defendants also assert that Plaintiff did not give a confession on February 17, 2014 and, therefore, was not coerced. Plaintiff does not oppose summary judgment on this part of his Complaint.

employed by the Chicago Police Department, live elsewhere on the same block of Millard Avenue as Plaintiff and John. (SAF ¶ 3).

Both John and William have proven to be problematic neighbors to Plaintiff and Shirley. Plaintiff and Shirley have had to call the Chicago Police Department on multiple occasions to prevent John from drunkenly yelling at 2:00 AM and 3:00 AM and they also filed a criminal assault claim against John after he became extremely belligerent subsequent to Plaintiff and his mother trying to stop John's children from running across their Property. (SAF ¶¶ 4, 5). Another problem, necessitating a civil lawsuit, occurred when John refused to move a cable television wire that encroached into the Property. (SAF ¶ 6). William habitually plows John's driveway after any major snowstorm, directing the snow onto the Property and cursing and saying other hostile comments to Plaintiff and Shirley whenever he is requested not to do so. (SAF ¶ 7).

During the snowy evening of February 17, 2014, William once again began depositing the snow on the Property, and, when Plaintiff's elderly mother asked William to stop, he snarled "I'm sick of you people" and kept on blowing snow. (SAF ¶ 8). Shirley asked Plaintiff to intercede and Plaintiff kindly requested – from a dozen feet away – that William place the snow somewhere on John's property, rather than on the Property. (SAF ¶ 9). Rather than responding to Plaintiff's remarks, William suddenly and falsely accused Plaintiff of threatening him by saying "I'll kick your ass" and he yelled to his daughter-in-law (John's wife) to telephone the police. (*Id.*) In the belief that William was trying to set him up, Plaintiff also contacted the police and explained that William's accusation was false. (SAF ¶ 10).

Plaintiff and Shirley were inside their home when the police arrived and loudly banged on the front door. (SAF ¶¶ 11-12). Both Plaintiff and Shirley gave statements explaining that William was lying, but Defendant Officer T.J. Felmon ("Felmon") told Shirley to "shut up." (SAF ¶ 12). Without examining the areas where Plaintiff and Shirley indicated that William had been depositing snow, Officers Felmon and M.K. Devine ("Devine") ordered Plaintiff to go to John Hosty's home and apologize to William. (SAF ¶ 13). Before William, John's wife and Detective McKenna, Plaintiff apologized on three separate occasions to William, but William did not consider Plaintiff's apologies to be sufficient. (SAF ¶¶ 13-15). Officers Felmon and Devine then handcuffed Plaintiff and placed him in their police vehicle, where Plaintiff waited for approximately ten minutes while Officer Devine completed paperwork and spoke to William and McKenna. (SAF ¶ 16).

Plaintiff waited in a holding cell for several hours before he was released. (Id.) Plaintiff was retrieved by Shirley and his brother Daniel Dewar ("Daniel"), a retired suburban police officer. (SAF ¶¶ 22, 27). Before picking up Plaintiff, Daniel spoke to Officer Devine, who acknowledged that Plaintiff could have avoided arrest by satisfactorily apologizing to William. (SAF ¶ 23). As a condition to release Plaintiff, bail was set at $1,200 (and a $120 bond required to be paid) – a sum that is ten times the amount specified by the Illinois Supreme Court Rules. (SAF ¶¶ 24-25).

Plaintiff retained counsel to defend him in the misdemeanor assault case brought by William, but William withdrew the charge before trial. (SAF ¶ 28). Afterwards, Plaintiff successfully obtained an order of expungement. (SAF ¶ 29). Nonetheless, information about Plaintiff's arrest in February 2014 remains accessible on public internet websites. (SAF ¶ 30).

4

## LEGAL STANDARD

In evaluating Defendants' Motion for Summary Judgment, the Court should examine the record in the light most favorable to Plaintiff, resolve all evidentiary conflicts in his favor and afford him all reasonable inferences from the record. *Coleman v. Donahue*, 667 F.3d 835, 842 (7th Cir. 2012). The court should also disregard evidence favorable to Defendants that a jury would not be required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 US 133, 150-51 (2000). The sole focus of summary judgment is to determine if a case involves a genuine issue for trial and it is not necessary to weigh evidence or engage in fact finding. *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 527 (7th Cir. 2008).

Plaintiff's causes of action against Defendants are unlawful arrest, excessive bail, conspiracy and a state law claim for malicious prosecution. The Fourth Amendment of the United States Constitution prohibits arrest and detention in the absence of probable cause. *Manuel v. City of Joliet*, 137 S.Ct. 911, 918 (2017). Similarly, the Eighth Amendment of the United States Constitution forbids excessive bail, which is determined by ascertaining whether the government authority setting the bail acted arbitrarily. *United States ex rel. Garcia v. O'Grady*, 812 F.2d 347, 352 (7th Cir. 1987). To establish a civil conspiracy, Plaintiff must show that two or more people acted in concert to commit an unlawful act. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Lastly, malicious prosecution requires Plaintiff to demonstrate: (1) commencement of criminal proceedings by defendants; (2) termination of the criminal proceedings in favor of the plaintiff; (3) an absence of probable cause; (4) malice and (5) damages. *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir.

5

2013). Since Plaintiff can establish genuine factual issues on all of his causes of action, summary judgment should be denied.

## ARGUMENT

### I.   PLAINTIFF DID NOT COMMIT AN ASSAULT

While the Motion for Summary Judgment discuss probable cause and qualified immunity at length (see Memorandum, pp. 4-7 and 10-13), Defendants' analysis contains a conspicuous -- and telling -- omission. Defendants never address the elements of simple assault, the offense for which Plaintiff was arrested and charged. When William's claim against Plaintiff is evaluated under caselaw concerning assault charges, it is readily obvious that he had no viable case, there was no probable cause for Plaintiff's arrest or detention and Defendants are not entitled to qualified immunity.

Illinois law defines assault as knowingly engaging in conduct (without lawful authority) which places another in reasonable apprehension of receiving a battery. 720 ILCS 5/12-1(a). As the Seventh Circuit has recognized, *since the fourteenth century*, assault has involved a *threatening gesture or innocent gesture made threatening* based on accompanying words that create a reasonable apprehension of an imminent battery and a verbal threat of action at some indefinite time is not sufficient to constitute assault. *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004) (emphasis added); see also *People v. Floyd*, 663 N.E.2d 74, 76 (Ill. App. 1996) (In Illinois, words alone are not usually enough to constitute an assault and some action or condition must accompany those words). This case does not involve any form of gesture and no police officer could reasonably believe that an assault had occurred based on William's claims.

It is manifestly apparent that William did not have a reasonable apprehension of a battery on February 17, 2014 even if his allegations were given credence. William's deposition testimony, the misdemeanor complaint and the police report the identical assertion that Plaintiff had said something like "I'm going to kick your ass" and nowhere contend that Plaintiff made any threatening gesture. (SAF ¶¶ 9, 17 and 20; Exs. 5 and 6). Both Illinois state and federal courts have ruled that similar -- and even identical -- statements to those allegedly made by Plaintiff do not give rise to criminal or civil assault. See, e.g. *People v. Taylor*, 35 N.E.3d 171, 174-175 (Ill.App. 2015) (defendant alleged to have told court deputy that she was going "to get her" and "I'm going to kick your ass" did not commit assault); *Kijonka*, 363 F.3d at 647 (Comment that "Your ass is mine you son of a bitch and I will get you" could not reasonably be considered an assault).

Moreover, William's deposition testimony establishes that he really did not have any fear of a battery. William testified that Plaintiff was fifteen feet away when he made the alleged statement, William was operating his snowblower at the time and could only partially hear what Plaintiff was saying and he continued to blow snow after the purported statement for another ten minutes until the police arrived. (Deposition Transcript of William Hosty, attached as Response Ex. 3, p. 14, ln. 10 – p. 15, ln. 14 and p. 68, ln. 9 – p. 69, ln. 4). Of course, a person who reasonably believed that he was facing an imminent battery would not blithely continue to engage in the same type of activity that led to the purported threat in the first place. The Court should therefore conclude that there was no objective or subjective basis to believe that Plaintiff assaulted William on February 17, 2014.

7

**II.** **DEFENDANTS DID NOT HAVE PROBABLE CAUSE TO ARREST PLAINTIFF AND FELMON, DEVINE AND LONG ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

Defendants contend that they had probable cause to arrest Plaintiff, and, in any case, they had a reasonable belief that their arrest of Plaintiff was legal, thereby granting them qualified immunity. (Defs. Memo. pp. 4- 7, 11-13). Probable cause exists if at the time of the arrest, the facts and circumstances within an officer's knowledge are sufficient for a reasonable person to believe that the suspect has, is or is about to commit a criminal offense. *Williams*, 733 F.3d at 756. Even if probable cause is lacking, qualified immunity is still available if the officers reasonably could have believed the arrest to be lawful in light of established law and the circumstances known to them. *Hurt v. Wise*, 880 F.3d 831, 841 (7th Cir. 2018). Plaintiff has demonstrated disputed issues of fact on Defendants' claims of probable cause and qualified immunity because even if William's statements were taken at face value, no reasonable officer could believe that Plaintiff had committed assault, nor could he or she conclude that the arrest of Plaintiff was lawful.

The essence of Defendants' claims about probable cause and qualified immunity is that they were called out to investigate a dispute between neighbors, they listened to both Plaintiff's and William's version of events, Shirley supposedly was hysterical (although this is disputed), they did not observe any disturbed snow (although they did not perform any inspection), William appeared to be coherent and claimed that Plaintiff had threatened him with the words "I am going to kick your ass" and William wanted to sign a criminal complaint. (Defs. Memo., pp. 5-6 and 12). The problem with this reasoning, again, is that Defendants were not presented with any facts or inferences that Plaintiff made any threatening gestures or did anything to suggest that a battery was imminent. This is precisely the fact pattern of *Kijonka* and its holding that there is no probable cause to arrest

8

a person for assault in the absence of gestures or immediate threats, *Kijonka*, 363 F.3d at

648, fully applies to this matter. Indeed, as another court has ruled:

> Even if police need not establish every element of an offense, they will have probable cause to arrest only if the facts known to the officers at the time would have led to a reasonable belief that the suspect had committed a crime. ***The police cannot simply rely on a victim who reports that he was "threatened" or feared for his safety; before police officers conclude that they have probable cause to arrest a suspect, they must determine whether the words and conduct amounted to an assault and that the victim's fear was reasonable.*** Conclusory assertions that Baker threatened Ghidotti are insufficient.

*Baker v. Ghidotti*, 2014 US Dist. Lexis 41750, * 16 (N.D Ill. 3/28/14) (emphasis added), *rev'd in part on other grounds* by *Baker v. Lindgren*, 856 F.3d 498 (7th Cir. 2017). Since

Defendants did nothing more than rely on William's insufficient allegations, they clearly fail

to show probable cause.

The same holds true for Defendants' claim of qualified immunity. The question here

is whether a reasonable officer could have mistakenly believed that probable cause existed.

*Williams*, 733 F.3d at 758. Again, the officers merely relied upon William's statements,

which lacked any indication that Plaintiff had made any threatening gestures or that any

other factor existed to suggest an imminent threat. As *Kijonka* observed, 363 F.3d at 647, it

has been the law for ***six hundred years*** that assault requires more than just words and no

reasonable officer who heard that the only wrongful activity of a putative defendant was to

say "I'm going to kick your ass" could have a mistaken belief that those words constituted

criminal assault. *People v. Floyd*, 663 N.E.2d at 76.

Defendants reiterate their argument with respect to Officer Long, who they

characterize as merely a supervisor reviewing paperwork. (Defs. Memo at 11). However, a

supervisor can be liable for a Section 1983 violation if the conduct constituting the

constitutional violation occurs at his direction or with his knowledge and consent –

demonstrated by showing that the supervisor facilitated, approved, condoned or turned a

blind eye to the conduct. *Hildebrandt v. Ill. Dep't. of Natural Res.*, 347 F.3d 1014, 1039 (7th

Cir. 2003). Defendants admit that Officer Long reviewed the arrest report prepared by

Officer Felmon and approved probable cause based on the information within it. (See

Defendants' Statement of Facts, ¶ 23). The arrest report, however, only documents a verbal

threat of undescribed action at some unknown point in the future that could not reasonably

be believed to constitute a criminal assault. *Kijonka*, 363 F.3d at 647. Since Long approved,

condoned or turned a blind eye to an arrest based on a patently inadequate claim of

assault, there are genuine issues of fact precluding summary judgment in his favor.

## III. THE EXCESSIVE BAIL IMPOSED FOR PLAINTIFF'S RELEASE ALSO MAKES HIS ARREST UNLAWFUL

Not only was the beginning of Plaintiff's detention unconstitutional, the end of the

detention was unconstitutional for a different reason. The United States Supreme Court

has described the purpose of bail and how the Eighth Amendment of the United States

Constitution can be violated as follows:

> [l]ike the ancient practice of securing the oaths of responsible
> persons to stand as sureties for the accused, the modern
> practice of requiring a bail bond or the deposit of a sum of
> money subject to forfeiture serves as additional assurance of
> the presence of an accused. Bail set at a figure higher than an
> amount reasonably calculated to fulfill this purpose is
> "excessive" under the Eighth Amendment.

*Stack v. Boyle*, 72 S.Ct. 1, 3 (1951). In this case, the Illinois Supreme Court has determined

the amount reasonably necessary to ensure that a defendant accused of assault attends his

or trial, but Officer Felmon prepared an arrest report which set a bail amount that

10

egregiously exceeded the level specified by the Illinois Supreme Court and this report was approved by Officer Long. (See SAF ¶ 21 and Defendants' Statement of Facts, ¶ 23). The Court should conclude that this violation is a separate reason to deny summary judgment in favor of Defendants.

Simple assault is classified as a Class C misdemeanor by the Illinois Criminal Code. 720 ILCS 5/12-1(b). Illinois Supreme Court Rule 528(c) provides that the bail amount for Class C misdemeanors is $120.00. Under Illinois law, bail bonds are based on ten percent (10%) of bail amount, or a minimum of $25.00. 725 ILCS 5/110-7. Thus, it is the judgment of the Illinois Supreme Court that the bail amount necessary to ensure the trial appearance of a defendant accused of misdemeanor assault in Illinois is $120, and the bond amount that needs to be paid is $25.00.

In derogation of the Illinois Supreme Court's calculations, the Arrest Report and subsequent bond form computed the amount of bail for Plaintiff's release at $1,200.00 – an amount **ten times** that set by the Illinois Supreme Court. (SAF ¶¶ 21, 25). Rather than being obligated to pay $25 for Plaintiff's bond, Shirley had to pay $120.00 before Plaintiff was released. (SAF ¶¶ 24, 26). There was no basis for Defendants to impose such a significantly higher bond amount for Plaintiff's release. At very least, the Court should conclude that there is an issue of fact regarding whether Defendants' imposition of a $1,200.00 bail amount was arbitrary and deny summary judgment on that basis.

## IV. THERE ARE GENUINE ISSUES OF FACT ON PLAINTIFF'S CONSPIRACY CLAIM

According to Defendants, summary judgment should enter on Plaintiff's conspiracy claim because he cannot show a deprivation of constitutional rights and the claim allegedly is "nothing more than an assemblage of vague, conclusory allegations bereft of the factual

11

context necessary to survive summary judgment." (Defs. Memo. pp. 9-10). This assertion is completely misplaced, both because Plaintiff has established issues of fact on two separate constitutional violations and because there is ample evidence of a conspiracy. The Court should find that the merits of Plaintiff's conspiracy claim cannot be determined at the summary judgment stage.

To prove a Section 1983 conspiracy claim, a plaintiff must show: (1) individuals reached an agreement to deprive him of a constitutional right and (2) overt acts in furtherance of the conspiracy actually deprived him of those rights. *Beaman*, 776 F.3d at 510. Plaintiff can demonstrate an agreement by showing Defendants understood the objectives of the scheme, accepted them and agreed to do their part to further the scheme. *Spalding v. City of Chicago*, 186 F.Supp.3d 884, 913 (N.D. Ill. 2016). Moreover, so long as it is not speculative, Plaintiff is allowed to use circumstantial evidence to establish a conspiracy. *Beaman*, 776 F.3d at 510.

For the reasons stated above, on February 17, 2014, Plaintiff was clearly deprived of his rights under the Fourth, Eighth and Fourteenth Amendments, and, therefore, Defendants' summary judgment arguments against the conspiracy claim turn solely on whether there are factual disputes about an agreement to deprive Plaintiff of those rights. Contrary to Defendants' position, there are several factual issues in dispute. As is discussed in Plaintiff's Statement of Additional Facts, for years prior to February 17, 2014, Plaintiff, William and William's son John had been involved in many disputes and/or altercations, including a situation when Plaintiff filed a criminal assault claim against John. (See SAF ¶¶ 4-7). Plaintiff's arrest on February 17, 2014 was a type of "payback" by William, in which Defendants willingly participated. Officers Felmon and Devine completely disregarded the

statements of Plaintiff, told his 76-year old mother to "shut up" when she tried to explain the situation and arrested Plaintiff for a statement that would not have been an assault even if it had been stated, in circumstances where William's actions demonstrated that he was not truly afraid of Plaintiff. (SAF ¶¶ 12-15). The officers then placed the decision about whether Plaintiff would be arrested in the hands of William – requiring Plaintiff to make an apology in front of William, Detective McKenna and John's wife and permitting William to judge whether the apology was acceptable and whether Plaintiff would go free or go to jail. (*Id.*) After Plaintiff's arrest, Officer Devine consulted with Detective McKenna and William as he prepared paperwork and Officer Devine later confirmed to Plaintiff's brother that the only reason for Plaintiff's arrest was his failure to make an apology satisfactory to William. (SAF ¶¶ 16, 23). To end Plaintiff's detention, Shirley was compelled to pay a bond that was multiple times more expensive than what is specified by the Illinois Supreme Court. (SAF ¶¶ 24-25). Plaintiff's mobile telephone was returned in a bag labelled "Daniel Dewar." (SAF ¶ 27). Further, although Plaintiff obtained an expungement order for the February 17, 2014 arrest, the arrest is still visible in public records. (SAF ¶¶ 29-30). This pattern of harassment is precisely the type of circumstantial evidence on which a conspiracy finding could be based at trial. See *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012).

## V.  PLAINTIFF HAS A VIABLE MALICIOUS PROSECUTION CLAIM AGAINST DEFENDANTS

The final reason for the Court to deny Defendants' request for summary judgment is that Defendants have not challenged Plaintiff's malicious prosecution claim at all. Plaintiff's evidence for this claim is compelling.

There is no dispute in this case that Plaintiff was charged and prosecuted with criminal assault by Defendants and that the voluntary dismissal of that claim was a disposition in his favor. See *Williams v. City of Chicago*, 733 F.3d at 759. Furthermore, for the reasons discussed above, Defendants lacked any probable cause to prosecute Plaintiff because the allegations against him simply did not satisfy the requirements for a charge of assault under Illinois law. In the context of a malicious prosecution claim, malice can be inferred from a lack of probable cause when there is no other credible evidence which refutes the inference. *Collier v. City of Chicago*, 2015 US Dist. Lexis 113336, **25-26 (N.D. Ill. 8/26/15). Since Defendants offer no evidence of any kind to address malice, the existence of malice is a factual question to be resolved by the trier of fact. *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 274 (Ill.App. 2002). Plaintiff's claim of malicious prosecution should be ruled on at trial.

## CONCLUSION

For all of the foregoing reasons, Plaintiff David Dewar respectfully requests that the Court deny Defendants' Motion for Summary Judgment, that it set this case for trial and that it take such further action as is just and appropriate.

Date: June 28, 2018                     Respectfully submitted,

                                        */s/ David A. Dewar*
                                        David A. Dewar, *pro se*


David A. Dewar, *pro se*
11347 S. Millard Avenue
Chicago, IL 60655

14

## CERTIFICATE OF SERVICE

In accordance with 28 U.S.C. § 1746, I certify under penalties of perjury that I caused a copy of Plaintiff's Response Memorandum in Opposition to Motion for Summary Judgment to be served by mailing the same via first-class mail before 5:00 PM on June 28, 2018 to the following attorney:

> Kelly C. Bauer
> City of Chicago Department of Law
> 30 N. LaSalle Avenue, Suite 900
> Chicago, IL 60602

Executed on June 28, 2018          _/s/ David A. Dewar_
                                    David A. Dewar, *pro se*

15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID A. DEWAR, | ) | |
| | ) | |
| *Pro se* Plaintiff, | ) | Case No. 16 cv 2287 |
| | ) | |
| v. | ) | The Honorable Virginia Kendall |
| | ) | |
| CHICAGO POLICE DEPARTMENT and | ) | Magistrate Judge Jeffrey Cole |
| CHICAGO POLICE OFFICERS T.J. FELMON, | ) | |
| M.K. DEVINE and C.J. LONG, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

Plaintiff David Dewar, *pro se*, for his Response to the Statement of Fact jointly

submitted by Defendants TJ Felmon, MK Devine and CJ Long, pursuant to Local Rule

56.1(b)(3), alleges and states as follows:

### JURISDICTION AND VENUE

1.    Jurisdiction is proper as this action is brought under 42 U.S.C. §§ 1983 to
redress the alleged deprivations under color of law of David Dewar's civil rights. Plaintiff's
Complaint ("Pl. Compl."), ECF No. 1, a copy of which is attached hereto as Exhibit A, at ¶¶ 1-
2; Defendants' Answer, Affirmative and Other Defenses to Plaintiff's Complaint ("Defs.
Ans."), ECF No. 23, a copy of which is attached hereto as Exhibit B, at ¶¶ 1-2.

#### RESPONSE:

Plaintiff admits that this court has jurisdiction over this proceeding.

2.    Venue is proper as the events giving rise to the alleged claims occurred
within the Northern District of Illinois. *Pl. Compl., Ex. A,* ¶ 2; *Defs. Ans., Ex. B,* ¶ 2.

#### RESPONSE:

Plaintiff admits that this court is the proper venue for this matter.

3.    In his Complaint, Plaintiff alleges § 1983 False/Unlawful Arrest against

Defendant Officers Felmon, Devine, and Long (Count I), § 1983 Conspiracy (Count II), Coercion to Obtain False Confession (Count III), and Failure to Provide Plaintiff with Miranda Rights (Count IV). *Pl. Compl., Ex. A.*

**RESPONSE:**

Plaintiff denies that this Paragraph No. 3 fully and accurately summarizes the

allegations of his Complaint. In addition to the matters listed in Paragraph No. 3, Plaintiff's

Complaint also pleads that Defendants acted in derogation of Article V of the City of

Chicago's Rules of Conduct and that Plaintiff was subjected to a malicious prosecution.

## PARTIES

4. On February 17, 2014, David Dewar ("Plaintiff") was a resident of the City of Chicago. *See* Deposition of David Dewar ("Pl. Dep."), a copy of which is attached hereto as Exhibit C, at 7:13-19.

**RESPONSE:**

Plaintiff admits the allegations of Paragraph 4.

5. Timothy Felmon ("Officer Felmon") is employed by the City of Chicago as a police officer. *Pl. Compl., Ex. A,* ¶ 4; *Defs. Ans.,* Ex. B, ¶ 4; *See also* Affidavit of Defendant Timothy Felmon ("Felmon Aff."), a copy of which is attached hereto as Exhibit D, at ¶ 1. On February 17, 2014, Officer Felmon was working as a patrol officer assigned to the 22nd District. *Felmon Aff.,* Ex. D, at ¶ 1.

**RESPONSE:**

Upon information and belief, Plaintiff admits the allegations of Paragraph 5.

6. Michael Devine ("Officer Devine") is employed by the City of Chicago as a police officer. *Pl. Compl., Ex. A,* ¶ 4; *Defs. Ans.,* Ex. B, ¶ 4; *See also* Affidavit of Defendant Michael Devine ("Rodriguez Aff."), a copy of which is attached hereto as Exhibit E, at ¶ 1. On February 17, 2014, Officer Devine was working as a patrol officer assigned to the 22nd District. *Devine Aff.,* Ex. E, at ¶ 1.

**RESPONSE:**

Upon information and belief, Plaintiff admits the allegations of Paragraph 6.

2

## PLAINTIFF'S ARREST

8.    Officers Felmon and Devine were partnered together on February 17, 2014. *Felmon Aff., Ex. D*, at ¶ 1; *Devine Aff., Ex. E*, at ¶ 1.

### RESPONSE:

Plaintiff lacks knowledge sufficient to form a belief about the truth of the allegations

made in Paragraph 8.

9.    On February 17, 2014, Officers Felmon and Devine were in uniform and on patrol in a marked Chicago Police vehicle. *Felmon Aff., Ex. D*, at ¶¶ 1-2; *Devine Aff., Ex. E*, at ¶¶ 1-2.

### RESPONSE:

Plaintiff admits only that at the time of the incident, Defendants Felmon and Devine

were in uniform and drove a marked Chicago Police Department vehicle. Plaintiff lacks

knowledge sufficient to form a belief about the truth of the remaining allegations made in

Paragraph 9.

10.    On February 17, 2014, Officers Felmon and Devine responded to a call for police assistance regarding an individual who had been assaulted for snow-blowing snow off of his son's driveway at 11343 S. Millard Ave., Chicago, Illinois 60655. *Pl. Dep., Ex. C*, at 53:15-18, 63:5-7; *Felmon Aff., Ex. D*, at ¶ 2; *Devine Aff., Ex. E*, at ¶ 2.

### RESPONSE:

Plaintiff admits only that Defendants Felmon and Devine were the officers who

3

appeared at his home at 11347 S. Millard Avenue, Chicago, Illinois 60655 (the "Residence")

and that, upon information and belief, William Hosty ("William") is the father of John Hosty,

who resides at 11343 S. Millard Avenue, Chicago. Plaintiff denies that he assaulted William.

[Affidavit of David Dewar ("Pl. Aff."), attached to Response as Exhibit 1, ¶ 12].

11.     Once at 11343 S. Millard Ave., Chicago, Illinois 60655, Defendant Officers first
spoke to the victim, Mr. Hosty, outside of his son's home and then the offender, Plaintiff
David Dewar, outside of his and his mother's home. *Felmon Aff., Ex. D*, at ¶¶ 4, 6; *Devine Aff.,
Ex. E*, at ¶¶ 4,6.

### RESPONSE:

Plaintiff admits that he spoke to Defendants Felmon and Devine outside the

Residence. Plaintiff lacks knowledge sufficient to form a belief about the truth of the

remaining allegations made in Paragraph 11.

12.     As Officers Felmon and Devine exited the vehicle, they heard and saw
Plaintiff's mother, Shirley Dewar, screaming unintelligibly from behind the screen to her
front door. *Felmon Aff., Ex. D*, at ¶ 3; *Devine Aff., Ex. E*, at ¶ 3.

### RESPONSE:

Plaintiff denies the allegations of Paragraph 12. Before Defendants Felmon and

Devine spoke to Plaintiff, Shirley Dewar was inside the house with Plaintiff and was not

screaming or talking unintelligibly. [Pl. Aff. ¶¶ 14-15; Affidavit of Shirley Dewar ("Shirley

Aff."), attached to Response as Ex. 2, ¶¶ 15-16].

13.     Mr. Hosty communicated that there had been a verbal altercation between
Plaintiff and Mr. Hosty in regards to Mr. Hosty snow blowing the snow off of his son's
driveway. *Felmon Aff., Ex. D*, at ¶ 4; *Devine Aff., Ex. E*, at ¶ 4.

### RESPONSE:

With the presumption that Defendants are referring to a discussion they had with

4

7.     Charles Long ("Sergeant Long") was employed by the City of Chicago as a sergeant. *Pl. Compl., Ex. A,* ¶ 4; *Defs. Ans.,* Ex. B, ¶ 4; *See also* Affidavit of former Sergeant Charles Long ("Long Aff."), a copy of which is attached hereto as Exhibit F, at ¶ 1. On February 17, 2014, Sergeant Long was assigned to the 22nd District. *Long Aff.,* Ex. F, at ¶ 1.

**RESPONSE:**

William before speaking with Plaintiff, Plaintiff lacks knowledge sufficient to form a belief

about the truth of the allegations made in Paragraph 13.

14.     Plaintiff complained that the snow was being blown onto the windows of the
property next door, which is Plaintiff's mother's property and where Plaintiff also lives.
*Felmon Aff., Ex. D*, at ¶¶ 6-7; *Devine Aff., Ex. E*, at ¶¶ 6-7.

### RESPONSE:

Plaintiff admits the allegations of Paragraph No. 14.

15.     During this time, Plaintiff's mother, Shirley Dewar, was still hysterically and
unintelligibly yelling from the steps leading up to her front door. *See Pl. Dep., Ex. C*, at
77:1120; *Felmon Aff., Ex. D*, at ¶ 8; *Devine Aff., Ex. E*, at ¶ 8, *See* Deposition of William Hosty
("Hosty Dep."), a copy of which is attached hereto as Exhibit H, at 26:14-16.

### RESPONSE:

Plaintiff denies the allegations of Paragraph 15.   (See Pl. Aff. ¶ 15; Shirley Aff. ¶ 16).

16.     Officers Felmon and Devine investigated the windows and did not see any
snow on the window screen, window ledge, or any disturbed snow at the base of house
under the windows. *Felmon Aff., Ex. D*, at ¶ 9; *Devine Aff., Ex. E*, at ¶ 9.

### RESPONSE:

Plaintiff denies the allegations of Paragraph 16.   (See Pl. Aff. ¶ 16; Shirley Aff. ¶ 17).

17.     Mr. Hosty reported to Officers Felmon and Devine that during the verbal
altercation Plaintiff had assaulted him by stating something to the effect of, "I am going to
kick your ass." *Pl. Dep., Ex. C*, at 93:2-10; *Felmon Aff., Ex. D*, at ¶ 4; *Devine Aff., Ex. E*, at ¶ 4.

### RESPONSE:

Plaintiff admits that during the discussion that he had with William and Defendants

Felmon and Devine, William made this false assertion. To the extent that this allegation is

referring to a discussion outside of Plaintiff's presence, he lacks knowledge sufficient to

form a belief about the truth of the allegation. Plaintiff denies that he ever told William that

5

he was "going to kick your ass." Answering further, for the reasons stated in his Response

Memorandum, even if Plaintiff had made such a statement, it would not constitute assault

under Illinois law. (See Pl. Aff. ¶ 12; Shirley Aff. ¶ 13).

18.     Mr. Hosty was coherent, did not appear intoxicated, did not smell of alcohol, was not slurring his words and provided consistent statements throughout the course of Officer Felmon and Devine's investigation into the dispute. *Felmon Aff., Ex. D*, at ¶ 5; *Devine Aff., Ex. E*, at ¶ 5.

### RESPONSE:

To the extent that this allegation is referring to perceptions formed outside

discussion outside of Plaintiff's presence Plaintiff lacks knowledge sufficient to form a

belief about the truth of the allegations made in Paragraph 18.   Plaintiff admits that

William did not appear to be intoxicated during the discussion that he had with William

and Defendants Felmon and Devine.

19.     Mr. Hosty informed the officers that he wanted to sign and did sign a criminal complaint that evening of his own free will stating that Plaintiff had assaulted him. *Felmon Aff., Ex. D*, at ¶ 10; *Devine Aff., Ex. E*, at ¶ 10; Misdemeanor Complaint, *William Hosty v. David Dewar*, No. 14-194709 ("Mis. Comp."), a copy of which is attached hereto as Exhibit G; *Hosty Dep., Exhibit H*, at 21:11-17, 29:14-17, 30:20-31:20, 58:1-8.

### RESPONSE:

Plaintiff admits that Exhibit G is the misdemeanor complaint filed against him.  Upon

information and belief, Plaintiff admits the remainder of Paragraph 19, except he denies

that he assaulted William.  (See Pl. Aff. ¶ 12; Shirley Aff. ¶ 13).

20.     At approximately 7:00 p.m., Officers Devine and Felmon arrested Plaintiff, who was handcuffed without any resistance. *Pl. Dep., Ex. C*, at 101:11-24, 102:18-23; *Felmon Aff., Ex. D*, at ¶ 11; *Devine Aff., Ex. E*, at ¶ 11.

**RESPONSE:**

Plaintiff admits the allegations of Paragraph 20.

21.    Plaintiff testified that he was not read his Miranda rights. *Pl. Dep., Ex. C,* at 102:24-103:1.

**RESPONSE:**

Plaintiff admits the allegations of Paragraph 21.

21 (sic).  Plaintiff was transported to the 22nd district for processing. *See Pl. Dep., Ex. C,* at 121:19-21; *Felmon Aff., Ex. D,* at ¶ 12; *Devine Aff., Ex. E,* at ¶ 12.

**RESPONSE:**

Plaintiff admits the allegations of the second Paragraph 21.

## PLAINTIFF IS TAKEN TO THE CHICAGO POLICE STATION

22.    Officer Felmon prepared the "Arrest Report." *Felmon Aff., Ex. D,* at ¶ 13; *Devine Aff., Ex. E,* at ¶ 13; *see also* February 17, 2014 Arrest Report of David Dewar ("Arrest Report"), a copy of which is attached hereto as Exhibit I.

**RESPONSE:**

Plaintiff lacks knowledge sufficient to form a belief about the truth of the allegations

made in Paragraph 22.

23.    Sergeant Long reviewed the "Arrest Report" and approved probable cause of the arrest based on the information communicated to him by Officer Devine. *Long Aff.,* Ex. F, at ¶ 2; *Felmon Aff., Ex. D,* at ¶ 14; *Devine Aff., Ex. E,* at ¶ 13; *see also Arrest Report, Ex. I.*

**RESPONSE:**

Plaintiff lacks knowledge sufficient to form a belief about the truth of the allegations

made in Paragraph 23.

24. Sergeant Long relied upon the statements made in the incident narrative of the Arrest Report, including that a complaint had been signed for Plaintiff's arrest, as true and accurate statements as attested to by his fellow law enforcement Officer Devine. *Long Aff.*, Ex. F, at ¶ 3; *Felmon Aff., Ex. D*, at ¶ 14; *Devine Aff., Ex. E*, at ¶ 13 *see also Arrest Report, Ex. I.*

**RESPONSE:**

Plaintiff lacks knowledge sufficient to form a belief about the truth of the allegations

made in Paragraph 24.

25. Sergeant Long neither responded to the call for police assistance at 11343 South Millard Avenue, Chicago, Illinois 60655, nor assisted in the arrest of Plaintiff David Dewar. *See Pl. Dep., Ex. C*, at 53:15-18; *Long Aff.*, Ex. F, at ¶ 7; *Felmon Aff., Ex. D*, at ¶ 21; *Devine Aff., Ex. E*, at ¶ 20.

**RESPONSE:**

Upon information and belief, Plaintiff admits Paragraph 25.

26. At no point did Officers Devine and Felmon or Sergeant Long coerce Plaintiff into providing a false confession on February 17, 2014. *Felmon Aff., Ex. D*, at ¶ 15; *Devine Aff., Ex. E*, at ¶ 15; *Long Aff.*, Ex. F, at ¶ 8.

**RESPONSE:**

Plaintiff admits that he did not make a false confession on February 17, 2014, but

Defendants Felmon and Devine did use coercive tactics upon him. (Pl. Aff. ¶¶ 17-19;

Shirley Aff. ¶¶ 18-20).

27. At no point did Plaintiff provide a confession on February 17, 2014. *Pl. Dep., Ex. C*, at 95:20-96:2, 97:4-9, 97:23-98:1-9, 101:4-10; *Felmon Aff., Ex. D*, at ¶ 16; *Devine Aff., Ex. E*, at ¶ 15; *Long Aff.*, Ex. F, at ¶ 9.

**RESPONSE:**

Plaintiff admits the allegations of Paragraph 27.

28. Plaintiff was released at approximately 11:10 p.m. on February 17, 2014. *Pl.*

*Dep., Ex. C*, at 131:20-23; *Felmon Aff., Ex. D*, at ¶ 20; *Devine Aff., Ex. E*, at ¶ 19; *see also Arrest Report, Ex. I*; *see also* February 17, 2014 Bail Agreement for David Dewar ("Bail Agreement"), a copy of which is attached hereto as Exhibit J.

**RESPONSE:**

Plaintiff admits the allegations of Paragraph 28.

29.     Officers Felmon, Devine and Sergeant Long did not personally label an evidence bag, or provide Plaintiff with an evidence bag upon his release. *Pl. Dep., Ex. C*, at 132:3-19; *Felmon Aff., Ex. D*, at ¶ 18; *Devine Aff., Ex. E*, at ¶ 17; *Long Aff.*, at ¶ 5.

**RESPONSE:**

Plaintiff admits that he did not receive the evidence bag from Defendants Felmon,

Devine or Long. Plaintiff lacks knowledge sufficient to form a belief about the truth of the

remaining allegations made in Paragraph 29.

30.     Officers Felmon, Devine and Sergeant Long did not delete any record of a phone call made to 9-1-1 on Plaintiff David Dewar's phone. *See Pl. Dep., Ex. C*, at 136:9-18, 138:3-12; *Felmon Aff., Ex. D*, at ¶ 19; *Devine Aff., Ex. E*, at ¶ 18; *Long Aff.*, Ex. F, at ¶ 6.

**RESPONSE:**

Plaintiff lacks knowledge sufficient to form a belief about the truth of the allegations

made in Paragraph 30. Answering further, Plaintiff did make a telephone call to 911

regarding his dispute with William prior to the arrival of Defendants Felmon and Devine.

This telephone call did not appear on Plaintiff's records from T-Mobile, even though other

911 calls have appeared on his records. (Plaintiff Aff. ¶ 13).

31.     Plaintiff was charged with assault. *Pl. Dep., Ex. C*, at 147:3-7; *Felmon Aff., Ex. D*, at ¶ 10; *Devine Aff., Ex. E*, at ¶ 10; *See Long Aff.*, Ex. F, at ¶ 4; *Misdemeanor Complaint, Ex. G; Arrest Report, Ex. I*.

**RESPONSE:**

Plaintiff admits the allegations of Paragraph 31. Answering further, the specific

9

category of assault was Assault – Simple as defined by 720 ILCS 5/12-1A.

## CRIMINAL PROCEEDINGS

32.     On March 25, 2014, the victim, Mr. Hosty, dropped the assault charges he had filed against Plaintiff David Dewar. *Pl. Dep., Ex. C*, at 140:5-15, 141:24-143:7; *See* Transcript from March 25, 2014, *People of the State of Illinois v. David Dewar*, Case No. 14 MCI 1947093 ("Mar. 25, 2014 Trans."), a copy of which is attached hereto as Exhibit K.

### RESPONSE:

Plaintiff admits the allegations of Paragraph 32.

33.     On March 25, 2014, Judge Joseph Sconza granted the Assistant State's Attorney's motion to strike with leave to reinstate Plaintiff's criminal case. *Pl. Dep., Ex. C*, at 140:5-15, 141:24-143:7; *Mar. 25, 2014 Trans., Ex. K*.

### RESPONSE:

Plaintiff admits the allegations of Paragraph 33.

34.     At some point in time after March 25, 2014 and before May 19, 2015, Plaintiff filed a motion to expunge and impound all of Plaintiff's February 17, 2014 arrest and underlying criminal case. *See* Plaintiff's Interrogatory Responses ("Pl. Interrogatory Resp."), a copy of which is attached hereto as Exhibit M.

### RESPONSE:

Plaintiff admits the allegations of Paragraph 34.

35.     On May 19, 2015, Judge Paul Biebel, Jr. granted Plaintiff David Dewar's motion to expunge and impound all record of Plaintiff's February 17, 2014 arrest and underlying criminal case. *See* Pl. Interrogatory Resp.; *see also* May 19, 2015 Order, *People of the State of Illinois v. David Dewar*, Case No. 14 MCI 1947093 ("May 19, 2015 Ord."), a copy of which is attached hereto as Exhibit L.

### RESPONSE:

Plaintiff admits the allegations of Paragraph 35.

10

Date: June 28, 2018

Respectfully submitted,

*/s/ David A. Dewar*
David A. Dewar, *pro se*

David A. Dewar, *pro se*
11347 S. Millard Avenue
Chicago, IL 60655

11

## CERTIFICATE OF SERVICE

In accordance with 28 U.S.C. § 1746, I certify under penalties of perjury that I caused a copy of Plaintiff's Response to Statement of Fact to be served by mailing the same via first-class mail before 5:00 PM on June 28, 2018 to the following attorney:

Kelly C. Bauer
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

Executed on June 28, 2018                    */s/ David A. Dewar*
                                             David A. Dewar, pro se

12

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID A. DEWAR, ) | |
| ) | |
| *Pro se* Plaintiff, ) | Case No. 16 cv 2287 |
| ) | |
| v. ) | The Honorable Virginia Kendall |
| ) | |
| CHICAGO POLICE DEPARTMENT and ) | Magistrate Judge Jeffrey Cole |
| CHICAGO POLICE OFFICERS T.J. FELMON, ) | |
| M.K. DEVINE and C.J. LONG, ) | |
| ) | |
| Defendants. ) | |

### PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

Plaintiff David Dewar, *pro se*, for his Statement of Additional Facts, pursuant to Local Rule 56.1(b)(3)(C), alleges and states as follows:

1. Except for short breaks, Plaintiff has resided at 11347 S. Millard Avenue, Chicago, Illinois, 60655 (the "Property") since 1984. During this time period, Plaintiff's mother, Shirley Dewar ("Shirley"), who was seventy-six years of age on February 17, 2014, has also lived at the Property. [Affidavit of David Dewar ("Plaintiff Aff."), attached to Response as Exhibit 1, ¶ 3; Affidavit of Shirley Dewar ("Shirley Aff."), attached to Response as Exhibit 2, ¶¶ 1-3].

2. Since approximately 2000, the house immediately to the north of the Property, at 11343 S. Millard Avenue, has been owned by John Hosty ("John"), the son of William Hosty ("William"). The driveway for 11343 S. Millard Avenue is adjacent to the property line of the Property. (Plaintiff Aff. ¶ 4; Shirley Aff. ¶ 4).

3. William and Chicago Police Department Scott McKenna ("McKenna") live on the same block of Millard Avenue as Plaintiff, Shirley and John. William and McKenna know

one another and, on information and belief, are friends. William also has campaigned for local elected officials, including the alderman and state representative for the neighborhood. (Plaintiff Aff. ¶ 5; Shirley Aff. ¶ 5).

4.     In the years that John has lived next to the Property, he has repeatedly caused problems for Plaintiff and Shirley. On different occasions in 2009 and 2010, Plaintiff and Shirley were forced to call the Chicago Police Department when John and his friends became intoxicated and kept yelling and screaming at 2:00 and 3:00 in the morning. (Plaintiff Aff. ¶ 6; Shirley Aff. ¶ 6).

5.     In November 2010, after John's children had repeatedly ran across the front yard of the Property, Shirley asked them to stop. In response, John pounded on the front door and screamed that Shirley should not speak to his children. After hearing about the incident, Plaintiff asked John to talk. Rather than doing so, John, appearing intoxicated and slurring his speech, attempted to start a fistfight with Plaintiff, saying "You're nothing but a pussy" and "I ought to kick your butt." Ultimately, William, who was present during this altercation, interceded with his son and Plaintiff left to go grocery shopping. However, when Plaintiff returned, John again approached and pounded his fists on Plaintiff's car. Plaintiff tried to talk calmly to John, but John remained belligerent and threatening. Plaintiff filed an assault complaint against John with the Chicago Police Department as a result of this incident, but he chose not to proceed with the complaint. (Plaintiff Aff. ¶¶ 7-8; Shirley Aff. ¶¶ ).

6.     In 2011, John obtained cable television service from Wide Open West (WOW) and the cable was placed so that it encroached onto the Property. Plaintiff and Shirley initially asked WOW to move the cable, or to have John do so, but nothing happened.

2

Plaintiff and Shirley were forced to sue John and obtained a judgment compelling him to move the wire to his own property. (Plaintiff Aff. ¶ 9; Shirley Aff. ¶ 9).

7.      Since 2011, Plaintiff and Shirley also had difficulties with William. Whenever it snowed, William would habitually use a snowblower to clean John's driveway. In doing so, William would blow the snow onto different parts of the Property. The excess snow has occasionally melted and leaked into the house. In 2012, Shirley asked William to not deposit snow onto the Property. In response, William said he was fed up with her, cursed and walked away. (Plaintiff Aff. ¶ 10; Shirley Aff. ¶¶ 10-11).

8.      February 17, 2014 was a very snowy day and, in the evening, Shirley observed William again operating his snow blower so that the snow he was removing was being deposited onto the Property. Shirley asked William to stop doing so. In response, William said "I'm sick of you people," turned away and returned to his snow blower. (Shirley Aff. ¶ 12).

9.      Shirley then asked Plaintiff to talk to William. Plaintiff approached to approximately a dozen feet away from William and requested that he stop blowing snow onto the Property. In response, William asked whether Plaintiff was recording him. When Plaintiff answered that he was not, William suddenly claimed that Plaintiff had threatened to "kick your ass" and called to his daughter-in-law, who was standing in the doorway of 11343 S. Millard Avenue to call the police. Plaintiff had not made that statement. William immediately resumed plowing snow, doing so for another ten minutes before the police arrived. [Shirley Aff. ¶¶ 13-14; Plaintiff Aff. ¶ 12; Deposition Transcript of William Hosty ("William Tr."), attached to Response as Exhibit 3, p. 14, ln. 10 – p. 15, ln. 14 and p. 68, ln. 9 – p. 69, ln. 4].

10.    After Plaintiff became aware that William's daughter-in-law had telephoned the Chicago Police Department regarding the false threat, he also placed a call to the department, first calling a non-emergency number for the 22nd District local police station and then, after being told that he needed to call 911, telephoning 911. Plaintiff explained that after he had asked William to stop blowing snow onto the Property, William had falsely accused him of threatening to "kick your ass." The 911 dispatcher responded that he would dispatch a police car to the scene. (Plaintiff Aff. ¶ 13; Transcript of 911 call, attached hereto as Exhibit 4).

11.    After making the 911 call, Plaintiff went to change his clothes. Neither Plaintiff nor Shirley were outside or on the porch when Officers Felmon and Devine arrived. (Shirley Aff. ¶ 15; Plaintiff Aff. ¶ 14).

12.    Plaintiff and Shirley were alerted to the arrival of the Chicago Police when Officers Felmon and Devine loudly banged on the front door of their house. Although Shirley was upset about what had happened, she was coherent and explained that William's accusation that Plaintiff had threatened him was a lie. Officer Felmon told Shirley to "shut up" and go inside the house. Plaintiff calmed down Shirley and then provided his statement explaining that he had not threatened William in any fashion. Neither Officer Felmon or Devine examined the areas where William had been blowing snow and they did not address Plaintiff's 911 call at all. (Shirley Aff. ¶¶ 16-17; Plaintiff Aff. ¶¶ 15-16; Hosty Tr. p. 17, lns. 2-16).

13.    Officers Felmon and Devine then directed Plaintiff to talk to William and resolve the matter. The officers, Plaintiff and Shirley walked next door, where William, his daughter-in-law and McKenna were waiting. William again claimed that Plaintiff had

4

threatened to "kick your ass" and Officer Felmon, without asking about Plaintiff's version of the dispute, told Plaintiff that he needed to apologize. (Shirley Aff. ¶ 18; Plaintiff Aff. ¶ 17).

14. In response, Plaintiff twice apologized, stating that he was sorry that the officers had been required to come out and that he and William had not been able to resolve their differences. William stated that neither apology was adequate and Officer Felmon told Plaintiff that he needed to make an acceptable apology or be arrested. (Shirley Aff. ¶¶ 18-19; Plaintiff Aff. ¶18; Hosty Tr. p. 21, lns. 2-21; p. 24, ln. 19 – p. 25, ln. 8).

15. Plaintiff again apologized, but William stated that he did not accept the apology. Officer Felmon then stated that Plaintiff was under arrest, handcuffed him and placed him in the police car. Plaintiff was not given a Miranda warning at any time. (Shirley Aff. ¶ 20; Plaintiff Aff. ¶ 19; Hosty Tr. p. 21, lns. 2-21; p. 24, ln. 19 – p. 25, ln. 8).

16. After Plaintiff was arrested, Officer Felmon remained in the police car with him. Officer Devine spent about ten minutes outside the car preparing paperwork, during which time he spoke to William and McKenna. Officers Felmon and Devine then drove Plaintiff to the 22nd District police station for booking. The police took Plaintiff's property, photographed and fingerprinted him and placed him in a holding cell for several hours. (Shirley Aff. ¶ 21; Plaintiff Aff. ¶¶ 20-21).

17. William's criminal complaint against Plaintiff provides as follows:

> William Hosty, complainant, now appears before the Circuit Court of Cook County and states that David Dewar has, on or about 17 Feb 14 committed the offense of Assault Simple in that he/she without lawful authority, knowingly threatened William Hosty by telling him that he is going to give him an ass kicking placing William Hosty in reasonable apprehension of receiving a battery in violation of 720 ILCS 5.0/12-1A.

5

(Hosty Tr. p. 30, ln. 9 – p. 31, ln. 9; Criminal Complaint, attached as Exhibit 5.)

18.     Under Illinois law, simple assault is classified as a Class C misdemeanor. 720 ILCS 5/12-1(b).

19.     According to Defendants, Officer Felmon prepared the Arrest Report attached to the Motion for Summary Judgment as Exhibit I. (Affidavit of T.J. Felmon, attached to Motion for Summary Judgment as Exhibit D, ¶ 13; Affidavit of M.K. Devine, attached to Motion for Summary Judgment as Exhibit E, ¶ 13; see also Arrest Report, attached hereto as Exhibit 6).

20.     According to the Arrest Report, probable cause to arrest Plaintiff and to substantiate William's complaint against Plaintiff was based on the following allegations:

> Event # 11677 – In Summary – This is an arrest by Beat 2211.
> The above subject was placed into custody on signed
> complaints in that, during a verbal altercation with the victim
> (William Hosty), David Dewar stated that he was going to "Give
> him as Ass Kicking" which placed victim in fear recieving (sic) a
> battery. R/OS placed subject into custody. Read Miranda.
> Transported to 022 District for processing. Name Check clear
> with no warrants or two degrees of seperation (sic). Court KE
> IS C. No inventories. No gang affiliation. No GIP or TRAPP.
> Clear Leads.

(See Exhibit 6).

21.     The Arrest Report further states that Plaintiff's Bond was "10% of Bond Paid" in the amount of $1,200.00. (*Id.*)

22.     After Plaintiff's arrest, Shirley called another of her sons, Daniel Dewar ("Daniel"), to help her get Plaintiff out of jail. Daniel is a retired police officer who worked for suburban police departments. [Shirley Aff. ¶ 21; Affidavit of Daniel Dewar ("Daniel Aff."), attached as Exhibit 7, ¶¶ 2-3].

6

23.     As Daniel drove to the Property, he telephoned the Chicago Police Department and spoke to a person who identified himself as Officer Devine. Officer Devine stated that David had been arrested after an alleged threat to a neighbor and was being held at the station. Devine further stated that the arrest could have been avoided if David had apologized. (Daniel Aff. ¶ 4).

24.     After a few hours, the police notified Shirley and Daniel that David could be picked up. When they arrived, Shirley was notified that she had to pay $120.00 for a bond to ensure that David would appear at the criminal trial for the alleged assault. Shirley paid the money for the bond. (Shirley Aff. ¶ 22; Daniel Aff. ¶ 5).

25.     The bond form presented to Shirley purports to be setting bail based on the Rules of the Illinois Supreme Court. The bail amount listed on the bond form is **one thousand, two hundred dollars ($1,200)** and the bond (deposit) amount is listed as $120.00. (Shirley Aff. ¶ 23; Bond Form No. D8333971, attached as Exhibit 8).

26.     The Illinois Supreme Court Rules provide that the bail amount for Class C misdemeanors is **$120.00**. Under Illinois law, bail bonds are based on ten percent (10%) of bail amount, or a minimum of $25.00. (Ill. Sup.Ct. R. 528(c); 725 ILCS 5/110-7).

27.     Plaintiff was released from custody at approximately 11:00 PM on February 17, 2014. When the police returned Plaintiff's property, his mobile telephone was inexplicably inside a bag labeled "Daniel Dewar." (Plaintiff Aff. ¶ 22; Daniel Aff. ¶ 7).

28.     Plaintiff was required to hire an attorney to defend him in the misdemeanor proceeding filed by William. However, on March 25, 2014, William notified the criminal court that he did not wish to pursue the matter and the case was dismissed (Plaintiff Aff. ¶ 23).

29.     A few months after the dismissal of the criminal complaint, Plaintiff petitioned for an expungement of the criminal record of the February 17, 2014 arrest. The Chicago Police Department and Chicago Corporation Counsel received notice of Plaintiff's petition. On May 19, 2015, Plaintiff's petition was granted. (Plaintiff Aff. ¶ 24, May 19, 2015 Order, attached hereto as Exhibit 9).

30.     Although the May 19, 2015 Order directed the Chicago Police Department to expunge the arrest from its records, information about the arrest remains visible on the public-record.com internet website. (Plaintiff Aff. ¶ 25; June 21, 2018 Report obtained from public-record.com website, attached as Exhibit 10).

Date: June 28, 2018                                    Respectfully submitted,

                                                        /s/ David A. Dewar
                                                        David A. Dewar, *pro se*

David A. Dewar, *pro se*
11347 S. Millard Avenue
Chicago, IL 60655

8

## CERTIFICATE OF SERVICE

In accordance with 28 U.S.C. § 1746, I certify under penalties of perjury that I caused a copy of Plaintiff's Statement of Additional Fact to be served by mailing the same via first-class mail before 5:00 PM on June 28, 2018 to the following attorney:

Kelly C. Bauer
City of Chicago Department of Law
30 N. LaSalle Avenue, Suite 900
Chicago, IL 60602

Executed on June 28, 2018                    /s/ David A. Dewar
                                             David A. Dewar, pro se

9

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DAVID A. DEWAR,             )

            )

       *Pro se* Plaintiff,   )    Case No. 16 cv 2287

            )

   v.              )    The Honorable Virginia Kendall

            )

CHICAGO POLICE DEPARTMENT and  )    Magistrate Judge Jeffrey Cole

CHICAGO POLICE OFFICERS T.J. FELMON, )

M.K. DEVINE and C.J. LONG,     )

            )

     Defendants.     )

### AFFIDAVIT OF DAVID DEWAR

David Dewar, after duly being placed under oath, deposes, and states that if called as a witness in this matter, he would testify to the following based on his own personal knowledge:

    1.    I am over 18 years of age and am competent to testify to the following matters.

    2.    I am the plaintiff in the above-captioned matter.

    3.    Since 1984, I have continuously lived at 11347 S. Millard Avenue, Chicago, Illinois 60655 (the "Property") except for short periods of time. My mother, Shirley Dewar, is the Property's owner and has also resided at the Property during this time period.

    4.    The house to the immediate north of the Property, located at 11343 S. Millard Avenue (the "Hosty house"), has been owned by John Hosty ("John") since approximately 2000. The driveway leading to the Hosty house is located right next to the property line separating that residence and the Property.

5.    John's father, William Hosty ("William") is also a resident on the same block of Millard Avenue as John, Shirley and me. William has been involved in several political campaigns for the neighborhood's alderman and state representative. From my observations over several years, William is friends with Detective Scott McKenna, a Chicago Police Department employee, who also lives on the same block of Millard Avenue.

6.    For several years, John has been a very difficult neighbor. On different occasions in 2009 and 2010, John and his friends became intoxicated and began yelling and screaming from the back yard or garage of the Hosty house at 2:00 and 3:00 in the morning. Either Shirley or I were forced to call the Chicago Police Department to stop the racket and be able to get back to sleep.

7.    One day in November 2010, I returned to the Property after work. Shirley told me that John's children had been running across the Property and she told them to stop doing so. Shortly afterwards, John banged on the front door and yelled at Shirley, screaming that she should not speak to his children. I went to the Hosty house and spoke to John. John slurred his speech and, from his demeanor, appeared to be intoxicated. Although I tried to remain calm, John tried to begin a fistfight and yelled at me "You're nothing but a pussy" and "I ought to kick your butt." During this part of the altercation, William was present at the Hosty house and he successfully convinced John to calm down. I left the Hosty house and went grocery shopping.

8.    When I returned from the grocery store, Shirley told me that while I was gone, John's children had thrown objects at her bedroom window. I told the children to stop. When I turned away, I heard a loud bang. John was pounding his fists on my car. I tried to calm John, but he was very hostile, threatening and wanted to fight. Eventually,

2

John's wife pulled him away. Because I was genuinely fearful due to this incident, I filed an assault complaint with the Chicago Police Department. However, as time passed, I elected not to pursue the complaint.

9.     In 2011, John began receiving cable television service from Wide Open West (WOW). The cable wire was installed in a way that it encroached into the Property. Shirley and I asked WOW to move the wire onto John's property or have John move the wire, but they took no action. After waiting several months, we were required to sue John to remove the wire and eventually procured a judgment compelling the move.

10.     Both Shirley and I have also had multiple disputes with William. William used his snowblower to clear the driveway of the Hosty house whenever we had a substantial snowfall, but every time he did so, he directed the snow being scooped up onto the Property. As this has happened over the years, the melting snow has periodically leaked into our house. We have periodically asked William not to do this, but he never has listened to our requests.

11.     On February 17, 2014, about 15 inches of snow fell on Millard Avenue. In the evening, I was removing snow from my car and Shirley was shoveling the walk and driveway. I observed William come down the block and start removing snow from the driveway of the Hosty house with his snowblower. Once again, William began depositing the snow onto the Property. Shirley went over to talk to William and returned a few minutes later. She told me that when she asked William to stop placing the snow on the Property, he had answered "I'm sick of you people," turned the snowblower back on and continued directing snow onto the Property.

12. Shirley asked me to talk to William and I did so. I called out to William when I was about 12 feet away. William turned and asked whether I was recording him. When I said that I was not, William yelled that I had threatened him by saying "I'll kick your ass" and told his daughter-in-law (John's wife) to call the police. This shocked me because I had not made that comment, or any similar comment, to William.

13. Since these circumstances led me to believe that William was trying to set me up, I also telephoned the Chicago Police Department to notify the police about the falsity of William's claims against me. I first telephoned the local 22nd District police station but was told that I needed to call 911. I then did so. The document attached to the Response to Motion for Summary Judgment as Exhibit 4 is a true and accurate transcription of the telephone call that I placed to 911 at approximately 6:27 PM on February 17, 2014. Even though other 911 calls have appeared on the T-Mobile invoices that are sent the month after calls are placed, this 911 call was conspicuously absent from my T-Mobile invoice that I received in March 2014.

14. Because I was cold and my clothes were wet from shoveling, I went back inside after calling 911 to change my clothes. I did not see Officers Felmon or Devine when they arrived.

15. Around 6:40 or 6:45 PM on February 17, 2014, I heard a loud bang on the front door. When I answered the door, I was accosted by Officers Felmon and Devine, who wanted to talk to Shirley and me about what had happened. I helped my mother down the steps outside the front door so that she could talk first. Shirley was scared and upset, but she was fully coherent. She told Officers Felmon and Devine that William's claims that I

4

had threatened him were false. In response, Officer Felmon told Shirley to "shut up" and to go into the house.

16.    I calmed my mother and she remained outside. I then talked to the officers about what had occurred, pointed to the locations where the snow had been placed and emphasized that I had not threatened William at all. Neither officer examined the side or back of the house when I pointed, and during the entire time that I was with the officers, I never observed them go to the side or back of the house.

17.    Officer Felmon told me that I needed to resolve the dispute and had to go to the Hosty house. The officers and Shirley walked with me, and I saw William, John's wife and Detective McKenna waiting in the driveway of the Hosty house. Officers Felmon and Devine allowed William to speak first and he again repeated his false claim against me. Officer Felmon then said I needed to apologize to William – without waiting for me to give my side of the story.

18.    I apologized by saying that I was sorry that it had been necessary for the police to come out and that William and I had not been able to resolve our differences by ourselves. William stated that my apology was not good enough. I apologized another time and this also was rejected by William. Officer Felmon then said that I had to provide an apology that satisfied William or that I would be arrested.

19.    Upon hearing this, I once more apologized to William and the officers. William said that he did not accept this apology. Officer Felmon then placed me under arrest, handcuffed me in front of my mother and placed me in the police car. Neither Officer Felmon nor Officer Devine ever gave me a Miranda warning.

20.     Officer Felmon and I waited in the police car for approximately ten minutes until we finally left for the police station.

21.     Officers Felmon and Devine drove me to the 22nd District police station. When I arrived, the police took all of my property, including my mobile telephone, belt and shoelaces. I was photographed, fingerprinted and placed in a holding cell for several hours.

22.     Finally, at approximately 11:20 PM on February 17, 2014, I was released from custody after Shirley paid for a bail bond, and Shirley and my brother Dan picked me up. As I was departing, the police returned my property. I observed that my mobile telephone had been placed in a bag labelled "Daniel Dewar."

23.     After being released, I retained an attorney to defend me in the criminal proceeding brought by William. However, when we appeared in court on March 25, 2014, William stated that he did not want to proceed and the case was dismissed.

24.     About a year after the dismissal of William's criminal complaint, I petitioned the court to expunge the criminal record of my arrest. On May 19, 2015, my petition was granted. The document attached to the Response to Motion for Summary Judgment as Exhibit 9 is a true and accurate copy of the expungement order. As part of the expungement process, notice of my petition was served on the Chicago Police Department and Chicago Corporation Counsel.

25.     Even though the expungement was supposed to remove all records of my arrest, I can still find the arrest record when I search the public-record.com internet website. The document attached to the Response to Motion for Summary Judgment as Exhibit 10 is a true and accurate copy of a report that I ran on June 21, 2018 that still shows the arrest record.

6

FURTHER AFFIANT SAYETH NAUGHT

_____

**DAVID DEWAR**

    In accordance with 28 U.S.C. § 1746, I certify under penalties of perjury that the foregoing statements are true and correct.

Executed on: ___June 27, 2018___    _____

**DAVID DEWAR**

7

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID A. DEWAR, | ) | |
| | ) | |
| *Pro se* Plaintiff, | ) | Case No. 16 cv 2287 |
| | ) | |
| v. | ) | The Honorable Virginia Kendall |
| | ) | |
| CHICAGO POLICE DEPARTMENT and | ) | Magistrate Judge Jeffrey Cole |
| CHICAGO POLICE OFFICERS T.J. FELMON, | ) | |
| M.K. DEVINE and C.J. LONG, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF SHIRLEY DEWAR

Shirley Dewar, after duly being placed under oath, deposes, and states that if called as a witness in this matter, he would testify to the following based on his own personal knowledge:

1.      At the present time, I am 80 years of age. In February 2014, I was 76 years old. I am competent to testify to the following matters.

2.      I am the mother of David Dewar ("David"), the plaintiff in this matter.

3.      Since 1984, I have been the owner of 11347 S. Millard Avenue, Chicago, Illinois 60655 (the "Property") and have resided at the Property. David has lived at the Property for most of this time period.

4.      Since approximately 2000, the house to the north of the Property at 11343 S. Millard Avenue (the "Hosty house"), has been owned by John Hosty ("John"). The driveway for the Hosty house is located right next to the property line separating that residence and the Property.

5.     John's father, William Hosty ("William") also lives on the same block of Millard Avenue as John, Shirley and me, as does Detective Scott McKenna, a Chicago Police Department employee.

6.     David and I have had many problems with John over the years. In 2009 and 2010, we were forced to call the police on different occasions after John and his friends became intoxicated and began yelling and screaming from the back yard or garage of the Hosty house at 2:00 and 3:00 in the morning.

7.     One day in November 2010, I saw John's children running across the Property and asked them to stop. A few minutes later, John pounded on the front door of the Property and, when I answered, screamed at me, saying that I should never admonish his children. When David came home, I told him what had occurred and asked him to speak to John. About 15 to 20 minutes later, David returned, said that he had nearly gotten into a fight with John and left for the grocery store.

8.     While David was away, John's children threw objects at my bedroom window. I told the children to stop. Once David returned, I told him about this latest issue and he again went out. When he returned, he stated that John had again wanted to fight with him and was very threatening. I understand that David filed an assault complaint against John with the Chicago Police Department because of this incident, but did not pursue the complaint.

9.     In 2011, John began receiving cable television service from Wide Open West (WOW). The cable wire was installed in a way that it encroached onto the Property. David and I asked WOW to move the wire onto John's property or to have John move the wire, but

2

they took no action. After waiting several months, I sued John to remove the wire and eventually procured a judgment ordering him to move the wire.

10.     I also have had multiple disputes with William, all relating to snowstorms. William used his snowblower to clear the driveway of the Hosty house whenever we had a substantial snowfall, but every time he did so, he directed the snow being scooped up onto the Property. The melting snow he puts on the Property has periodically leaked into the house. We have periodically asked William not to do this, but he never has listened to our requests.

11.     In 2012, we had a major storm and William used his snowblower to put snow on the Property. I went outside and asked him to stop. William said that he was "fed up," cursed using the f-word multiple times and walked away.

12.     On February 17, 2014, about 15 inches of snow fell on Millard Avenue. In the evening, I was outside shoveling the walk and driveway. William appeared and started removing snow from the driveway of the Hosty house with his snowblower, depositing the snow onto the Property. When I went over to William and asked him to stop placing the snow on the Property, he had answered "I'm sick of you people," turned the snowblower back on and continued directing snow onto the Property.

13.     I asked David to talk to William and he did. I could overhear David's conversation. He did not make any threats to William, but suddenly, William yelled that David had threatened to "kick your ass." I never heard David say anything like that statement during his conversation with William.

14.     William said he was calling the police and asked his daughter-in-law to make the call. Shortly afterwards, David also called the police.

3

15.     David then went inside to change his clothes and I followed him into the house. About fifteen minutes later, the police loudly knocked on the door and asked David and me to come outside to talk. When I exited the house, I saw William outside the Hosty house talking to Detective McKenna.

16.     I was upset when I spoke to the police officers, but I was not hysterical or incoherent. I explained about how William had been depositing snow onto the Property and how his claim that David had threatened him was false. As I was talking, Officer Felmon told me to shut up. I obeyed the officer and stopped speaking.

17.     During our conversation, even though David and I gestured to the areas where William had placed snow on the Property, the officers never went over to those locations. Instead, they ordered us to go to the Hosty house and Officer Felmon told David that he needed to apologize to William.

18.     William, his daughter-in-law Jennifer and Detective McKenna were waiting in front of the Hosty house when David and I arrived with the officers. Officer Felmon repeated his demand that David apologize to William. David said that he was sorry that the police had been called. William said that apology was not good enough and that David had to say he was sorry that he had threatened William by saying he would "kick your ass." David apologized another time and this also was rejected by William.

19.     Officer Felmon again ordered David to apologize and began to twirl his handcuffs, saying that if William was not satisfied with the apology, he would arrest David.

20.     I told David that he should apologize even if he had not threatened William to avoid getting arrested. David again said that he was sorry, but William stated he was not satisfied. Officer Felmon then put handcuffs on David and marched him to the police car.

4

21.    I was very upset and went into the house. As I looked out the front window, I could see Officer Devine talking to Detective McKenna and William and preparing paperwork. I called Daniel, one of my other sons, who is a retired police officer and asked for help. Daniel drove over from his house and we waited until the police called to say that David could be picked up.

22.    About 10:30 PM on February 17, 2014, the police said that we could now bail out David and Daniel and I drove to the police station where David was being held. When we arrived, I was told that I needed to pay $120.00 for a bond that would allow David to be released.

23.    The document attached as Exhibit 8 of the Response to Motion for Summary Judgment is a true and correct copy of the form I signed to bail out David. My signature appears at the lower right side of the document.

FURTHER AFFIANT SAYETH NAUGHT

_Shirley Dewar_
SHIRLEY DEWAR

In accordance with 28 U.S.C. § 1746, I certify under penalties of perjury that the foregoing statements are true and correct.

Executed on: _June 27, 2018_    _Shirley Dewar_
SHIRLEY DEWAR

5

# EXHIBIT 3

CERTIFIED TRANSCRIPT

```
1            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3    DAVID A. DEWAR,                  )
                                      )
4                   Plaintiff,        )
                                      )
5            vs.                      )    No. 16 CV 0228
                                      )
6    Officers T.J. FELMON, M.K.       )
     DEVINE and Supervisor C.J.       )
7    LONG and CHICAGO POLICE          )
     DEPARTMENT,                      )
8                                     )
                    Defendants.       )
9

10           The deposition of WILLIAM HOSTY, taken

11   pursuant to the Federal Rules of Civil Procedure,

12   before Nick D. Bowen, Certified Shorthand Reporter

13   No. 084-001661, at 30 North LaSalle Street, Suite

14   900, Chicago, Illinois, on Thursday, March 1, 2018,

15   commencing at 11:19 a.m. pursuant to subpoena and

16   notice.

17      APPEARANCES:

18           MR. DAVID A. DEWAR
             (11347 South Millard Avenue
19            Chicago, Illinois  60655
              773.445.5340
20            ddewar@hotmail.com)
                appeared pro se;
21

22

23

24
```

WILLIAM HOSTY, 03/01/2018                                    Page 2

1          APPEARANCES:   (Cont'd)

2              HONORABLE EDWARD N. SISKEL
               CORPORATION COUNSEL, by
3              MS. KELLY C. BAUER
               Assistant Corporation Counsel
4              (30 North LaSalle Street, Suite 900
                Chicago, Illinois 60602-2502
5               312.742.9586
                kelly.bauer@cityofchicago.org)
6                 appeared on behalf of the defendants.

7
                       *   *   *   *   *   *   *
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1                          I N D E X

2
     Witness:                              Page
3
          WILLIAM HOSTY
4
              Examination by:
5
              Ms. Bauer.....................      5
6             Mr. Dewar....................      34

7

8

9

10                     E X H I B I T S

11   No.   Description                 Marked/Referenced

12    1    Complaint.............................   30
      2    Photograph............................   38
13

14              (Exhibits attached/scanned.)

15
                        -  -  -
16

17

18

19

20

21

22

23

24
```

```
 1                    (Witness sworn.)
 2          MS. BAUER:  Good morning.  My name is Kelly
 3   Bauer.  I represent the defendant officers in this
 4   case.
 5              Let the record please reflect that
 6   this is the deposition of the witness pursuant to
 7   subpoena, mutual agreement, and notice.
 8              The deposition is taken pursuant
 9   to Federal Rules of Civil Procedure and the local
10   rules of the Northern District of Illinois in the
11   case David Dewar v. Felmon, et al., case No. 16 CV
12   2287 pending before the United States District
13   Court for the Northern District of Illinois,
14   Eastern Division.
15              And just generally how depositions
16   work, as Mr. Dewar is pro se, I know that you've
17   been in on other -- and I've taken your deposition.
18   You've been in on your mother's deposition in this
19   case.  How it's going to work is I'm going to ask
20   questions of Mr. Hosty, and then you will get a
21   chance at the end of it to ask your questions.
22          MR. DEWAR:  Okay.
23          MS. BAUER:  And during this deposition, we're
24   going to be maintaining calm composure, and we're
```

```
 1   going to be professional throughout.
 2         MR. DEWAR:  Agreed.
 3                     WILLIAM HOSTY
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6                     EXAMINATION
 7   BY MS. BAUER:
 8         Q.    Okay.  Could you please spell your name
 9   for the record?
10         A.    H-o-s-t-y.  First name is William,
11   W-i-l-l-i-a-m.
12         Q.    Have you ever been deposed before?
13         A.    I think so.  Many years ago, yeah.
14         Q.    What was that regarding?
15         A.    Oh, no.  No, I haven't.  No.
16         Q.    Okay.
17         A.    I'm sorry.  I was thinking of something
18   else.  I'm sorry.
19         Q.    That's fine.
20               So when I say "deposed," it's the
21   verb form of what we're doing here today.
22         A.    Okay.
23         Q.    Have you ever sat down and been asked
24   questions under oath like this before?
```

1          A.    Yes, I have.

2          Q.    You have?  Okay.

3          A.    Yeah.

4          Q.    And what was that regarding?

5          A.    It was regarding to my job with people

6    that -- for filing grievances and stuff, yes.

7          Q.    Okay.  And are you currently represented

8    by counsel today?

9          A.    No.

10         Q.    And I just ask -- I have a couple

11   questions that I ask everyone --

12         A.    Okay.

13         Q.    -- so please don't take offense.  I ask

14   this in every deposition.

15               Do you understand that you are under

16   oath?

17         A.    Yes, I do.

18         Q.    And what does that mean to you?

19         A.    It means I got to tell the truth.

20         Q.    And are you currently under the

21   influence of alcohol?

22         A.    No, I'm not.

23         Q.    Are you currently under the influence

24   of any illegal drug?

1          A.      No.

2          Q.      Are you on any medication that would

3     prevent you from testifying fully and accurately

4     today?

5          A.      No.

6          Q.      Is there any reason that you can think

7     of that you would not be able to give truthful and

8     complete testimony today?

9          A.      Well, I'll give it to the best of my

10    ability as good as my memory is.

11         Q.      Okay.  So I'd also like to go over a

12    couple more ground rules for depositions.

13                 If you do not understand a question,

14    let me know, and I'll rephrase it.

15         A.      Okay.

16         Q.      And if you answer my question, I'm

17    going to assume you understood it.  Is that fair?

18         A.      Okay.

19         Q.      If you don't hear an entire question,

20    let me know; I can repeat it or have the court

21    reporter read it back.

22         A.      Okay.

23         Q.      And please answer every question out

24    loud so the court reporter can take it down.

1        A.    Okay.

2        Q.    And just wait until I finish asking my

3    question before you give your answer so the court

4    reporter can get everything we say down.

5        A.    Okay.

6        Q.    We can also take breaks.  So just let

7    me know if you need one or if you need more water.

8        A.    Okay.

9        Q.    Okay.  What is your highest level of

10   education?

11       A.    High school.

12       Q.    And are you currently working?

13       A.    No.

14       Q.    Are you retired?

15       A.    Yes, I am.

16       Q.    Okay.  What did you do before you

17   retired?

18       A.    I'd rather not answer that.

19       Q.    Okay.  Were you working on February 17,

20   2014?

21       A.    No, I was not.

22       Q.    Okay.  And do you have children?

23       A.    Yes, I do.

24       Q.    Okay.  And how many?

1       A.      Three.  One natural born and two

2   adopted.

3       Q.      Okay.  And do any of those children

4   live next to the Dewars?

5       A.      Yes.

6       Q.      Okay.  Which one of those children --

7   or which of those children lives --

8       A.      My son John.

9       Q.      All right.  Now, I'd like to -- and is

10  his last name Hosty as well?

11      A.      That is correct.

12      Q.      Okay.  And who does he live with?

13      A.      With his wife and three kids.

14      Q.      And would you feel comfortable telling

15  me the names of their kids?

16      A.      Pardon me?

17      Q.      Would you feel comfortable telling me

18  the names of their kids today?

19      A.      No, I wouldn't.  No.

20      Q.      Okay.  Can you tell me their ages?

21      A.      To the best of my ability.  16.

22      Q.      Okay.

23      A.      14 and 13, I think.

24      Q.      Okay.  And can you tell me what Mr. --

1  your son John's wife's name is?

2        A.    Jennifer.

3        Q.    Okay.  And how long have they been

4  living next door to the Dewar family?

5        A.    Oh, boy.  Probably 17, 18 years,

6  I suppose.  Again, that's to the best of my

7  recollection.

8        Q.    Okay.  And do you live in the

9  neighborhood as well?

10       A.    Yes, I do.

11       Q.    Okay.  About how far away do you live?

12       A.    I think it's about ten doors from my

13  son, south of my son.  Half a block.

14       Q.    Okay.

15       A.    Maybe a little more.  I'm not sure.

16       Q.    All right.  I'd like to discuss what is

17  the subject of the lawsuit today.

18             Do you remember the day February 17,

19  2014 at about 6:40 p.m.?

20       A.    Yes.

21       Q.    Okay.  What were you doing that evening?

22       A.    Blowing snow.

23       Q.    Okay.  And when you say "blowing snow,"

24  what do you mean?

1       A.    We had a snowstorm, and I was -- you

2   know, say snow shoveling.  But at this time I had

3   a snowblower.

4       Q.    Okay.  And what were you doing with the

5   snowblower?

6       A.    Clearing my son's driveway.

7       Q.    And when you say clearing your son's

8   driveway, is that the son that lives next to the

9   Dewar family?

10      A.    That is correct.

11      Q.    Okay.  And where is the -- where is

12  your son's driveway located in relation to the

13  Dewars' property?

14      A.    In between the two houses.  In between

15  his house and the Dewars' house.

16      Q.    Okay.

17      A.    It runs east and west.

18      Q.    Okay.  So is it close to the property

19  line between the two?

20      A.    Yes, it is.  Yes.

21      Q.    Okay.  And then on the Dewars' property

22  line, is it a front yard?  Is it also a driveway

23  that's right next to it?  What's right next to it?

24      A.    No.  It's the lawn.

```
 1          Q.    Okay.
 2          A.    And part of it is a front yard, yeah.
 3          Q.    Okay.  All right.  And did you speak to
 4    David Dewar that day?
 5          A.    No.
 6          Q.    Did you speak to Shirley Dewar that day?
 7          A.    Well, when you say "speak," there
 8    was -- you could say I did speak, yes.  Yes.
 9          Q.    To David Dewar or Shirley Dewar?
10          A.    Well, they were both out screaming,
11    so ...
12          Q.    Okay.  So you verbally communicated
13    with David Dewar that day?
14          A.    You could say so, yeah.
15          Q.    Okay.  And when did you first speak to
16    David Dewar that day?
17          A.    When the police were there, arrived.
18          Q.    Okay.  So you hadn't had any
19    communication with David Dewar prior to --
20          A.    No.  No conversation with him prior to
21    that.
22          Q.    Did you have a conversation with
23    Shirley Dewar prior to that?
24          A.    No.
```

```
 1        Q.    Okay.  Did you call the police that day?

 2        A.    Yes, I did.

 3        Q.    Okay.  And why was that?

 4        A.    Because I feared for my life;

 5   threatened -- my life was threatened because

 6   they were both screaming at me.

 7        Q.    Okay.  So --

 8        A.    My daughter did.  My daughter-in-law

 9   called the police.

10        Q.    And is that Jennifer?

11        A.    That's Jennifer Hosty, yes.

12        Q.    Okay.  So let me reask a few questions.

13              When did you -- when did David Dewar

14   first start screaming at you that day?

15        A.    When I was blowing the snow, clearing

16   the snow.

17        Q.    Okay.  And about how long --

18        A.    And he was taking pictures with his

19   phone.  I didn't know what they were saying.  I had

20   the snowblower going, and I couldn't hear.  I have

21   no idea what anybody was saying.  All I could hear

22   was people screaming.

23        Q.    Okay.  So about how long had you been

24   blowing snow prior to Mr. Dewar begin screaming at
```

WILLIAM HOSTY, 03/01/2018                                    Page 14

1   you?

2        A.    About 20 minutes, a half hour.  Again,

3   to the best of my recollection.  That's many years

4   ago.

5        Q.    Okay.  No problem.

6              And then where were you on your

7   son's property when David Dewar started screaming

8   at you?

9        A.    My son's driveway.

10       Q.    And when did you first notice Mr. Dewar

11  screaming at you?

12       A.    As I was -- again, as I was blowing the

13  snow.

14       Q.    Okay.  Did he walk up to you?

15       A.    He was at a distance and standing on

16  his property.

17       Q.    Okay.

18       A.    Yeah.

19       Q.    About how far away would you say

20  Mr. Dewar was?

21       A.    About 15 feet.

22       Q.    Okay.

23       A.    My snowblower was going.

24       Q.    Okay.  And how could you tell that

1   Mr. Dewar was screaming at you?

2       A.    Well, I could hear him, but I couldn't

3   understand him.

4       Q.    Okay.  And --

5       A.    I understood some words, yeah.

6       Q.    Okay.  What did you hear when he was

7   screaming at you at that point?

8       A.    About the snow going onto the property,

9   and he said something about an ass kicking.  With

10  that I hollered at my daughter-in-law, Call the

11  police.

12      Q.    Okay.

13      A.    And I had no more to do with him until

14  the police came.

15      Q.    Okay.  Did you hear him say anything

16  else at that point?

17      A.    I just couldn't -- can't recall that.

18      Q.    Okay.  All right.  And did you --

19      A.    At that point, no.

20      Q.    Okay.  And did you say anything in

21  response?

22      A.    No.  Just that I'm calling the police.

23      Q.    Okay.  And where was your daughter-in-

24  law at this point?

```
 1          A.    Standing at her door.

 2          Q.    Okay.

 3          A.    Which would be halfway between me and

 4   him, Mr. Dewar.

 5          Q.    Okay.  And do you know why she had come

 6   out at that point?

 7          A.    She always comes out when I'm down

 8   there.

 9          Q.    Oh, okay.

10          A.    See that I was okay.  I was blowing the

11   snow.  I'm an elder person, and she didn't want

12   anything to happen to me.

13          Q.    So just to check on you?

14          A.    Yes.  She always checks on me.

15          Q.    Okay.  And then do you know if your

16   daughter-in-law called the police?

17          A.    Yes, she did.

18          Q.    Okay.  And then what did you do at that

19   point?  Did you keep --

20          A.    I waited for the police to come.

21   I kept blowing the snow until the police came.

22          Q.    Okay.  And what did Mr. Dewar do?

23          A.    He stood there and waited for the

24   police to come as well.
```

WILLIAM HOSTY, 03/01/2018                                    Page 17

1          Q.    Okay.  And was he yelling --

2          A.    Let me -- he was in the house when the

3    police came.  And the police went up and knocked on

4    the door.  And then he and his ma came out.

5          Q.    Okay.  So before -- after the police

6    were called, but before they arrived, was Mr. Dewar

7    sitting outside?

8          A.    I don't think he sit out the whole time

9    till they came.

10         Q.    Okay.  He went back inside at some

11   point?

12         A.    I do believe he did, yes.

13         Q.    Okay.  And then --

14         A.    I remember the policeman went to the

15   door and knocked on the door for him to come out,

16   and they came out.

17         Q.    Okay.  And then during the time that

18   Mr. Dewar was still outside but after the time the

19   police had been called, was he still yelling at you?

20         A.    No.  I -- no, I didn't -- no.

21         Q.    But he was just standing out there at

22   that point?

23         A.    Yeah.  Yeah.

24         Q.    Okay.  And prior to this time, did you

1  see Mrs. Dewar, David Dewar's mother, outside at

2  all?

3        A.    Yeah.   She was out there earlier, yeah.

4        Q.    Okay.   But was she out there at this

5  point?

6        A.    When you say "at this point," what

7  point is that?

8        Q.    Before Mr. Dewar went back into the

9  house, but after --

10        A.    But, yeah, he was out -- she was out

11  before he went back in.  I do believe she was

12  helping him shovel as well.

13        Q.    Oh, okay.  And prior to the police

14  being called, did Mrs. Dewar say anything to you?

15        A.    She was screaming, but I don't know

16  what she was saying.  I have no idea what the lady

17  was saying.

18        Q.    Okay.  And was she screaming at you at

19  the same time Mr. Dewar was?

20        A.    I don't know if she was screaming at

21  him or screaming at -- screaming at her son or

22  screaming at me or screaming at herself.  All I

23  could hear was screams.

24        Q.    Okay.  And at what point did this

1    happen?  Was this -- in relation to when Mr. Dewar
2    first started screaming at you.
3         A.    It was kind of almost the same time.
4         Q.    And could you understand anything that
5    Mrs. Dewar was saying?
6         A.    No.
7         Q.    Okay.  And then did Mrs. Dewar go back
8    in the house after the police were called?
9         A.    To the best of my knowledge, she did.
10        Q.    Okay.  After the police were called,
11   did she -- was she screaming any more at you?  What
12   was she doing at that point?
13        A.    After the police came?
14        Q.    No.  After they were called.
15        A.    No.
16        Q.    No.
17              So once the -- once you had asked
18   your daughter-in-law to call the police, Mr. and
19   Mrs. Dewar were just standing there?
20        A.    For a little while.  And I do believe
21   they went to the house -- into the house then.
22        Q.    Okay.  And about how long did it take
23   for the police to arrive?
24        A.    I'm not sure.  Maybe ten minutes or

1   something.  I'm not -- I'm not exactly sure.

2        Q.    Okay.

3        A.    I just continued on clearing snow at

4   that point.

5        Q.    Okay.  And the police did arrive that

6   day, though?

7        A.    Yes, they did.

8        Q.    Okay.  And did police cars drive up?

9        A.    There was one.  I don't know if there

10  was two or not.  But I know there was one.

11       Q.    Okay.  And once the police got there,

12  what happened?

13       A.    They got out of the car.  And one of

14  them went to the door.  And then the people next

15  door to me came out.  And they wanted to know what

16  happened.  And they were explaining to the police

17  that he was putting snow on the property.  And I

18  remember distinctly the policeman saying to him,

19  Well, what are we supposed to do?  We got a foot of

20  snow.

21             And the wind was blowing real hard.

22  I could be blowing it that way and it would still

23  blow -- it was blowing in my face.  It was blowing

24  all over.  You wouldn't know where it would be

1   blowing the way the wind was.

2               So he wanted to know -- the officer

3   asked me, he wanted to know what was going on.  So

4   I told him what happened, that I feared for my life

5   and I felt threatened.

6               So at this time he asked Mr. Dewar

7   what happened, and he said that he didn't say it.

8   So there was some words spoken back and forth

9   between the police and him in a nice conversation,

10  I do believe.  And he was denying that he said it.

11              So he finally -- the policeman says

12  to me, If he gives you an apology, will you accept

13  it?  And I says, Yes, I will.

14              So he gave me an apology, but it

15  wasn't in the words -- I never heard the words "ass

16  kicking" put into it.  And so I did not accept the

17  apology.  He apologized three times.  And the

18  policeman says to him -- there was a great big

19  policeman, I think he was a sergeant, and a smaller

20  policeman.  And he says to him, If -- we'll give

21  you one more chance at it.

22              So with that, his ma started

23  screaming and yelling.  And the police says to

24  Mr. Dewar, Would you please have your ma go in the

1  house, go up on the front steps, or whatever.  And

2  he was telling her to go in the house.  But she was

3  going berserk.  I have no idea what she was saying.

4            So about ten feet away from me --

5  before -- Mr. Dewar walked a little bit north with

6  one of the police officers.  And then before he

7  did, the police officer said to him, I give you one

8  more chance to apologize.  And he didn't apologize.

9  And I heard the policeman talking to him.  But with

10 her screaming, I could hardly know what he was

11 saying.

12           And as he was -- he was putting the

13 cuffs on him.  And he spun him around and put the

14 cuffs -- well, not spun him around.  He asked him

15 to turn around, I guess.  I didn't hear it.  But he

16 put the cuffs on him.  He got him arrested.  He

17 arrested him.

18           And with that, they took him away.

19 She went in the house.  And I finished doing the

20 snow and went home.

21           And one of the police officers came,

22 and I filed a complaint and everything, to my

23 house.  And that was the gist of my evening.

24      Q.    Okay.  So I'm going to have to break a

1  little bit down what you --

2       A.    Okay.  Sorry.

3       Q.    No.  That's fine.  That's fine.

4       A.    I answered it the best I could.

5       Q.    Yeah, absolutely.  So I'll just ask a

6  little more pointed questions, and we'll just kind

7  of go over the event and talk a little bit more

8  about the details.

9            So when the police arrived, did --

10 how many police officers were there approximately?

11      A.    I do believe there was two.

12      Q.    Okay.  And --

13      A.    Two that was handling the situation.

14 If there was a second police car, I can't recall

15 or not.

16      Q.    Okay.  And when the police arrived, did

17 either of the officers come to talk to you?

18      A.    Oh, yeah.

19      Q.    Oh, okay.

20      A.    Yeah.

21      Q.    And what was the conversation that you

22 had with them?

23      A.    Well, I told them exactly what I told

24 you, yeah.

WILLIAM HOSTY, 03/01/2018                              Page 24

1        Q.    Okay.

2        A.    That I felt threatened and everything

3    else, and that's what I felt.

4        Q.    Okay.  And what did the police officer

5    say in response?

6        A.    Then he went to talk to Mr. Dewar.

7        Q.    Okay.  And did both police officers go

8    over to the Dewars' house at that point?

9        A.    None of them went there at that point.

10   The one that went to the door prior to that, the

11   one that took him out -- the person that took him

12   out, they did.

13       Q.    Okay.  So while one officer was

14   speaking with you, another officer went to the

15   Dewars' house?

16       A.    That's right.  He didn't hardly say

17   anything to me.  He was just waiting for him to

18   come out.

19       Q.    Okay.  And then when the Dewars came

20   out, what happened?

21       A.    Just like I said.

22       Q.    Okay.

23       A.    They -- he denied saying anything.  And

24   they asked him to apologize.  And he apologized in

1    a way that he kept saying that if he offended me

2    or threatened me in any way that I felt threatened

3    because of him, he apologized.  But he didn't

4    apologize for the exact word.  I didn't hear "ass

5    kicking" in it, but I heard in the context of

6    yelling.

7            Q.    Okay.

8            A.    I didn't accept the apology.

9            Q.    Okay.  So when the Dewars came out, did

10   you all have a conversation at that point or --

11           A.    Well, yeah.  The policeman was telling

12   us all, you know, that it's a bad snowstorm and we

13   have to -- people have to put the snow someplace.

14   And he says he had to put it someplace.  And I

15   could be blowing it north and his house was south

16   of me, and with the way the wind was, it would blow

17   it right back.  I mean, it was just a bad -- it was

18   Mother Nature at its best.

19           Q.    Okay.  So is it fair to say that you

20   weren't purposely blowing snow on --

21           A.    No, I don't purposely blow snow on

22   anybody's property.

23           Q.    Okay.  Sorry --

24           A.    Not unless it's two or three feet and I

1   have no place to put it.

2          Q.    Okay.  So let me just finish my question

3   for the record so everything can be taken down.

4          A.    Sure.

5          Q.    So is it fair to say that you weren't

6   personally blowing the snow on the Dewars' property?

7          A.    Yes, it is.

8          Q.    Okay.  Other than one of the officers

9   asking Mr. Dewar to apologize, do you remember the

10  officer saying anything else to the Dewars that day?

11         A.    Other than telling us, like I just said

12  to you, about the snow and, you know, let's try to

13  work together with it, you know.

14         Q.    Okay.  And then what was Mrs. Dewar

15  doing at this point?

16         A.    Yelling and screaming.

17         Q.    Okay.  And do you remember what she was

18  yelling and screaming?

19         A.    It was all about, My son, my son; I

20  could hear that much.  And I don't know what else

21  she was saying.

22         Q.    Okay.  And at some point you said one

23  of the officers asked Mr. Dewar to ask his mother

24  to go back inside?

```
 1        A.    Yes.
 2        Q.    Okay.  And do you remember specifically
 3   what that officer said?
 4        A.    He said, Would you please calm your mom
 5   down and have her go in the house?
 6        Q.    Okay.  And did Mr. or Mrs. Dewar
 7   respond to that?
 8        A.    Yeah.  I think David says to her a
 9   couple times, Would you please go in the house?
10        Q.    Okay.  And did his mother go in the
11   house at that point?
12        A.    No.
13        Q.    No.  Okay.
14              Was she still yelling and screaming
15   at that point?
16        A.    Yeah.
17        Q.    And at that point do you understand --
18   did you understand what she was screaming and
19   yelling?
20        A.    All I could hear was something about,
21   My son, my son.  That's all.
22        Q.    Okay.  And then -- so then it sounds
23   like Mr. Dewar apologized three times, but not in
24   the way that you had asked, right?
```

WILLIAM HOSTY, 03/01/2018                                    Page 28

```
 1        A.    Right.   The officer asked me, Do you
 2   accept that?  And I said, No.
 3        Q.    Okay.  And why specifically was that?
 4        A.    Because I already told you that I
 5   didn't hear the word -- anything about the ass
 6   kicking there, and I felt threatened.
 7        Q.    Okay.  And then what happened --
 8        A.    Can we take a short recess for a
 9   minute?
10        Q.    Sure.
11        A.    Can I talk to you for a minute?  No?
12        Q.    No.
13        A.    No.  Okay.  That's all right.
14                    (Recess taken.)
15   BY MS. BAUER:
16        Q.    All right.  And then -- so let's start
17   where we left off.
18              So you said that Mr. Dewar was
19   handcuffed at some point, correct?
20        A.    Yes.
21        Q.    Okay.  And did you actually see
22   Mr. Dewar get handcuffed?
23        A.    Yes.
24        Q.    Okay.  In your opinion, were the
```

1  officers rough with Mr. Dewar when they were
2  handcuffing him?

3      A.    Well, I've never seen too many people
4  get handcuffed.  He just put the handcuffs on him.
5  I didn't see anybody getting roughed up from either
6  side.

7      Q.    Okay.  And then at that point did any
8  of the officers say anything to you?

9      A.    No.

10     Q.    No.

11     A.    They said they were taking him in; if I
12 wanted to file a complaint, file a complaint.  So I
13 did.

14     Q.    Okay.  And did you sign a complaint
15 that day?

16     A.    That evening, yeah.  The officer came
17 to my house later on, and I signed it.

18     Q.    Okay.  And did you -- and other than
19 the officer informing you that you could sign a
20 complaint, did you have any other conversations
21 with them that day?

22     A.    No.

23     Q.    No.  Okay.

24           And then the officers left; is that

1  right?

2          A.     Yes.   They left, yeah.

3          Q.     Okay.

4          A.     Well, at that time they left and came

5  back later to my house with the complaint to be

6  filed.

7          Q.     Oh, okay.

8          A.     Yeah.

9          MS. BAUER:   Okay.   And then if we could mark

10 this as Exhibit 1, please.

11                         (Deposition Exhibit No. 1,

12                          Witness Hosty, was marked for

13                          identification 03/01/2018.)

14 BY MS. BAUER:

15         Q.     I'm handing you what's been marked as

16 Exhibit 1.   If you wouldn't mind reviewing this,

17 please.

18         A.     (Reviewing exhibit.)

19                Yeah.

20         Q.     Okay.   And is that the complaint you

21 signed that evening?

22         A.     Well, I don't have the complaint I

23 signed that evening in front of me, but it

24 certainly seems like it, yes.

WILLIAM HOSTY, 03/01/2018                          Page 31

1         Q.    Okay.

2         A.    It looks like it.

3         Q.    Okay.  So it looks like a --

4         A.    That's my signature, yes.  So that's

5    got to be it.

6         Q.    So it looks like an accurate --

7         A.    Yes.  Yes, it is.

8         Q.    -- an accurate copy of the complaint?

9         A.    Yes.

10        Q.    Okay.  And did any police officers

11   coerce you into bringing these charges?

12        A.    No.  Absolutely not.

13        Q.    Okay.  And did you bring these charges

14   on your own free will?

15        A.    Yes, I did.

16        Q.    And you also knew that it was

17   no mistake that Mr. Dewar was the one who had

18   committed the offense that's on the complaint,

19   right?

20        A.    That is correct.

21        Q.    Did any officer suggest to you or

22   otherwise tell you that Mr. Dewar was not the

23   person involved in this complaint?

24        A.    No.

```
 1        Q.    Okay.  And did an assistant state's

 2   attorney contact you?

 3        A.    No.

 4        Q.    No.  Okay.

 5              Did you receive a subpoena to go to

 6   court?

 7        A.    I received -- I don't know if it was a

 8   subpoena or a notice, whatever.  But I did receive

 9   something, and I did go.

10        Q.    Okay.  And did you go to court?

11        A.    Yes.

12        Q.    Okay.  Did you ever testify against

13   plaintiff?

14        A.    I met up that day with an assistant

15   state's attorney, I think she was, at the place.

16   I asked for her when I got there.

17        Q.    Okay.  And do you know what happened to

18   the criminal charges in this case?

19        A.    The assistant state's attorney talked

20   and his attorney, I believe, David Dewar's, and the

21   judge talked, and it got thrown out, you could say,

22   yeah.

23        Q.    Okay.

24        A.    I just -- the judge asked me what did I
```

1  want, you know.  And I told him, I says all I want

2  is peace and be left alone and my family left

3  alone, my son, grandson -- my son, grandkids, and

4  daughter-in-law.

5        Q.    Okay.

6        A.    So I just wanted them to be left alone.

7  And I don't want anything out of this.  I just want

8  peace.

9        Q.    Okay.

10       A.    So he told him, you know, be peaceful

11 and friendly.  And it has been since.

12       Q.    Okay.  And so is it fair to say that

13 you dropped the charges in this case?

14       A.    I do believe I did, yeah.  Yeah.

15       Q.    Okay.

16       A.    It's on file anyways, so, you know.

17       Q.    The transcript of the court proceedings?

18       A.    Yes.  I asked the judge if it could be

19 on file, and he says yes.

20       MS. BAUER:  Okay.  All right.  So I just need

21 one moment.  And then I'll be right back.  I can

22 actually put you in another conference room while I

23 take care of something.  But it'll only be five

24 minutes.  I'll be right back.

```
 1                      (Recess taken.)
 2          MS. BAUER:  So those are all the questions I
 3   have.
 4                    Mr. Dewar, do you have any rebuttal
 5   questions regarding this specific incident?
 6          MR. DEWAR:  You mean rebuttal in response to
 7   the questions you asked Mr. Hosty?
 8          MS. BAUER:  Just if you have any questions
 9   that relate to this incident.
10          MR. DEWAR:  Yes.
11                      EXAMINATION
12   BY MR. DEWAR:
13          Q.    The date of this incident, you recall,
14   was February 17th, 2014, Mr. Hosty?
15          A.    I do believe that's right, yeah.
16          Q.    Yes.  Okay.
17                    Did you ever speak -- excuse me.
18   Did my mom, Shirley Dewar, did she ever speak with
19   you?  Did you have a conversation with her at all
20   in regards to the snow removal?  Did you guys speak?
21          A.    No.
22          Q.    No.  Okay.
23                    So you don't recall having a
24   conversation with Shirley --
```

1       A.    All I recall is what I said.  And I
2   don't know what she was saying.

3       Q.    Okay.  So you don't recall her asking
4   you kindly not to blow the snow --

5       A.    No.

6       Q.    -- upward because the wind was carrying
7   it into --

8       A.    If she did, I would have turned -- I
9   do believe I wasn't blowing it on there anyways.
10  Because of the way the wind was blowing, no matter
11  how I blew it, it was going to blow all over.  I
12  was doing my best not to blow the snow on her
13  property -- on her lawn.

14      Q.    So you never spoke with her bottom line?

15      A.    That's what I just told you.

16      Q.    Okay.  Do you recall where I was
17  standing at the time she was screaming as you said?

18      A.    No, I don't recall that, if you were
19  standing in the area, a specific area.

20      Q.    Okay.  Do you --

21      A.    The lawn -- the whole thing was only 30
22  square feet, maybe 40 square feet.

23      Q.    Did you speak with me at all?  Do you
24  recall me --

WILLIAM HOSTY, 03/01/2018                                    Page 36

1      A.    I remember you pointing the phone at me
2  taking my picture, I thought, and I says, Hey, quit
3  taking my picture.
4      Q.    Did you ask me if I was recording you
5  or taking pictures?
6      A.    Yes.
7      Q.    Yes.  Okay.
8            And why did you ask me that?
9      A.    Because I don't want anybody recording
10 me or taking pictures.  I don't like that.
11     Q.    And do you recall the way I responded?
12     A.    I couldn't hear you what you -- I
13 yelled at you, Don't take my picture.  Don't be
14 recording me.  The snowblower was going.  The wind
15 was blowing.  I don't know did you say yes or did
16 you say no.  You said a few words, and I caught
17 something in there that I didn't like, and that's
18 why I decided to call the police.
19     Q.    Okay.  So when you had the conversation
20 with me, words in reference to this picture, were
21 you --
22     A.    But I wasn't having a conversation with
23 you.
24     Q.    You just said you did.

```
 1        A.    No.   You -- I said I kept blowing the
 2  snow.   The conversation with me -- to me was to
 3  stop the snowblower and talk.   I couldn't hear you.
 4  I did yell kind of loud not to take my picture or
 5  record me.
 6        Q.    Okay.   So when you asked me if I was
 7  recording you or taking your picture, where in
 8  reference to the driveway were you on -- with your
 9  snowblower on your son's driveway?
10              And that's Exhibit 2, which you
11  presented at the last deposition.
12        MS. BAUER:   Okay.   So if we could mark this
13  as Exhibit 2, please.
14        MR. DEWAR:   So can he take a look at that and
15  then reference where he was actually at when this
16  occurred?
17        MS. BAUER:   Yes.   So how we do this is that
18  we have to mark this for the deposition.
19        MR. DEWAR:   Okay.
20        MS. BAUER:   And so the court reporter is
21  going to mark this, and then Mr. Hosty can look
22  at it.
23        MR. DEWAR:   Okay.   So should we proceed from
24  there then?
```

1          MS. BAUER:  Sure.

2          MR. DEWAR:  Okay.  When -- because it would

3   be easier to reference that visually to go further

4   with this because there's kind of a communication

5   issue in terms of where he was and where I was as

6   far as what he recalls.  It was four years ago.  I

7   understand.

8          MS. BAUER:  Okay.  So the court reporter

9   can't mark this while we're talking.

10         MR. DEWAR:  Okay.

11         MS. BAUER:  We all have to be silent for a

12  minute and then let the court reporter mark this.

13  Okay?

14         MR. DEWAR:  Okay.  Great.

15                        (Deposition Exhibit No. 2,

16                         Witness Hosty, was marked for

17                         identification 03/01/2018.)

18  BY MR. DEWAR:

19         Q.    So, Mr. Hosty, where were you standing

20  at the time that you felt I was recording you or

21  taking pictures in reference to that picture?

22         A.    Do I look at that?

23         MS. BAUER:  You can.

24         THE WITNESS:  I just wanted to be sure it was

```
 1  the picture here.  I do believe I was standing in
 2  the driveway, my son's driveway, towards the end of
 3  it.
 4  BY MR. DEWAR:
 5        Q.    Okay.  Can you mark that, please?
 6        A.    I can't mark it exactly.  I don't know
 7  where.  As I told you --
 8        Q.    Well, just guesstimate.  Roughly.
 9        A.    (Complying.)
10        Q.    Okay.  So this is where you were at
11  blowing --
12        A.    In or around.
13        Q.    In that vicinity.  And when you blow
14  the snow, do you go like an S pattern, up and down
15  like so?
16        A.    No.  When I blow the snow -- I feel
17  like I'm on trial here.  But anyways, I'll tell you
18  what I do.
19        Q.    I'm asking a question.
20        A.    When I blow the snow, I go up the
21  driveway, you know that, and I blow it north.
22  And I come down and I -- all the way, and I come
23  down the driveway, and I blow it north --
24  northwest.  And when I get to the -- in where the
```

1  two houses are where the lawn is here, my son's
2  lawn, I try to get it up there.  But then a lot of
3  times when the wind is bad, I'm blowing the snow
4  and it's blowing it back.  And I might have to do
5  it a couple times.  And a certain amount of it will
6  go all over the place.
7       Q.    Okay.  So the bottom line is when
8  you felt I was recording you and we had this
9  conversation, then you were at this point right
10 here?
11      A.    I do believe I was.
12      Q.    Okay.  Great.
13            Now, where was I in reference to
14 this?
15      A.    You were probably in here someplace in
16 your lawn.
17      Q.    Can you mark that?  Guesstimate.
18      A.    Well, I'm under oath.  I don't want to
19 mark this wrong.
20      Q.    You can guesstimate it.
21      MS. BAUER:  That's okay.  You can say that
22 it's an approximate.  That's fine.
23      THE WITNESS:  Property line, I suppose, in
24 and around there someplace.

```
 1   BY MR. DEWAR:
 2        Q.    Okay.  So we can guess the driveway
 3   here, your son's driveway, is about five to six
 4   feet in width?
 5        A.    Well, it's a lot more than five or six
 6   foot in width.
 7        Q.    Well, we can say -- we'll say eight
 8   feet.
 9        A.    No.  It's a lot more than that.
10        Q.    Ten feet.
11        A.    Eleven foot six.
12        Q.    Okay.  So we'll say it's twelve feet in
13   width.
14              So I was standing adjacent to you
15   then pretty much, right?
16        A.    Yeah.
17        Q.    So then it's fair to say then if the
18   driveway's twelve feet, then I was six feet away
19   from you, right?
20        A.    That's --
21        Q.    That would make sense, right?
22        A.    Yeah, it could be six.  It could be
23   eight.  Yeah.
24        Q.    Okay.  So the driveway's twelve.  We'll
```

1   do the math.  Six feet away.  So I was roughly six

2   feet away.  Okay.  All right.

3                  And at what point did you hear me

4   when I was six feet away from you --

5        A.    I didn't hear you.  I turned around and

6   I saw the camera -- your phone on me, the light on

7   the phone.  You were going like that, holding the

8   phone up.

9        Q.    Okay.  Did you hear me or understand

10  me with the snowblower ask you, based on what my

11  mom felt she asked you, not to hit the windows when

12  you --

13       A.    You could have asked me anything, and I

14  couldn't hear with the snowblower going.  All I saw

15  was the phone on.  I said, Put it down.  I just

16  heard a couple words about blowing the snow and the

17  other words I didn't like to hear.  And that's --

18       Q.    So you heard the other words, you said,

19  which was what, the alleged threat for your life?

20       A.    Yes.

21       Q.    So you heard that, "an ass kicking"?

22       A.    Not all of it.  But I heard the word

23  "ass kicking."  That was enough for me.

24       Q.    Okay.  So when you heard that, at what

1   point -- did you continue to blow the snow --

2          A.    Yes.

3          Q.    -- or did you --

4          MS. BAUER:  So I'm going to start objecting

5   at this point.  We've already gone over these

6   questions.  So ask him something new.  All right?

7   So these questions he's already been asked.  So

8   ask him questions that haven't been asked for

9   information you haven't received.  Okay?

10  BY MR. DEWAR:

11         Q.    Okay.  So once this was established, at

12  what point did you speak with your daughter-in-law

13  Jen to call the police?

14         MS. BAUER:  So we've already gone over this

15  as well, Mr. Dewar.  So ask questions that haven't

16  been asked of Mr. Hosty.  So ask questions of the

17  witness that haven't been asked yet because this

18  information has already been given.  So ask

19  questions that haven't been asked.

20         MR. DEWAR:  Right.  But, Mrs. Bauer, you just

21  mentioned a few minutes ago for me to ask questions

22  pertaining to the incident, and that's what I'm

23  doing.

24         MS. BAUER:  Right.  So if you already have

1  the information, if Mr. Hosty has already given

2  this information, you can't keep asking the same

3  question.  Right?  So that's one of the rules.

4  It's just repetitive, and it's a waste of

5  everyone's time.  So just ask questions that you

6  have not received answers to.  So I've literally

7  already asked these questions of him.

8       MR. DEWAR:  Okay.  And you understand why I'm

9  asking these questions?

10      MS. BAUER:  I have no idea why you're asking

11  these questions.

12      MR. DEWAR:  Okay.  Well, then let me clarify

13  why --

14      MS. BAUER:  Mr. Dewar, it does not matter why

15  you're asking these questions.  You do not need to

16  tell me that.  That's not something we need to have

17  a conversation about.  These questions have already

18  been asked of him.  Okay?  So just ask him new

19  questions for information that you don't have yet

20  about this case.  That's what a rebuttal is for.

21  Okay?

22      MR. DEWAR:  Okay.  All right.  Well, I'll go

23  further then.  Apparently make it noted for the

24  record that Mrs. Bauer will not let me ask any more

1 | questions pertaining to the incident.  So I guess
2 | we'll have to move on from there.  So I'd like to
3 | because there's differing information based on what
4 | actually occurred from both myself and Mrs. Dewar.
5 | But apparently you're going to not allow me, so
6 | we'll note that.  Okay.

7 |       MS. BAUER:  Okay.  So for the record, what I
8 | said was you need to ask questions that have not
9 | been asked of Mr. Hosty.  If you do not have any
10 | more questions that have not been asked, then
11 | that's fine.  That's up to you.

12 |       MR. DEWAR:  Okay.  I will ask different
13 | questions then.

14 | BY MR. DEWAR:

15 |       Q.    Did you notice the snow going upwards
16 | as you were snow-blowing it in the driveway that
17 | the wind was pushing it into Mrs. Dewar, my mom's
18 | windows, side windows?  Did you notice that at all?

19 |       A.    No.  I said that the snow was blowing
20 | all over the place.  I do believe I answered that
21 | question.

22 |       Q.    So you don't recall her approaching you
23 | asking you about the snow blowing into her windows?

24 |       A.    I told you I don't know what she was

1  saying.

2       Q.    Okay.  When you were blowing the snow

3  in the backyard and your son's patio --

4       A.    Yes.

5       Q.    -- were you blowing the snow do you

6  recall over the fence into Mrs. Dewar's yard?

7       A.    No.  I blew it north in the backyard

8  where there was room for it because it was

9  impossible to blow it into Mrs. Dewar's backyard

10 because there was a six-foot fence.

11      Q.    Well, at the time the picture shows it

12 was a five-foot fence.

13      A.    It was six foot.  It was put up a

14 foot -- six inches from the bottom.  Okay.  It

15 was five foot six then.

16      Q.    Here's the picture of the fence.

17      A.    Yes.  It was -- it's down as a six-foot

18 fence.

19      Q.    So you don't recall blowing --

20      A.    No.  Why would I blow there when I can

21 blow from down -- this is all from down here on his

22 property.  That would be -- because the snowblower

23 wouldn't blow it over the fence.  It's not that

24 powerful.  Not unless the wind would take it over.

Case: 1:16-cv-02287 Document #: 117 Filed: 06/28/18 Page 100 of 162 PageID #:1413

1          Q.    So you --

2          A.    And I wouldn't blow it that way.  I

3    don't blow it that way.

4          Q.    So you didn't blow it over the fence?

5          A.    I didn't.

6          Q.    And you don't remember Mrs. Dewar

7    asking you not to blow it --

8          A.    A few years ago she asked me prior to

9    that not to blow it over the fence, and I told her,

10   I said, I don't blow it over the fence.  And I

11   never did blow it over the fence.  And nothing

12   happened.  That's all that was to that.  That was

13   the gist of that conversation.  That was years ago.

14   That was prior to that day.

15         Q.    Okay.  And do you recall on that

16   incident what had happened with Mrs. Dewar, the

17   conversation?

18         A.    There was no conversation.

19         MS. BAUER:  Okay.  I'm going to object to

20   that because that incident has nothing to do with

21   this lawsuit.  And so that's not proportional to

22   this case.  If you have questions about this

23   incident that have not been asked before, please

24   ask those.

```
 1          MR. DEWAR:  It is relevant because of the
 2   conversation which we had -- he had with
 3   Mrs. Dewar.  There were profanities used over and
 4   over by Mr. Hosty because he was blowing the snow
 5   over the fence.  I was a witness to that.
 6          MS. BAUER:  Okay.  So, Mr. Dewar, this has
 7   nothing to do with this lawsuit.  Okay?  So if
 8   you -- and you're also not here to testify today.
 9          MR. DEWAR:  Okay.
10          MS. BAUER:  Okay?
11          MR. DEWAR:  Okay.  So I can be clear on the
12   rule guidelines here, the federal rule guidelines,
13   am I going to be allowed to ask Mr. Hosty other
14   questions that are not pertaining specifically to
15   this incident?
16          MS. BAUER:  No.  No.  In regards to other
17   incidents that you've had with Mr. Hosty, no.  That
18   is not related to this lawsuit.  Those are entirely
19   separate incidents.
20                  So if you have questions regarding
21   this incident in relation that is proportional to
22   the lawsuit that you have brought against my
23   clients that are new, then please ask them.
24          MR. DEWAR:  Okay.  I will.
```

1   BY MR. DEWAR:

2         Q.    Which officer do you recall was

3   knocking on my mom's front door when we were

4   in the house?

5         A.    I don't recall.

6         Q.    But you do recall an officer knocking

7   on that front door as you told Mrs. Bauer?

8         A.    Yes.

9         Q.    Yes.  Okay.

10              Your daughter-in-law Jen, you said

11  that she called the police?

12        A.    Yes.

13        Q.    At what point did she call the police?

14  Was it after you felt you were threatened for your

15  life, or was it a few minutes thereafter?

16        A.    Maybe two seconds later I yelled up

17  to her, she was standing on the porch, Call the

18  police.  And she called the police.

19        Q.    Okay.  So was she actually in the house

20  with the door shut, or where was she exactly?

21        A.    I think we went through this already.

22  She was standing on the porch.

23        Q.    So she was on the porch?

24        A.    Standing at the front door.

```
 1          Q.    Okay.  Because you had mentioned that
 2    you -- she was about halfway between myself and the
 3    house.  So you're saying now she was at the porch?
 4          A.    She was on the porch at the front door.
 5          Q.    So not halfway --
 6          A.    I didn't have a tape.  I couldn't
 7    measure it.  You -- okay?
 8          Q.    Okay.  That's your answer.
 9                When you shovel your son's snow or
10    snow-blow his snow, typically what time do you do
11    that at in the mornings?
12          A.    Does that relate to this day?
13          Q.    Yes.
14          MS. BAUER:  Okay.  So I'm going to object to
15    that because it's vague.  You haven't provided a
16    timeframe, and it's not related to this incident.
17    BY MR. DEWAR:
18          Q.    Okay.  When I apologized, you said that
19    I made three attempts to apologize to you.
20          A.    Um-hmm.  Yes.  I'm sorry.
21          Q.    Yeah.  Because you said -- and -- but
22    it was unacceptable to the police.
23          A.    No, I didn't say it was unacceptable to
24    the police.  It was unacceptable to me.
```

1         Q.    To you.  Okay.

2         A.    The police officer asked me would I

3   accept it, and I said no.

4         Q.    Okay.  Do you recall what -- how I

5   supposedly apologized to you, the phraseology?

6         A.    To the best of my ability, you

7   apologized -- I answered that question earlier.

8   But I can answer it again.  I -- you apologized in

9   a way -- I may not have the word for word -- that

10  if you offended me, if you scared me in any way

11  that you were sorry.  But you failed to apologize

12  for -- I didn't hear the word "ass kicking" put in

13  there.  So, therefore, I did not accept it.

14              This is the third time I think I've

15  answered that question.

16        Q.    Okay.  No.  That's good, because you're

17  clarifying how you remember I apologized supposedly.

18              So you don't recall me apologizing

19  to the police for coming out there wasting the

20  taxpayers' dollars and not handling this like two

21  gentlemen?

22        A.    No.

23        Q.    So you felt that was an apology to you

24  then?

```
 1        A.     What was an apology to me?  You have
 2   to make the question clearer.  Was it -- you're
 3   putting in -- two questions into one.
 4        Q.     Okay.  Let me clarify.  You do not --
 5   so what you're telling me is you don't recall me
 6   stating to the two police officers I apologize to
 7   the police for coming out here and wasting the
 8   taxpayers' dollars and not being able to handle
 9   this like two gentlemen?
10        A.     I honestly don't recall.
11        Q.     You don't recall that?
12        A.     No.
13        Q.     Okay.  Which officer do you recall
14   arrested me and handcuffed me out of the two,
15   Officer Devine or Officer Felmon, out of your --
16   based on your memory of the occurrence four years
17   ago?
18        A.     It was --
19        MS. BAUER:  I'm going to object to foundation.
20   You haven't established that he knows the officers'
21   names or that those officers were even on scene
22   that day.
23             But to the extent that you can
24   answer that question, go ahead.
```

```
 1        THE WITNESS:  There was two police officers.
 2   One of them was Officer Devine.  The other officer
 3   I can't remember his name.  But it was the tallest
 4   of the two that put the handcuffs on you.
 5   BY MR. DEWAR:
 6        Q.    So you never met them before, either of
 7   the two officers before the incident?
 8        A.    No.
 9        Q.    You never met them.  Okay.
10              Okay.  At the time when the incident
11   occurred, was there anyone else out there as well
12   besides the two officers, myself, my mom, and
13   yourself?
14        MS. BAUER:  I'm going to object because it's
15   vague.  In relation to what incident?
16        MR. DEWAR:  This incident.
17        MS. BAUER:  Okay.  So at what point within
18   the incident?
19              But if you know what's talking
20   about, you can answer.
21   BY MR. DEWAR:
22        Q.    Let me clarify.  At the time when the
23   officers arrived, do you recall the neighbor across
24   the street, Scott McKenna, being near, present
```

1  during this whole situation?

2          A.    I -- let me think about that one.

3          Q.    And this is Chicago Police Department

4  Detective Scott McKenna at                       .

5  You don't recall him being there?

6          A.    I recall him standing across the

7  street.

8          MS. BAUER:  Okay.  Actually -- I'm sorry.

9  Could you please mark that as confidential, what

10 Mr. Dewar just stated as far as that address?

11                To be clear, for this deposition,

12 any numbers or residential addresses that you have

13 for police officers cannot be stated on the record.

14         MR. DEWAR:  Okay.  Agreed.

15         MS. BAUER:  Okay.  Continue.

16         MR. DEWAR:  Agreed.

17         MS. BAUER:  You can answer the question that

18 he asked.

19         THE WITNESS:  Could you repeat the question,

20 please?

21 BY MR. DEWAR:

22         Q.    Sure.

23                So at the time when officer -- the

24 two officers were there questioning -- looking

1   supposedly for an apology from me, do you remember

2   your neighbor across the street, Scott McKenna,

3   Officer Scott McKenna, being present?

4        A.    I don't remember him being present.

5   But I remember him standing across the street

6   looking over.  There was neighbors on every porch

7   it seemed like to me that night.  A lot of people

8   were looking out.

9        Q.    So he was across the street, he wasn't

10  there --

11       A.    That's the only place I saw him.  If he

12  was there, I didn't see him.  He could have been

13  there.  He could have been up in our driveway for

14  all I care because my business was with the police

15  and you at that time, and I wasn't looking around

16  to see who's who.

17       Q.    Okay.  And you mentioned -- do you

18  remember what time you signed the complaint here

19  against me?

20       A.    I don't remember what time, no.  It was

21  later in the evening.

22       Q.    But they came -- did they come to your

23  house, or did you sign it at the place where it

24  occurred, at your son's house?

```
 1          A.    No.   They came to my house.

 2          Q.    They came to your house.   Okay.

 3          A.    For me to sign it.

 4          Q.    Okay.  And you had mentioned that they

 5   came a second time.  Do you recall what time that

 6   was?  Or did they only come once?

 7          A.    They only came once.  He came back to

 8   get it signed.  I never said they came a second

 9   time.

10          Q.    Okay.  And do you remember at all what

11   time they came?

12          A.    No.

13          Q.    No.   Was it between 7:00 p.m. and 11:00

14   p.m.?  Was it that evening?

15          A.    Well, I usually go to bed at 10:30.  It

16   was before I went to bed.

17          Q.    Okay.

18          A.    Sometimes I stay up to 11:00.  I don't

19   know.  Before I went to bed anyway, so ...

20          Q.    Okay.  Now, you had mentioned the

21   police car.  Was it a standard police car, or was

22   it a squad care?

23          A.    It was a police car with lights on top

24   of it.  I don't know the difference on it.  I
```

```
 1   didn't look.  You couldn't see from here to across
 2   the street with the snow and the wind blowing.
 3        Q.    And do you remember where that car was
 4   parked, if it was parked on the same side as --
 5        A.    I have no idea.
 6        Q.    You don't remember?
 7        A.    I don't remember.  I don't recall.
 8        Q.    Okay.  After the cuffs were put on me
 9   and I was put into the vehicle, which it was across
10   the street, were you outside, and if so, for how
11   long?
12        A.    As far as I know, I probably finished
13   blowing the snow and went home.
14        Q.    So do you recall how long you --
15        A.    No.
16        Q.    -- were outside?
17              Okay.  Do you recall any of the two
18   officers getting out of the car and conferring with
19   Detective Scott McKenna afterwards?
20        A.    No.
21        Q.    No.  Okay.
22              At any point after the incident, did
23   you confer with either of the two police officers
24   or with Officer Scott McKenna?
```

1        A.    How do you mean confer with them?   What

2   do you mean?

3        Q.    Speak with them.   Talk with them.

4        A.    Well, I spoke with Mike -- with Devine

5   when he came to tell me just file the complaint.

6   That was all.   And he said, This is the compliant

7   if you want to file it and sign it.   And I signed

8   it, and he was on his way.   That was all.

9        Q.    So you said you signed the complaint

10  that came to your house.

11       A.    Yeah.   That's when I spoke with him.

12       Q.    Okay.   So when you spoke with Detective

13  Scott McKenna, where did you speak with him?

14       A.    Where did I speak with Detective

15  McKenna?   I didn't say I spoke with Detective Scott

16  McKenna.

17       Q.    So you didn't speak with him after the

18  incident?

19       A.    You're telling me that I didn't, or are

20  you asking me?

21       Q.    No.   I'm asking.   I'm asking.

22       A.    No, I didn't.

23       Q.    Okay.   So you don't recall speaking

24  with him at all?

Case: 1:16-cv-02287 Document #: 117 Filed: 06/28/18 Page 112 of 162 PageID #:1425

```
 1         A.    I don't recall speaking --
 2         MS. BAUER:  Okay.  I'm going to object to --
 3  you've already asked this question.
 4  BY MR. DEWAR:
 5         Q.    Okay.  When you signed the complaint,
 6  did they ask you what your age was at the time you
 7  signed the complaint?
 8         A.    Don't recall.
 9         Q.    Okay.  So one of the officers came
10  over, and this is all you signed?  That was it?
11         A.    That's what I said to you.
12         Q.    That's what you said.  Okay.
13               Because at the time --
14         A.    That I can recall.  That I can recall.
15  That's all.
16         Q.    Okay.  Now, Mrs. Bauer, I'm going to
17  ask some questions pertaining to the court case
18  that Mr. Hosty -- you had ask him on March 25th,
19  2017 when he went with the assistant state's
20  attorney.
21               So at the time of the incident, it
22  was, we established, February 17, 2014, and then
23  five weeks later you had mentioned you went to
24  court and you met with the assistant state's
```

1  attorney which you never met.

2        MS. BAUER:  Okay.  So you're testifying?  So

3  you can ask him questions.

4        MR. DEWAR:  Okay.  I'm going to ask him

5  questions here.

6        MS. BAUER:  Okay.  So you can't just testify

7  as -- like you can't say this is your account of

8  what happened here because it's not your deposition

9  today.  So we're just asking questions of Mr. Hosty

10  that are new and that pertain to the lawsuit

11  against my clients.

12        MR. DEWAR:  Gotcha.

13  BY MR. DEWAR:

14        Q.    When your were, on March 25th, at the

15  court hearing with the assistant state's attorney,

16  do you recall what age you mentioned you were at

17  the time to the Court?

18        MS. BAUER:  Okay.  So I'm going to object to

19  this.  If you're going to ask him to give his date

20  of birth or any sort of personal information like

21  that, I'm going to object to that.

22              Also, how is this -- like this is

23  not related to the lawsuit against my clients.

24  Okay?  So ask him questions that relate to the

```
 1  lawsuit that you've brought against the police
 2  officers in this case.
 3          MR. DEWAR:  Okay.  You already asked
 4  Mr. Hosty his date of birth.
 5          MS. BAUER:  No, I didn't.
 6          MR. DEWAR:  Okay.  So --
 7          MS. BAUER:  To be clear, I did not ask
 8  Mr. Hosty's date of birth.
 9          MR. DEWAR:  Will you allow me to ask
10  Mr. Hosty --
11          MS. BAUER:  No.
12          MR. DEWAR:  -- his date of birth?
13          MS. BAUER:  No.  He is a victim in this case.
14  Okay?  I'm not -- I'm not going to allow you to be
15  asking a victim certain identifying information,
16  date of birth, Social Security, personal address,
17  that sort of thing.  No.
18          MR. DEWAR:  Okay.  Even though he stated his
19  age --
20          MS. BAUER:  So if you have that paper, then
21  you already have something that he said.
22                    For the record, Mr. Dewar appears to
23  be referencing a court transcript of some type.
24  Okay?
```

1          MR. DEWAR:  March 25th, 2014.

2          MS. BAUER:  And that's fine.  Okay.  So ask

3    Mr. Hosty questions that you don't know the answer

4    to that relate to the lawsuit against my clients.

5    If you have some sort of transcript there, that's

6    something you can bring up later on.  This isn't a

7    trial proceeding.  This is a deposition.  We're not

8    in court.

9    BY MR. DEWAR:

10         Q.    Okay.  So on March 25th, you didn't

11   testify against myself, you basically --

12         A.    I did whatever that piece of paper says

13   you have there in your hand.

14         Q.    Right.

15         A.    So you know what I did.

16         Q.    Okay.  On that day that occurred, did

17   you have any other form of contact with myself

18   other than that incident that occurred at 6:30 p.m.

19   on the 17th of February 2014?

20         A.    Could you just repeat that now again

21   because I lost you a little bit?

22         Q.    Yeah.  Have you had -- did -- on that

23   particular day, was this the only point of contact

24   you had with me?

1          A.     To the best of my knowledge, yes.

2          Q.     Okay.

3          A.     I don't recall anything else.

4          Q.     Okay.  All right.  And at the time did

5     you see me blowing snow while you were blowing

6     snow, or did you even pay attention to that?

7          A.     I didn't pay any attention.  Everybody

8     was out blowing snow.  The neighbors all over the

9     place blowing snow.  It seemed like it was one in

10    every driveway.  All I could hear was snowblowers

11    going.

12         Q.     Okay.  So the only conversation you had

13    with me, Mr. Hosty, was over the pictures and the

14    cellphone, that you felt I was taking pictures and

15    recording you?

16         A.     Well, until the police came.  And then

17    there was apologies back and forth and while you

18    were here.  We already went through all that.  That

19    was the only conversation I recall that happened

20    with you.  That wasn't a conversation.  I didn't

21    have a conversation like I answered that earlier.

22    My snowblower was going.  I didn't have a

23    conversation with you to the best of my knowledge.

24         Q.     Okay.  So when the officers arrested

1    me, did I resist arrest or did I not resist arrest

2    based on your recollection?

3         A.    Didn't look to me like you resisted

4    arrest, no.

5         Q.    Okay.  Do you recall after the second

6    time I stated that I apologized to the police

7    officers for coming out, that we couldn't -- we had

8    to pay -- the taxpayers had to pay for it, and we

9    couldn't handle this like two gentlemen, do you

10   recall stating, Apologize for what?

11        MS. BAUER:  Okay.  So I'm going to object

12   because you misstated testimony there.  Like he

13   never said that he recalled you saying that.  So

14   just ask him --

15   BY MR. DEWAR:

16        Q.    Okay.  Then let me go past that.

17             Do you recall right before I was

18   arrested standing in the driveway at this point and

19   walking around in a circle and saying in a very

20   comfortable voice, Apologize for what?  Do you

21   recall that?

22        MS. BAUER:  Okay.  So I'm going to object.

23   You can -- you can't testify when you ask a

24   question.  Okay?  So you can't say that this person

1   was doing something.  You can ask Mr. Hosty what he

2   remembers someone doing something.

3   BY MR. DEWAR:

4       Q.   Okay.  Mr. Hosty, right before they

5   arrested me, do you remember what you were doing?

6   Were you standing still, or were you walking in a

7   circle?

8       A.   I don't know why I'd be walking in a

9   circle.  I would imagine I'd be standing there

10  waiting to see what was going to happen there, you

11  know.  It's hard to recall.

12      Q.   So after I made two, as you say,

13  apologies to you --

14      A.   Yeah.

15      Q.   -- did you ask me the third and final

16  time for me to apologize to you?

17      A.   I never asked you at any time.  The

18  police officers had asked you.

19      Q.   Okay.  So you never asked me to

20  apologize?

21      A.   No.

22      Q.   No.  Okay.

23           At the time of the incident, do you

24  recall your son John being present?

1        A.     No.   I do believe my son John was not

2   present.

3        Q.     Okay.

4        A.     I don't recall him being present, no.

5   I would imagine I should be able to recall that.

6        Q.     Okay.   Were there any other witnesses

7   other than your daughter-in-law there, Jennifer?

8        A.     To my knowledge, no.

9        Q.     Okay.

10       A.     At that time she may not be a witness.

11  She only called the police.   I don't even know if

12  she came out there -- if she even passed the porch

13  at any given time.

14       Q.     Did she hear the conversation?

15       A.     I don't know.

16       Q.     Did you ask her?

17       A.     No.

18       Q.     She just -- but she did hear you say

19  call the police?

20       A.     Yes, she did.   When I yelled it out to

21  her, she did, yeah.

22       Q.     Did you ask her if she heard the

23  conversation?

24       A.     I already answered it.

1          MS. BAUER:  Yeah.  I'm going to object
2    because you're asking the same question that you
3    just asked.  So ask new questions that relate to
4    this incident.
5    BY MR. DEWAR:
6          Q.   Okay.  I'm going to ask a question,
7    Mrs. Bauer, here that was not answered in regards
8    to Mr. Hosty.
9               What was your previous employment,
10   or what did you do before retiring?
11         A.   I'm not going to answer that question.
12         MS. BAUER:  Yeah.  I asked that, and he
13   refused to answer it.
14   BY MR. DEWAR:
15         Q.   When you blew the snow, did you come
16   from your house and -- to your son's house to blow
17   the snow, and how did you -- what path do you take?
18         A.   The city sidewalk from my house to my
19   son's house.
20         Q.   And did you take a straight shot?
21         A.   I walk down the city sidewalk.  It's a
22   straight street.
23         Q.   Do you go around Mrs. Dewar's house?
24         A.   Go around Mrs. Dewar's house?  No.  I

1   stay on the city sidewalk.

2          Q.    Okay.  Straight to your son's --

3          A.    Yes.

4          Q.    -- driveway?

5                Okay.  Did you mention to either of

6   the officers you felt threatened by me by stating I

7   was going to kick your ass?

8          A.    Yes.

9          Q.    Was there a reason why you continued to

10  blow snow after you felt threatened?

11         A.    Yeah.  Waiting for them to come.  I

12  wanted to get the snow done, get out of there, go

13  home.

14         Q.    So the snow was more important than

15  your safety at that point then?

16         A.    I was on my son's property.

17         Q.    So you felt safe on your son's

18  property?

19         A.    Well, I didn't feel safe until the

20  police come.  Then I felt much safer.

21         Q.    And you said it took ten minutes?

22         A.    I said approximately.

23         Q.    About ten.  Okay.

24               So you were approximately out there

1  on your son's driveway for ten minutes after you

2  felt threatened?

3       A.    Yeah.  I kept -- I continued to blow

4  the snow, yes.

5       Q.    Okay.  When my mom was yelling, did you

6  feel she was yelling at you, Mr. Hosty?

7       A.    I didn't know who she was yelling at.

8       Q.    Was she yelling in your direction?

9       A.    I don't know.  The snowblower was

10  going.  The wind was blowing.  The snow was

11  blowing.  I don't know what direction she was

12  yelling.

13       Q.    Did you see her at all?  But you --

14  did you see her at all?

15       A.    Yeah.  I could see her like I see

16  everybody.  Bad snowstorm, everybody was bundled

17  up.  You could see a person there.  I couldn't tell

18  who it was.  Yeah.

19       Q.    Okay.  At what point did you

20  acknowledge Mrs. Dewar?

21       A.    When I was blowing the snow.

22       Q.    Okay.

23       A.    And I was down there.  I don't know

24  what time it was.

1        Q.    Okay.  So where were you in reference
2   to the driveway when you acknowledged Mrs. Dewar?
3        A.    On my son's driveway.
4        Q.    Okay.  Now, you acknowledged me --
5        A.    Yeah.
6        Q.    -- here, which you said about twelve
7   feet; so we were about six feet.  So at what point
8   were you blowing snow when you acknowledged
9   Mrs. Dewar screaming as you said?
10       A.    Well, I would have to say I was down
11  towards the end of the driveway.
12       Q.    Okay.
13       A.    My son's driveway.
14       Q.    So how far down?  Towards the patio?
15  Towards the last window?
16       A.    Towards the city sidewalk.
17       Q.    Well, the city sidewalk's in front.
18       A.    Close to where you were at.  In or
19  around that area there someplace.
20       Q.    Okay.
21       A.    Where I was at, rather.
22       Q.    Can you mark that, please?
23       A.    I already did.
24       Q.    You marked where I was.

```
 1        A.    Okay.

 2        Q.    Thank you.

 3        A.    (Complying.)

 4        Q.    Okay.  So that's where you were at.

 5              And where was Mrs. Dewar when you

 6   heard her yelling you couldn't understand her?

 7        A.    She was over here this side someplace.

 8   I do believe she was close to your lawn.  I can't

 9   mark it because it's not on there.  It's the walk

10   going right into your house, which is right here.

11   She couldn't be here because there's two foot of

12   snow -- three foot of snow on that lawn there.  So

13   there was no way she could be there.  She was on

14   the sidewalk which led from the city walk to your

15   front door.

16        Q.    So she was way over there.

17        A.    Yeah.

18        MS. BAUER:  Okay.  So you can't testify,

19   right?  Just ask him questions.  You can't mark on

20   exhibits and put things downs that the witness

21   didn't put down.

22   BY MR. DEWAR:

23        Q.    Okay.  So at that point you acknowledge

24   Mrs. Dewar, but you couldn't understand her?
```

```
 1          MS. BAUER:  I'm going to object because we've
 2   already been over this a couple times.  Okay?  So
 3   ask new questions that pertain to this incident.
 4   BY MR. DEWAR:
 5          Q.   Okay.  At any point did you acknowledge
 6   Mrs. Dewar talking with me to approach you?
 7          MS. BAUER:  Okay.  So I'm going to object
 8   because I don't even know what you're asking.  So
 9   I'm going to say that it's vague and unclear and
10   confusing.
11                    But if you understand what he's
12   asking, go ahead.
13          THE WITNESS:  I really don't.  Because -- I
14   don't recall him talking to her.  That's the answer
15   to the question.  I don't recall him.  He could
16   have been for all I know.  I wasn't looking over to
17   see what they were doing.  I was trying to do my
18   own thing with the snow.
19   BY MR. DEWAR:
20          Q.   Okay.  So did you -- when you heard
21   Mrs. Dewar screaming and you couldn't understand
22   her, did you respond to her in any manner --
23          A.   No, I don't respond because --
24          Q.   -- or you just kept blowing?
```

1        A.    I just kept blowing snow.

2        Q.    Okay.  So you don't recall saying, You

3   people --

4        MS. BAUER:  Okay.  I'm going to start

5   objecting because you've already gone over this.

6   I've asked him these questions, and you've already

7   asked him these questions.  Okay?  So ask him new

8   questions that he hasn't given responses to yet

9   that pertain to the lawsuit against my clients.

10       MR. DEWAR:  Okay.

11       MS. BAUER:  If you have any.

12       MR. DEWAR:  Yeah, I have a few.

13       THE WITNESS:  I need to send a text real

14  quick.

15       MS. BAUER:  Absolutely.  Go ahead.

16                  (Brief pause.)

17  BY MR. DEWAR:

18       Q.    Couple more questions, and we'll end

19  this.

20                  Do you recall what neighbors were

21  watching at the time the officers arrived?

22       A.    I think I already answered it.  But I

23  don't.

24       Q.    You don't.  Okay.

```
 1                  All right.  One more question.  So
 2   just to be redundant, all you remember was me
 3   threatening to kick your ass, and you don't
 4   remember me asking you not to blow the snow?
 5        MS. BAUER:  Okay.  I'm going to object
 6   to that question.  That's not -- it misstates
 7   testimony.  And it's a compound question.
 8                  So answer if you know what he's
 9   talking about.
10        THE WITNESS:  I don't know what he's talking
11   about.
12   BY MR. DEWAR:
13        Q.   Well, let me clarify.  So all you
14   remember was when you were blowing the snow that
15   you heard me mutter, I'm going to kick your ass?
16        MS. BAUER:  I'm going to object because
17   you're misstating his testimony.
18   BY MR. DEWAR:
19        Q.   Okay.  Then let me rephrase it.
20                  When do you recall me stating I was
21   going to threaten you?
22        MS. BAUER:  I'm going to object to that as
23   well because we've already been over this.  I've
24   asked this question, and so have you.  So please
```

```
 1   ask new questions that pertain to the lawsuit
 2   against the defendant officers in this case if
 3   you have any.
 4   BY MR. DEWAR:
 5        Q.   Okay.  Do you recall the officers
 6   coercing me to apologize to you?
 7        MS. BAUER:  So I'm going to object to that
 8   as well, to your use of the term "coercing."
 9   BY MR. DEWAR:
10        Q.   Do you recall the officers persuading
11   me, trying to convince me to apologize to you?
12        MS. BAUER:  I'm going to object to that as
13   well.  Answer --
14        MR. DEWAR:  Why?
15        MS. BAUER:  I'm going to object to that as
16   being vague and testifying.
17                  And answer if you know.
18        THE WITNESS:  Ask it again.
19   BY MR. DEWAR:
20        Q.   Do you recall the two officers
21   persuading me to apologize to you?
22        A.   I don't recall the persuading you.  I
23   recall them asking you -- asking me, like I said
24   before, if I was satisfied with that, and I said
```

1   no.  And they said, Well, you have a chance to

2   apologize again.  So I've answered that question

3   I think three times now.

4        Q.    Do you recall my mom, Mrs. Dewar,

5   persuading me and screaming to apologize to you?

6        MS. BAUER:  I'm going to object as well

7   because we've already asked Mr. Hosty about what he

8   remembers your mom saying.  So this has already

9   been asked.  So please ask new questions that

10  pertain to the lawsuit against my clients.

11       MR. DEWAR:  Pertaining to the incident?

12       MS. BAUER:  Yes, pertaining to the lawsuit

13  that you've brought against the Chicago police

14  officers.

15       MR. DEWAR:  Well, that's it for questions.

16       MS. BAUER:  Okay.  Great.  So we're all done.

17       THE WITNESS:  Okay.  Thank you.

18       MS. BAUER:  As far as your signature goes,

19  this is totally up to you.  You can waive or

20  reserve signature.

21            So what that means is that if you

22  waive it, then you trust that what the court

23  reporter has taken down today is true and accurate.

24  They're a third party, and this is what they do for

1  a living.  But it's completely up to you.

2              If you want to reserve it, then what

3  you can do, depending on how Urlaub Bowen does it,

4  is you can review the transcript and send in a form

5  that if like a name was spelled incorrectly or that

6  sort of thing.

7        THE WITNESS:  Just waive it.  That's fine.

8        MS. BAUER:  Okay.  Most people waive it, but

9  it's up to you.

10        THE WITNESS:  Yeah.

11                          (The deposition concluded at

12                           12:53 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

1

2                    REPORTER'S CERTIFICATE

3         I, Nick D. Bowen, do hereby certify that
   WILLIAM HOSTY was duly sworn by me to testify the
4  whole truth, that the foregoing deposition was
   recorded stenographically by me and was reduced to
5  computerized transcript under my direction, and
   that the said deposition constitutes a true record
6  of the testimony given by said witness.

7         I further certify that the reading and
   signing of the deposition was waived by the
8  deponent.

9         I further certify that I am not a relative
   or employee or attorney or counsel of any of the
10 parties, or a relative or employee of such attorney
   or counsel, or financially interested directly or
11 indirectly in this action.

12        IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Chicago,
13 Illinois, this 21st day of March 2018.

14

15

16            Illinois CSR No. 084-001661

17

18

19

20

21

22

23

24

# EXHIBIT 4

Capital Reporting Company
911 CALL 02/17/2014

1

1
2
3
4
5
6
7
8                          911 CALLS
9              Monday, February 17, 2014
10                       6:27:46 PM
11
12
13
14
15
16
17
18
19
20
21
22
23

**Capital Reporting Company**
**911 CALL 02/17/2014**

2

```
 1              P R O C E E D I N G S
 2          911 OPERATOR:  Sky Rowan 911, Griffin.
 3          MR. DEWAR:  Yeah, hey Griffin.  I just called
 4  19th Ward and they told me to call here.  I'm on 11347
 5  South Millard, and ah, I hate to bother you guys with
 6  this but they told me to call this number.
 7              I'm having an issue with my neighbor on the
 8  north, at 11343 South Millard: Hosty, and
 9  unfortunately we got a paper trail with them, it's
10  just unfortunate.  Ah, the father, he's -- asked him
11  nicely not to blow the snow.  Obviously, you gotta put
12  it somewhere, I'm understandable, but he's actually --
13  he's actually hitting our upper windows and it don't
14  look like he's making an attempt to blow it otherwise.
15  So, I asked him nicely and then he -- he told his
16  daughter-in-law that was in the house to call the
17  police and say I threatened him.  And I was real nice
18  to him, I said, "You know, I understand you gotta put
19  the snow somewhere but try not to jack it up six,
20  seven feet and hit our window."  And then he goes
21  crazy and he says, "I'm calling -- you know I'm going
22  to call and say this guy threatened me."  So --
```

3

1        911 OPERATOR: What's your name, sir?

2        MR. DEWAR: Last name's Dewar. D - E - W - A

3 - R.

4        911 OPERATOR: Okay. We'll send an officer

5 as soon as we can.

6        MR. DEWAR: Yeah, this -- you know, this has

7 got to stop. I understand there's nowhere to put the

8 snow but, you know, you ask the guy nicely.

9        MRS. DEWAR: We got a whole yard full.

10        MR. DEWAR: So, you're going to send out a

11 guy, then?

12        911 OPERATOR: Yes, sir.

13        MR. DEWAR: Okay. All right. Thank you.

14        911 OPERATOR: All right.

15        (WHEREUPON, the call ended.)

16

17

18

19

20

21

22

23

**Capital Reporting Company**
**911 CALL 02/17/2014**

4

1                    CERTIFICATE OF TRANSCRIPTION

2

3        I, ERIN POLLOCK, hereby certify that I am not the

4    Court Reporter who reported the following proceeding

5    and that I have typed the transcript of this

6    proceeding using the notes and recordings.  The

7    foregoing/attached transcript is a true, correct, and

8    complete transcription of said proceeding.

9

10

11      03/18/2014

12      Date                      ERIN POLLOCK

13                                Transcriptionist

14

15

16

17

18

19

20

21

22



# OFFICE OF EMERGENCY MANAGEMENT AND COMMUNICATIONS
## CITY OF CHICAGO

March 13, 2014

**David Dewar – FA-14-0190**
Ddewar05@hotmail.com

**RE: FOIA Request**

Dear David Dewar,

On behalf of the Office of Emergency Management and Communications (OEMC), I am responding to your Freedom of Information (FOIA) request that our office received on March 10, 2014 were you requested the following information:

*"The audio and transcript of a call from February 17, 2014. The call was made from telephone number 708-369-1153 at 11347 S. Millard Ave"*

In response to your request the 911 audio and event query have been provided.

Sincerely,

Dionne Tate
Freedom of Information Officer
Office of Emergency Management and Communications
312-746-9424



Customer Service Number
Feb-19, 2014

Case: 1:16-cv-02287-JD Document #: 117 Filed: 06/28/18 Page 139 of 162 PageID #:1452

Mobile Number:    (708) 365-1155
Account Number:   310653095

Page 11

LOCAL AIRTIME, LONG DISTANCE and INTERNATIONAL CHARGES (Continued)

| Date | Destination | Time | Number | Call Type | Minutes | Airtime | Toll | Total |
|------|-------------|------|--------|-----------|---------|---------|------|-------|
| 2/16/14 | 1-800 # | 11:01 AM | 800-244-2273 | | 1 | - | - | - |
| 2/16/14 | Chicago, IL | 12:30 PM | 773-445-5340 | | 1 | - | - | - |
| 2/16/14 | Palos Park, IL | 3:01 PM | 708-361-9610 | | 2 | - | - | - |
| 2/16/14 | 1-800 # | 3:28 PM | 800-972-3030 | | 1 | - | - | - |
| 2/16/14 | 1-800 # | 3:30 PM | 800-972-3030 | | 1 | - | - | - |
| 2/16/14 | Northbrook, IL | 3:43 PM | 630-302-9570 | | 1 | - | - | - |
| 2/16/14 | Chicago, IL | 8:30 PM | 773-445-5340 | | 3 | - | - | - |
| 2/16/14 | 1-800 # | 9:02 PM | 800-244-2273 | | 1 | - | - | - |
| 2/16/14 | 1-800 # | 9:03 PM | 800-972-3030 | | 1 | - | - | - |
| 2/17/14 | Oak Lawn, IL | 8:35 AM | 708-499-5857 | | 1 | - | - | - |
| 2/17/14 | Harvey, IL | 8:39 AM | 708-596-4444 | | 3 | - | - | - |
| 2/17/14 | La Grange, IL | 8:43 AM | 708-238-5328 | | 1 | - | - | - |
| 2/17/14 | La Grange, IL | 8:59 AM | 708-238-5328 | | 8 | - | - | - |
| 2/17/14 | 1-866 # | 9:14 AM | 866-607-6646 | | 1 | - | - | - |
| 2/17/14 | 1-800 # | 2:24 PM | 800-404-2856 | | 12 | - | - | - |
| 2/17/14 | Chicago, IL | 3:46 PM | 773-316-1017 | | 2 | - | - | - |
| 2/17/14 | Northbrook, IL | 3:48 PM | 630-302-9570 | | 35 | - | - | - |
| 2/17/14 | Vm Retrieval | 6:24 PM | 123 | | 1 | - | - | - |
| 2/17/14 | Chicago, IL | 6:26 PM | 312-745-0570 | | 5 | - | - | - |
| 2/18/14 | Lemont, IL | 12:01 AM | 630-257-0051 | | 3 | - | - | - |
| 2/18/14 | Chicago, IL | 12:12 AM | 773-445-5340 | | 4 | - | - | - |
| 2/18/14 | Chicago, IL | 12:17 AM | 773-885-3440 | | 4 | - | - | - |
| 2/18/14 | Chicago, IL | 12:22 AM | 773-445-5340 | | 6 | - | - | - |
| 2/18/14 | 1-800 # | 12:28 AM | 800-244-2273 | | 1 | - | - | - |
| 2/18/14 | 1-800 # | 12:29 AM | 800-972-3030 | | 1 | - | - | - |
| 2/18/14 | 1-800 # | 12:58 AM | 800-972-3030 | | 1 | - | - | - |
| 2/18/14 | 1-800 # | 10:12 AM | 800-244-2273 | | 1 | - | - | - |
| 2/18/14 | Midvale, UT | 1:58 PM | 801-985-4445 | | 3 | - | - | - |
| 2/18/14 | Jackson, MS | 3:50 PM | 601-359-3582 | | 5 | - | - | - |
| 2/18/14 | Oak Lawn, IL | 4:07 PM | 708-499-6300 | | 15 | - | - | - |
| 2/18/14 | Chicago, IL | 4:27 PM | 773-553-1400 | | 2 | - | - | - |
| 2/18/14 | Chicago, IL | 4:29 PM | 773-553-1400 | | 6 | - | - | - |
| | | | | **SUBTOTAL** | **2,607** | - | **5.88** | **5.88** |

## MESSAGING CHARGES

| Date | Service | Time | Destination | Message Type | Messages | Direction | Total |
|------|---------|------|-------------|--------------|----------|-----------|-------|
| 1/23/14 | Chicago, IL | 3:20 PM | 312-218-9444 | Text | 1 | Incoming | - |
| 1/23/14 | Chicago, IL | 3:25 PM | 312-218-9444 | Text | 1 | Outgoing | - |
| 1/23/14 | Chicago, IL | 3:25 PM | 312-218-9444 | Text | 1 | Outgoing | - |
| 1/23/14 | Chicago, IL | 3:27 PM | 312-218-9444 | Text | 1 | Incoming | - |
| 1/23/14 | Chicago, IL | 3:29 PM | 312-218-9444 | Text | 1 | Outgoing | - |
| 1/23/14 | Chicago, IL | 6:48 PM | 773-355-6373 | Text | 1 | Outgoing | - |
| 1/23/14 | Chicago, IL | 6:53 PM | 773-355-6373 | Text | 1 | Incoming | - |
| 1/23/14 | Chicago, IL | 9:13 PM | 773-355-6373 | Text | 1 | Outgoing | - |
| 1/23/14 | Roselle, IL | 10:36 PM | 847-347-7979 | Text | 1 | Outgoing | - |
| 1/24/14 | Chicago, IL | 9:15 PM | 773-387-9288 | Text | 1 | Incoming | - |
| 1/27/14 | Chicago, IL | 3:36 PM | 773-230-8968 | Text | 1 | Outgoing | - |
| 1/27/14 | Chicago, IL | 3:36 PM | 773-230-8968 | Text | 1 | Outgoing | - |
| 1/27/14 | Chicago, IL | 3:39 PM | 773-230-8968 | Text | 1 | Incoming | - |
| 1/27/14 | Chicago, IL | 3:39 PM | 773-230-8968 | Text | 1 | Incoming | - |
| 1/27/14 | Chicago, IL | 3:39 PM | 773-230-8968 | Text | 1 | Incoming | - |
| 1/27/14 | Chicago, IL | 3:45 PM | 773-230-8968 | Text | 1 | Outgoing | - |
| 1/27/14 | Chicago, IL | 3:45 PM | 773-230-8968 | Text | 1 | Outgoing | - |
| 1/27/14 | Chicago, IL | 4:03 PM | 773-230-8968 | Text | 1 | Outgoing | - |
| 1/27/14 | Chicago, IL | 4:03 PM | 773-230-8968 | Text | 1 | Outgoing | - |

© 2013 T-Mobile USA, Inc.

# EXHIBIT 5

(This form replaces CCCR 0657 and CCMD 0224)
**\* USE ONLY FOR CLASS "C" MISDEMEANORS/ORDINANCE VIOLATIONS** (Rev. 1/17/01) CCCR 0224

## INFORMATION AND DESCRIPTION OF DEFENDANT

Name _____ DAVID DEWAR _____ Alias _____

Residence ___ 11347 SOUTH MILLARD ___ CHICAGO ___ IL ___ 60655

| | | | | | | City/Town | | State | Zip |

| Sex | Race | Weight | Height | D.O.B. | Age | Complexion | Build | ☐ Yes ☒ No |
|-----|------|--------|--------|--------|-----|------------|-------|------------|
| M | WHITE | 6'03" | 230 | 20 OCT 64 | 49 | HEAVY | FAIR | Arrestee had been using Alcohol/Drugs |

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CPD022 DEPARTMENT/ 1ST DISTRICT

WILLIAM HOSTY

v.
_____ **Plaintiff**

DAVID DEWAR
_____ **Defendant**

} No. ___1-7 1 5 7 9 0 5 3___

WILLIAM HOSTY
(Complainant's Name Printed or Typed) _____ complainant, now appears before

The Circuit Court of Cook County and states that ___ DAVID DEWAR ___
(defendant)

has, on or about ___ 17 FEB 14 ___ _____
(date) (place of offense)

committed the offense of ___ ASSAULT SIMPLE ___ in that he/she
(offense)

WITHOUT LAWFUL AUTHORITY, KNOWINGLY THREATENED WILLIAM HOSTY BY TELLING HIM THAT HE IS

GOING TO GIVE HIM AN ASS KICKING PLACING WILLIAM HOSTY IN REASONABLE APPREHENSION OF

RECEIVING A BATTERY.

in violation of ___ 720 ___ **ILCS** ___ 5.0 ___ / ___ 12-1A ___ . OR _____
(Ordinance Citation)

STATE OF ILLINOIS }
COOK COUNTY } ss.

X _William_ _E_ _Hosty_
(Complainant's Signature)

_____
(Complainant's Address) (City/State/Zip)

▢▢▢▢▢▢▢▢ _____
A O I C  C O D E (Complainant's Telephone)

FEB 2 4 2014 WILLIAM HOSTY
(Complainant's Name Printed or Typed)

being first duly sworn, _____ on oath, deposes and says that he/she read the foregoing
complaint by him/her subscribed and that the same is true.

X _William_ _E_ _Hosty_
(Complainant's Signature)

Subscribed and sworn to before me on this ___ 17 ___ day of ___ FEB ___, 2014

_P. Brown_ _TL_
(Judge or Clerk)

I have examined the above complaint and the person presenting same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

Summons Issued, Judge _____
or _____
Warrant Issued, Bail set at: _____ (Judge's No.)
or

Bail set at _____ Judge _____
(Judge's No.)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

14119470901

3.25

**14119470901**
CB/DCN: 018838176   IR: 1475483   BRANCH 35
COURT DATE: 03/25/2014 ROOM: 7135 TIME: 2:30
BOND NO: $:

| C001   720-5/12-1-A |
| |
| |
| |

STATE OF ILLINOIS
- VS -
DEWAR, DAVID

| DATE | JUDGE | ORDERS ENTERED | CASE FILE REVIEWED | |
|------|-------|----------------|--------------------|--|
| | | | DATE | INITIALS |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**First Municipal District – Criminal**
**Clerk of the Circuit Court**

*1-CM-MI-120000-2014-(ITEM 1.4.4)

CASE: 141194T0901 S  (START OF CASE            )        PAGE: 001 OF  001      _ PROD
  DEFENDANT NAME: DAVID          DEWAR                  LST APPEAL:
GENERAL INFORMATION
    CB: 018838176 IR: 1475483 SID:              FBI:              RD: HW154717

CHARGE INFORMATION

NBR A TYPE CLASS CHAPTER/SECTION                        DESCRIPTION
001    M          720-5/12-1-A                          ASSAULT - SIMPLE

DISPOSITION INFORMATION

022414-
BOND SET BY RULE OF COURT              032514            7135            I10000001
BRANCH 35        RM 2                      0230 PM

END OF FILE



ENTER=CONT PF3=RETN PF7=BKW PF8=FRW PF9-APPL PF10=RESET PF12=PRINT CLEAR=EXIT
=> PRINT PAGES PAGE: 001 THRU 001 DESTINATION ____

# EXHIBIT 6

CHICAGO POLICE DEPARTMENT

**FINAL APPROVAL**

CB #: 18838176
IR #: 1475483
YD #:
RD #: HW154717
EVENT #: 1304403568

## ARREST REPORT

3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11. 420C(REV. 6/30)

### ARREST REPORTING

**OFFENDER**

Name: **DEWAR, David**
Res: 11347 S Millard Ave
 Chicago, IL 60655
Empl: Tax Free Retirement Solutions
 Fianacial Advisor
DOB: 20 October 1964
AGE: 49 years
POB: Illinois
ARMED WITH Unarmed

Beat: 2211

Male
White
6' 03"
230 lbs
Brown Eyes
Unknown Hair
Bald Hair Style
Fair Complexion

**INCIDENT**

Arrest Date: 17 February 2014 19:00
 Location: 11343 S Millard Ave
 Chicago, IL 60655
 304 - Street
Holding Facility: District 022 Lockup
Resisted Arrest? No

TRR Completed? No
Beat: 2211

Total No Arrested: 1 Co-Arrests Assoc Cases
 DCFS Ward ? No
Dependent Children? No

**CHARGES**

Offense As Cited **720 ILCS 5.0/12-1-A**
 **ASSAULT - SIMPLE**
 **Class C - Type M**

Victim
Hosty, William

25 MAR

**RECOVERED NARCOTICS**

NO NARCOTICS RECOVERED

FILED
FEB 24 2014

1419-1709

**WARRANT**

NO WARRANT IDENTIFIED

Print Generated By: ELLMAN, Christine ( PC0S917 )

Page 1 of 5
powered by: CLEAR Technology

17 FEB 2014 11:20

# Chicago Police Department - ARREST Report

CB #: 18838176

DEWAR, David

## ARREST REPORTING

**VICTIM AND COMPLAINANT**

Name: HOSTY, William

Res

Beat:2211

Male
White
DOB:
Age: 61

Comments:

Injured? No     Deceased? No

Hospitalized? No

Treated and Released  No

**ARRESTEE VEHICLE**

NO ARRESTEE VEHICLE INFORMATION ENTERED

**PROPERTIES**

Confiscated Properties :

All confiscated properties are recorded in the e-Track System. This system can be queried by the inventory number to retrieve all official court documents related to evidence and/or recovered properties.

PROPERTIES INFORMATION FOR     DEWAR, David,     NOT AVAILABLE IN THE AUTOMATED ARREST SYSTEM.

**INCIDENT NARRATIVE**

(The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following)

EVENT # 11677 - IN SUMMARY - THIS IS AN ARREST BY BEAT 2211 . THE ABOVE SUBJECT WAS PLACED INTO CUSTODY ON SIGNED COMPLAINTS IN THAT , DURING A VERBAL ALTERCATION WITH THE VICTIM ( WILLIAM HOSTY ) , DAVID DEWAR  STATED THAT HE WAS GOING TO" GIVE HIM AN ASS KICKING" which placed victim in fear recieving a battery . R/OS PLACED SUBJECT INTO CUSTODY . READ MIRANDA . TRANSPORTED TO 022 DISTRICT FOR PROCESSING . NAME CHECK CLEAR WITH NO WARRANTS OR TWO DEGREES OF SEPERATION . COURT KE' IS C . NO INVENTORIES . NO GANG AFFILIATION . NO GIP OR TRAPP . CLEAR LEADS .

**COURT INFO**

Desired Court Date:     25 March 2014
Branch: 35-5     727 E 111TH ST - Room
Court Sgt Handle? Yes
Initial Court Date:   25 March 2014
Branch: 35-5     727 E 111TH ST - Room
Docket #:

**BOND INFO**

Bond Date: 17 February 2014 23:10
Type:          10% Of Bond Paid
Receipt #:    D8333971
Amount:       $1,200.00

## Chicago Police Department - ARREST Report

CB #: 18838176
DEWAR, David

**ARREST REPORTING**

**ATTESTING OFFICER:**

I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.

| Attesting Officer | #4080 | DEVINE, M K (PC0M180) | 17 FEB 2014 19:54 |

**ARRESTING OFFICER(S):**

| | | | Beat |
|---|---|---|---|
| 1st Arresting Officer: | #4121 | FELMON, T J (PC0F159) | 2211 |
| 2nd Arresting Officer: | #4080 | DEVINE, M K (PC0M180) | 2211 |

**APPROVING SUPERVISOR:**

| Approval of Probable Cause : | #1171 | LONG, C J (PC0I126) | 17 FEB 2014 20:15 |

# Chicago Police Department - ARREST Report

CB #: 18838176

DEWAR, David

## ARREST PROCESSING REPORT

**Holding Facility:** District 022 Lockup
**Received in Lockup:** 17 February 2014 20:28
**Prints Taken:** 17 February 2014 20:30
**Palmprints Taken:** Yes
**Photograph Taken:** 17 February 2014 20:36
**Released from Lockup:**

**Time Last Fed:**
**Time Called:** 17 February 2014 20:39     **Phone#:** 7734455340
**Cell #:** 07

**Transport Details :** 1PO     2211     17-FEB-2014 19:05

### VISUAL CHECK OF ARRESTEE

| | |
|---|---|
| Is there obvious pain or injury? | No |
| Is there obvious signs of infection? | No |
| Under the influence of alcohol/drugs? | No |
| Signs of alcohol/drug withdrawal? | No |
| Appears to be despondent? | No |
| Appears to be irrational? | No |
| Carrying medication? | No |

### ARRESTEE QUESTIONNARIE

| | |
|---|---|
| Presently taking medication? | No |
| (if female)are you pregnant? | No |
| First time ever been arrested? | No |
| Attempted suicide/serious harm? | No |
| Serious medical or mental problems? | No |
| Are you receiving treatment? | No |
| Transgender/Intersex/gender non-conforming? | No |

**RETURN TO HOLDING FACILITY COMMENTS:**

**QUESTIONNAIRE REMARKS:**

**LOCKUP KEEPER COMMENTS:**

**EMERGENCY CONTACT**

**Name :** REFUSED

Res:                                        Beat:

**NO INTERVIEWS LOGGED**

**NO VISITORS LOGGED**


powered by: CLEAR Technology

## Chicago Police Department - ARREST Report

CB #: 18838176

DEWAR, David

### ARREST PROCESSING REPORT

**MOVEMENT LOG**

MOVEMENT LOG INFORMATION NOT AVAILABLE

**W/C COMMENTS**

Watch Commander Comments:

REL w/o CHARGING

DOES NOT APPLY TO THIS ARREST

**PROCESSING PERSONNEL**

ARRESTEE PROCESSING PERSONNEL:

Beat

| | |
|---|---|
| Searched By: | HOUSTON, D M (PC0AF41) |
| Lockup Keeper: | HOUSTON, D M (PC0AF41) |
| Fingerprinted By: | HOUSTON, D M (COC246879) |

APPROVAL PERSONNEL:

Beat

Final Approval of Charges :   #2133   ELLMAN, C E(PC0S917)   17 FEB 2014 23:17

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID A. DEWAR,                                  )
                                                 )
            *Pro se* Plaintiff,                  )        Case No. 16 cv 2287
                                                 )
      v.                                         )        The Honorable Virginia Kendall
                                                 )
CHICAGO POLICE DEPARTMENT and                    )        Magistrate Judge Jeffrey Cole
CHICAGO POLICE OFFICERS T.J. FELMON,             )
M.K. DEVINE and C.J. LONG,                       )
                                                 )
            Defendants.                          )

## AFFIDAVIT OF DANIEL DEWAR

Daniel Dewar, after duly being placed under oath, deposes, and states that if called as a witness in this matter, he would testify to the following based on his own personal knowledge:

1.      I am over 18 years of age and am competent to testify to the following matters.

2.      I am the brother of David Dewar ("David"), the plaintiff in this matter.  For 28 years, until January 30, 2015, I was employed as a police officer for the Village of Westmont, Illinois.

3.      On the evening of February 17, 2014, I was telephoned by my mother, who told me that David had been arrested by the Chicago Police Department as a result of a dispute with her neighbor.  I agreed to pick up my mother and to take her to the police station where David had been detained.

4.      On the drive to pick up my mother, I telephoned the police station where David was located to find out more about what had occurred.  After speaking to the front

desk officer, my call was transferred to a person who identified himself as Officer M.K. Devine. Officer Devine confirmed that David had been arrested in connection with an alleged threat to a neighbor and that David was being held at the station. Devine further stated that the arrest could have been avoided if David had apologized.

5.     When I arrived at my mother's house, I comforted her because she was upset. We had to wait several hours until the police department indicated that David was ready to be bonded out.

6.     My mother paid for David's bond in cash and I took him and my mother back to her house. On the trip, David appeared upset and stated that he had been set up and that the accusations against him were false.

7.     I have never been arrested by the Chicago Police Department or any other police agency. I have no knowledge as to why my name may have been placed on the evidence bag containing David's mobile telephone prepared on the night of his arrest.

2

FURTHER AFFIANT SAYETH NAUGHT

DANIEL DEWAR

In accordance with 28 U.S.C. § 1746, I certify under penalties of perjury that the foregoing statements are true and correct.

Executed on: ___6/20/18___

DANIEL DEWAR

3

# EXHIBIT 8

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CASH DEPOSIT BAIL BOND: CRIMINAL OR QUASI-CRIMINAL (10% OF BAIL, $25.00 MINIMUM DEPOSIT)

D 8333971

| ORIGIN OF BOND | ☑ Bail set by Rule of the Illinois Supreme Court OR | |
|---|---|---|
| USING AGENCY NO. CPD | By _____ | |
| | (PRINT NAME OF JUDGE) (JUDGE'S NO.) | (OFFICE USE) |

**BAIL AMOUNT**

$ X , X X 1 , 2 0 0 / X X ——— One Thousand Two Hundred ——— 00/100

**DEPOSIT AMOUNT**

$ X , X 1 2 0 / X X ——— One Hundred Twenty ——— 00/100

**STATEMENT OF DEFENDANT:** I understand and accept the terms and conditions set forth below and on the reverse side of this bail bond. I understand in all cases, 10 % of any amount posted as bail is retained by the Clerk of Court, by law. Further, I hereby certify that I understand the consequences of failure to appear for trial as required.

**ASSIGNMENT OF BAIL BOND BY THE DEFENDANT:** I hereby authorize the return of the money posted above to the person shown on this bond as having provided money for my bail after all conditions of this bail bond have been met, or as ordered by the court.

DEFENDANT (Person Preparing Bond - Always complete this section)

Full Name (PRINT) DEWAR DAVID
(Last) (First) (MI)

Address (PRINT) 11347 S MILLARD Apt. No. _____

City and State (PRINT) CHICAGO, IL Zip Code 60655

Defendant's Signature _____

| COURT COMPLAINT OR INDICTMENT NUMBER(S) | CHARGE | DISPOSITION |
|---|---|---|
| | 720ILCS 5/12-1-A | |
| | | |

DISPOSITION entered by (Signature of Deputy Clerk) _____ Br. or Sub. CT _____ Court Date ___/___/___
Month Day Year

COURT APPEARANCE: Defendant named above shall appear in the Circuit Court of Cook County, Illinois located at:

Address (Number and Street) 727 E. 111th St City/Town/Village CHICAGO Illinois,

Branch No. 35 in Room No. _____ on MARCH 25 at 2014 2:30 ☐ a.m. ☑ p.m.

CONDITIONS OF BOND: The defendant is hereby released on the conditions as indicated below:

☑ Appear to answer the charge in court until discharge or final order of court.

☑ Obey all court orders and process; not leave this State without permission of court and report changes of address to the Clerk within 24 hours.

☑ Not commit any criminal offenses while awaiting final order in this case.

☑ If on appeal, prosecute the appeal, and surrender to custody if the judgment is affirmed or a new trial is ordered.

☐ Surrender (725 ILCS 5/110-10(a)(5)) OR not possess any firearms or dangerous weapons until final order in this case.

☐ Not contact or communicate with any complaining witnesses or members of their immediate families or: _____

☐ Not go to the area or premises of victims/complaining witnesses home, work, school or: _____

☐ Not to indulge in intoxicating liquors, illegal drugs or certain drugs, to-wit: _____

☐ Undergo alcoholism or drug addiction treatment as ordered by the court.

☐ Undergo medical or psychiatric treatment as ordered by the court.

☐ If you are charged with a criminal offense and the victim is a family or household member, you are ordered to refrain from all contact or communication with:

_____ for a minimum of 72 hours following release, and further ordered to refrain from entering and/or remaining at the location of: _____

_____ for a minimum of 72 hours following release.

☐ Reside with parents or in a foster home, attend school or nonresidential program for youths, contribute to his/her support at home or in a foster home, observe curfew set by court: _____

☐ Report to and remain under the pretrial supervision of such agency or third-party custodian as ordered by the court: _____

☐ Other conditions: _____

**CONDITIONS - Continued on reverse side.**

**NOTICE TO PERSON PROVIDING BAIL MONEY OTHER THAN THE DEFENDANT**

1. I understand that the money I have posted is for the bail for the defendant named on this bond in the above numbered case or cases.

2. I understand that even if the defendant follows all court orders, that this money may be ordered by the Judge to pay for the defendant's attorney fees, court costs, fines, fees and/or restitution to the victim, and that *I may lose all or part of my money.*

3. I understand that if defendant fails to comply with the conditions reflected on this bond, *I may lose all of my money* should the court enter a forfeiture of bail order.

4. I understand in all cases, 10 % of any amount posted as bail is retained by the Clerk of the Circuit court, by law.

Provider's Name (print): SHIRLEY DEWAR

Relationship to Defendant: MOTHER

Address: 11347 S. MILLARD

City: CHICAGO State: IL Zip: 60655

Area Code/Telephone No.: 773-445-5340

Provider's Signature: _____

| ☐ a.m. ☐ p.m. Hour 1110 | This bail bond form was prepared by: | Star No. 2133 | Police Dept. (PD)-022 |
|---|---|---|---|
| Date 2/1/14 Month Day Year | (Signature of Peace Officer) | | (CPD District No. or Suburban City, Town, or Village) |
| **TWO** | Or Clerk of the Circuit Court of Cook County, by _____ (Signature of Deputy Clerk) | | Loc. _____ (Branch or Suburban Court) |

D 8333971

DEFENDANT'S BOND & RECEIPT FOR CASH DEPOSITED

FOR APPROPRIATE REFUND, DEPOSIT THIS COPY WITH COURT CLERK ON DATE OF FINAL ORDER OF COURT.

CCG N696 A-5M-2/14/03 (33480657)

# EXHIBIT 9

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                      NUMBER 14119470901

    DAVID          DEWAR

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County/Local Prosecutor has filed a complaint
with the Clerk of the Circuit Court.

Charging the above named defendant with:

   720-5/12-1-A                    M          ASSAULT - SIMPLE
The following disposition(s) was/were rendered before the Honorable Judge(s):

02/24/14 BOND SET BY RULE OF COURT              03/25/14 7135
03/25/14 APPEARANCE FILED
     SCONZA JOSEPH  M
03/25/14 DEF DEMAND FOR TRIAL
     SCONZA JOSEPH  M
03/25/14 STRICKEN OFF - LEAVE REINSTATE    C001
     SCONZA JOSEPH  M
03/27/14 CBR PROCSED FRWD ACCT DEP
03/12/15 PETITION FOR EXPUNGEMENT FILED
03/12/15 EXPUNGE/SEAL - SENT TO AGNCY
03/12/15 EXP/SEAL HEARING DATE ASSIGNED         05/19/15 1797



                              I hereby certify that the foregoing has
                              been entered of record on the above
                              captioned case.
                              Date 05/19/15

                                        DOROTHY BROWN
                       CLERK OF THE CIRCUIT COURT OF COOK COUNTY

Order to Expunge and Impound Criminal Records

(Rev. 09/23/14) CCCR 0331

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

or

A Municipal Corporation,

v.

David A. Dewar

**Defendant/Petitioner**

Case No(s). 14119470901

Date of Birth: 10 20 1964
Gender: ☒ Male ☐ Female
Race: White

## ORDER TO EXPUNGE AND IMPOUND CRIMINAL RECORDS

This Court, having considered all pleadings and any objections thereto, and after an evidentiary hearing, ORDERS THAT:

1. The Petition to Expunge and Impound is granted.

2. The above Arresting Agency and the Chicago Police Department shall expunge the arrest(s) from its records, if any, within 60 days of the date of service of this order. It is further directed that the Arresting Agency shall request the return of all identification materials from any other repositories and custodians of statistics that were previously notified of this arrest(s) by the Arresting Agency.

3. The Circuit Court Clerk shall impound the record of this arrest until further order of the court upon good cause shown and shall obliterate the name of the Petitioner on the official index.

4. The Illinois State Police, Bureau of Identification, shall expunge (or impound, if required by law) their files of the record of this arrest(s) within 60 days of the date of service of this order.

5. This order shall not become effective until 30 days after entry.

6. In accordance with the law, orders of protection, civil no contact orders, civil no contact stalking orders and minor traffic orders shall not be expunged and impounded.

Prepared By: David A. Dewar
Cook County Attorney Code: 99500, Pro Se
Name: David A. Dewar
Address: 11347 S. Millard Ave.
City/State/Zip Code: Chicago, Illinois 60655
Telephone: (708) 369-5153

ENTERED
JUDGE PAUL BIEBEL, JR.-1588

ENTERED:

Dated: MAY 19 2015

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
DEPUTY CLERK OF COOK COUNTY, IL

Presiding Judge

Judge's No.

Notice of Filing                                                                 (Rev. 4/29/10) CCCR 032

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

☐ PEOPLE OF THE STATE OF ILLINOIS

or                                                    Case No(s).  141194709 01

☐ _____

_____ A Municipal Corporation,

David A. Dewar

Defendant/Petitioner

### NOTICE OF FILING
(District One Cases Only)

To:  **Cook County State's Attorney**          **Chicago Police Department**
2650 S. California Ave., 11th Floor          3510 S. Michigan Ave.
Chicago, Illinois 60608                       Chicago, Illinois 60653

**Illinois State Police**                      **Corporation Counsel**
260 N. Chicago St.                            121 N. LaSalle St., Room 600
Joliet, Illinois 60432                        Chicago, Illinois 60602

Take notice that I have this day filed with the Clerk of the Circuit Court of Cook County, Illinois the following:

☒ Petition to Expunge and Impound         ☒ Order to Expunge and Impound
☐ Petition to Seal                         ☐ Order to Seal
☐ Petition to Unseal and Reseal

A true and correct copy of the same is attached hereto and served upon you by the Circuit Court Clerk.

Date: March 12, 2015

Atty. No.: 99500, Pro Se          **Pro Se** 99500          _____
                                                            Signature of Petitioner

Attorney (or Pro Se Petitioner)

Name: David A. Dewar

Address: 11347 S. Millard Ave.

City/State/Zip: Chicago, Illinois, 60655

Telephone: (708) 363-1153

### CERTIFICATE OF MAILING

The undersigned certifies that the above notice and attached pleadings were placed in U. S. Mail with first class postage prepaid or by personal service and directed to all parties listed above.

_____          By: _____
      Signature                              Deputy Clerk

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# EXHIBIT 10

# Library Order Receipt: 90556

consumer@public-record.com

Thu 6/21/2018 2:18 AM

To: ddewar05@hotmail.com <ddewar05@hotmail.com>

📎 1 attachments (110 KB)

PurchasedRecords-90556.pdf



## Record Information Services
## Library Order Receipt: 90556

Thank you for using Check Illinois at your public library (Chicago Public Library)

Please consider us in the future for all of your public record searches. If we can be of any assistance, please feel free to e-mail us consumer@public-record.com

**View Current Records**

In case you need to view your records you just ordered. You can login and view each record or have them e-mailed to you. All you need to know is your Order Number and e-mail address.

Order Number: 90556
Library: Chicago Public Library, chicago

# Printed Record from Record Information Services

Source: Cook Criminal Misdemeanor Table #793862

| | | | |
|---|---|---|---|
| RIS Input Date | 03/06/2014 | District | 1 |
| Case Number | 2014119470901 | Police Dept | |
| Crime | 720-5/12-1-A ASSAUL | Appearance Date | |
| First Name | DAVID | Last Name | DEWAR |
| Date of Birth | 1964-10-20 | Ethnic Origin | Other |
| Street Address | 11347 S MILLARD AVE | City | CHICAGO |
| State | IL | Zip | 60655-3429 |
| Telephone Number | 7732532309 | County | COOK |
| Do Not Call | | Do Not Call Date | |
| Census Age | | Census Tract | |
| Census Block | | Property Identification Number | |
| tablename | Cook Criminal Misdemeanor Table | DB ID Number | 793862 |